**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| IN RE PRINCIPAL U.S. PROPERTY ACCOUNT ERISA LITIGATION | |
| | MASTER FILE NO.:  **4:10-cv-00198-RP-TJS** |
| This Document Relates To:<br><br>      All Actions. | |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT OF 1974**

### I.  PRELIMINARY STATEMENT

1.      Defendants Principal Global Investors, LLC, Principal Financial Group, Inc., Principal Life Insurance Company, Principal Management Company, Principal Real Estate Investors, LLC, and John Does 1-20 (collectively, "Principal" or "Defendants") failed to prudently and loyally manage the Principal U.S. Property Separate Account (the "Property Account" or the "Account"), an insurance company separate account managed by Principal, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA").   Principal breached its fiduciary duties under ERISA by, among other errors, managing the investment of the retirement assets in the Property Account inconsistently with the Property Account's stated objective to maintain adequate liquidity to provide for daily withdrawals and to be a lower risk investment option akin to other conservative fixed income funds.

2.      Principal offered the Property Account to retirement plans throughout the country as a "low risk" retirement savings option with a "strong focus on liquidity" that was open to daily withdrawals.  As a result of its mismanagement, the Property Account was exposed

to excessive risk and failed to maintain insufficient liquidity to meet the withdrawal requests of participants who had invested in the.

3.      On September 26, 2008, Principal imposed a withdrawal freeze, closing the Property Account to withdrawals and locking up participants' retirement savings in the Account. By preventing ERISA plans and plan participants from withdrawing their money from the Property Account, Principal forced these investors to sustain staggering losses as the assets in the Account declined sharply in value.  Since the freeze was imposed the stated per share value of the Property Account has declined from $704.32 to $450.07 as of August 4, 2010.

4.      To date, **almost two years later**, Principal has still not allowed investors to withdraw all of the money they requested to be withdrawn from the Property Account.  Instead, Principal has instituted a withdrawal queue (the "Withdrawal Queue" or the "Queue"), through which partial divestments have been made at Principal's discretion.  Through the Queue procedures that it has imposed on participants, Principal has authorized four partial payments to the participants waiting in the Queue, allocated pro rata based on the amount each ERISA Plan or Plan participant investor requested be withdrawn or transferred to another investment option. However, these partial payments have been made at the per share value *as of the date of the payments*, as opposed to the per share value on the date the withdrawal was requested.  As such, these payments have done little more than lock in a portion of the losses these ERISA plans and plan participants have suffered waiting in the Withdrawal Queue.

5.      Because the participants in the Withdrawal Queue have not, except in the limited circumstances described above, been able to access their retirement funds, they have remained trapped in the Property Account and have been unable to allocate those funds to investment options which have performed significantly better than the Property Account, including other

investment options offered by Principal in the same "fixed income" category during the same time period. Consequently, even if the ERISA plans and plan participants currently waiting in the Queue eventually are allowed to invest their retirement savings as they choose, as opposed to being forced to remain invested in the Property Account, the damage is done. They have suffered tremendous losses as the value of the Property Account plunged after the Withdrawal Queue was imposed, and have been denied the opportunity to invest in better performing funds.

6.      Thus, contrary to its statements about the Property Account's low-risk profile and strong focus on liquidity, Principal's investment practices maintained insufficient liquidity in the Account to ensure daily withdrawal requests, which was imprudent in light of the Account's stated objective to maintain liquidity sufficient for the Account to provide daily withdrawals.

7.      Principal's imprudent actions have caused the ERISA Plans that offered the Property Account to suffer potentially hundreds of millions of dollars of losses.

8.      Principal's conduct was a gross dereliction of its fiduciary duties under ERISA. Accordingly, Plaintiffs allege that Principal, as the investment fiduciary for the Property Account for ERISA retirement plans throughout the country, and Principal's employees who were responsible for managing the assets invested in the Property Account, breached their duties of prudence, loyalty, and exclusive purpose under 29 U.S.C. § 1104(a) by recklessly and imprudently investing the assets of the Property Account in a manner contrary to the stated objectives of the Property Account.

9.      This action is brought by Plaintiffs Francisco Carpio, Eric Cruise, Greta M. de Kock, David Engelbert, John Fischer, Jaime Jover, Denis P. Mullaney, Heinz Rosen and Michael E. Zall, participants in ERISA retirement plans described below, to recover the losses suffered by Plaintiffs' ERISA plans, and on behalf of a class consisting of all other similarly situated ERISA

plans and plan participants that have attempted to withdraw their investment from the Property Account, and have instead been placed into the Withdrawal Queue.  All of these ERISA plans (the "Plans") and plan participants were subject to and affected by Principal's conduct in the same manner and with the same effect.  Plaintiffs seek losses to these plans and plan participants for which Principal and Principal's employees responsible for managing the assets in the Property Account are liable pursuant to 29 U.S.C. §§ 1109 & 1132(a)(2).  In addition, under 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Principal, including, without limitation, injunctive relief, and, as available under applicable law, constructive trust, restitution, disgorgement of fees, equitable tracing, and other monetary relief.

10.     29 U.S.C. §§ 1109 & 1132(a)(2) authorize ERISA plan participants such as Plaintiffs to sue in a representative capacity for losses suffered by their ERISA plans as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action on behalf of their plans, and as a class action under Federal Rule of Civil Procedure 23 on behalf of the ERISA plans and plan participants that invested in the Property Account and have suffered losses since they were placed in the Withdrawal Queue (the class is formally defined *infra* in Paragraph 103).

11.     Because the information and documents on which Plaintiffs' claims are based remain largely in Principal's sole possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  Defendants have provided certain limited documents to Interim Lead Counsel; however, these documents do not describe the management of the Property Account in sufficient detail to avoid information and belief pleading.  At such time as Plaintiffs have had the opportunity to conduct further discovery, Plaintiffs will, to the extent necessary and

appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## II.  JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

13.     Venue is proper in this District, as, pursuant to 28 U.S.C. § 1404(a), and upon the motion of the Defendants, this action was transferred to this District by an Order of the United States District Court for the Southern District of New York, dated April 22, 2010, after full briefing and consideration of the relevant factors, including matters of convenience.  Venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some defendants reside or transact business in this District.

## III.  THE PARTIES

A.     **PLAINTIFFS**

14.     Francisco Carpio is a participant in the Shared Resources, Inc. and Affiliates Retirement Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2). Through this Plan, Mr. Carpio invested in the Property Account.  In September of 2008, Mr. Carpio contacted Principal and requested that his retirement savings invested in the Property Account be withdrawn, but was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Carpio has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

15.     Eric Cruise is and has been a participant in Rogers Fence Company, Inc. Retirement Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2), since March 2001.  Through the Rogers Plan, Mr. Cruise invested in the Property Account in May 2008.  On October 14, 2008, Mr. Cruise contacted Principal and requested that his retirement savings invested in the Property Account be withdrawn, but was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Cruise has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

16.     Greta M. de Kock is a participant in the Library Binding Service, Inc. Employee Pension Benefit Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Ms. de Kock invested in the Property Account.  In November of 2008, Ms. de Kock contacted Principal and requested that her retirement savings invested in the Property Account be transferred to another account, but she was informed that Principal would not comply with this request.  She has since been informed that she was placed into the Withdrawal Queue.  Ms de Kock has suffered substantial diminution in the value of her account as a result of her inability to withdraw such investment.

17.     David G. Engelbert is a participant in the Haldex Brake Products Corporation 401(K) Savings Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Mr. Engelbert invested in the Property Account.  In September of 2008, Mr. Engelbert contacted Principal and requested that his retirement savings invested in the Property Account be transferred into a different fund, but he was informed that Principal would not comply with this request.  He has since been informed that he was placed into the

Withdrawal Queue.  Mr. Engelbert has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

18.     John P. Fischer is a participant in the Southeastern Container Inc. Retirement Savings Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2). Through this Plan, Mr. Fischer invested in the Property Account on October 8 and 11, 2008 after the Withdrawal Queue was imposed.  In late October 2008, Mr. Fischer contacted Principal and requested that his retirement savings invested in the Property Account be transferred into a different fund, but he was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Fischer has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

19.     Jaime Rose Jover is a participant in the Wynn Resorts Ltd. 401k Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Ms. Jover invested in the Property Account.  In November of 2008, Ms. Jover contacted Principal and requested that her retirement savings invested in the Property Account be withdrawn, but she was informed that Principal would not comply with this request.  She has since been informed that she was placed into the Withdrawal Queue.  Ms. Jover has suffered substantial diminution in the value of her account as a result of her inability to withdraw such investment.

20.     Denis P. Mullaney is a participant in the Judicial Title Insurance Agency LLC Incentive Savings Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Mr. Mullaney invested in the Property Account.  In November of 2008, Mr. Mullaney contacted Principal and requested that his retirement savings invested in the

Property Account be withdrawn, but was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Mullaney has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

21.     Heinz Rosen is a participant in the Page One Consultants, Inc. 401(k) Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Mr. Rosen invested in the Property Account.  In December of 2009, Mr. Rosen contacted Principal and requested that his retirement savings invested in the Property Account be transferred into a different fund, but he was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Rosen has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

22.     Michael E. Zall is a participant in the ASICS America Corporation Retirement Savings Plan, an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2).  Through this Plan, Mr. Zall invested in the Principal U.S. Property Account.  In May of 2009, Mr. Zall contacted Principal and requested that his retirement savings invested in the Property Account be transferred into a different fund, but he was informed that Principal would not comply with this request.  He has since been informed that he was placed into the Withdrawal Queue.  Mr. Zall has suffered substantial diminution in the value of his account as a result of his inability to withdraw such investment.

23.     In addition to the Named Plaintiffs listed above (the "Plaintiffs"), numerous ERISA Plans invested in or offered the Property Account as an investment option for retirement savings.  The Plans and the participants in the Plans directed billions of dollars of retirement

savings into the Property Account.  The Plaintiffs seek to represent a class of these ERISA Plans and the participants in these Plans that have suffered losses because they were placed into the Withdrawal Queue, and were subject to the same common course of imprudent conduct by Principal, the investment manager of the Property Account.

**B.    DEFENDANTS**

24.     Defendant Principal Global Investors, LLC ("PGI") is a Delaware Limited Liability Company and is a subsidiary, and the institutional asset management division of, Defendant The Principal Financial Group.  PGI is a fiduciary and/or a party-in-interest with respect to the Plans.  Defendant PGI provides investment advisory services to the Property Account and produces reports regarding the Property Account, including the Quarterly Flash Report, the Quarterly Performance Report, and the Annual Report, which are publicly distributed.

25.     Defendant The Principal Financial Group, Inc. ("PFG") is a Delaware corporation, and is a fiduciary and/or a party-in-interest with respect to the Plans.  PFG offers and provides retirement savings investment and insurance products and services, including the Property Account, to the public through the Plans.  PFG is the parent company of defendants PGI, PMC, Principal Life, and Principal Real Estate (each defined herein).

26.     Defendant Principal Management Corporation ("PMC"), an Iowa corporation, is a subsidiary of PGI and a fiduciary and/or a party-in-interest with respect to the Plans.  PMC provides investment advisory services to the Property Account.

27.     Defendant Principal Life Insurance Company ("Principal Life") is a wholly owned subsidiary of PFG, operating as an insurance company, and, through its Retirement and Investor Services ("RIS") division, provides services and products to retirement plans.  Principal

Life is a fiduciary and/or party-in-interest with respect to the Plans.  Principal Life is the entity responsible for providing services and products, including the Property Account, to the Plans. Principal Life's Investment Committee and Real Estate Committee review, approve and supervise real estate asset transactions involving Principal Life assets as well as the retirement savings invested in the Property Account.  Principal Life also makes valuation determinations concerning the value of units issued by the Property Account.  Principal Life charges the Property Account annual management fees based upon a percentage of the Property Account's net assets under management, including the funds subject to the Withdrawal Queue, with such fees deducted daily.  These fees totaled $44,684,411, $65,200,822, and $65,474,671 in 2009, 2008, and 2007, respectively.

28.     Defendant Principal Real Estate Investors, LLC ("Principal Real Estate"), a Delaware limited liability company and wholly-owned subsidiary of PGI and indirect subsidiary of PFG and Principal Life, is a registered investment advisor which acts as the investment advisor for the Property Account, and is a fiduciary and/or party-in-interest with respect to the Plans.  Principal Real Estate, through its personnel (who, on information and belief are also employees of Principal Life) serves as the portfolio manager with day-to-day responsibility for investment decisions regarding the Property Account's real estate assets, including managing property acquisitions and dispositions.

29.     John Doe Defendants 1-20.  Plaintiffs currently do not know the identity of all of Defendants during the Class Period.  Therefore, such persons are named herein as unknown John Doe Defendants 1-20.  Once the identities of the John Doe Defendants are ascertained, Plaintiffs will seek leave to join them under their true names.

## IV.  THE PROPERTY ACCOUNT

30.     The Property Account is an open-end, commingled, insurance company separate account invested primarily in commercial real estate holdings.

31.     The Property Account was offered to ERISA plan participants as an investment option in the participants' individual account plans, such as 401(k) plans and other defined contribution plans, as well as to other qualified investors, including defined benefit plans.

32.     Principal had sole and exclusive investment discretion over the investment and management of assets in the Property Account at all relevant times.  Neither Plaintiffs, nor any other Class Members, nor any fiduciary of the Plans in the Class (except Principal itself, as defined above) had any discretion to direct the manner in which Principal invested any of the assets of the Property Account or any control over how Principal invested this money or managed these assets.

33.     Collectively, billions of dollars of retirement plan assets were invested in the Property Account.  This money was pooled and commingled by Principal, and invested by Principal into real estate assets.  Each participant was entitled to a pro rata share of the net value of the Account, based on how much each participant had contributed, and adjusted by the change in the Account's value since the participant's investment.  As a result, Principal's imprudent management of the Property Account affected all of the Plans and participants that invested in the commingled Account in precisely the same manner.

34.     According to Principal, the Property Account invested in a diverse portfolio of well-leased real estate.  Prior to the imposition of the Withdrawal Queue, Principal explained that the Property Account "is available to qualified retirement plans and is open to contributions and withdrawals daily." Principal U.S. Property Account 2004 Annual Report ("2004 Annual

Report") at D-ERISA-000002, attached as Ex. 1; Principal U.S. Property Account 2005 Annual

Report ("2005 Annual Report") at D-ERISA-000049, attached as Ex. 2; Principal U.S. Property

Account 2006 Annual Report ("2006 Annual Report") at D-ERISA-000097, attached as Ex. 3;

Principal U.S. Property Account 2007 Annual Report ("2007 Annual Report") at D-ERISA-

000130, attached as Ex. 4.

35.     In these same Annual Reports, Principal described the Property Account's

investment "Philosophy" as:

> The Principal U.S. Property Account is a core real estate fund designed to
> have a low to moderate risk profile compared to other open-end real estate
> funds. This risk profile has two components: 1) a low to moderate real
> estate property risk profile; and 2) a low to moderate risk fund-level
> operating profile. Low to moderate real estate property risk is
> accomplished by investing primarily in well-leased properties on an
> unleveraged or low leverage basis. **Low to moderate fund-level risk is
> accomplished by operating with a strong liquidity focus,** client
> diversification, and limited fund-level obligations, such as forward
> commitments and fund level debt.

2006 Annual Report at D-ERISA-000097, attached as Ex. 3 (emphasis added); *see also* 2004

Annual Report at D-ERISA-000002, attached as Ex. 1; 2005 Annual Report at D-ERISA-

000049, attached as Ex. 2; 2007 Annual Report at D-ERISA-000130, attached as Ex. 4 (the

precise phrasing of the Property Account's "Philosophy" differed slightly from year to year).

36.     Principal also stated that the three primary "Objectives" of the Property Account

were to:

> (1)     maintain a well-diversified real estate portfolio that generally reflects the
> overall performance of the U.S. commercial real estate market;
>
> (2)     **maintain appropriate liquidity so that clients can make daily
> contributions or withdrawals; and**
>
> (3)     provide clients with private real estate returns that meet or exceed the
> National Council of Real Estate Investment Fiduciaries (NCREIF)
> Property Index.  These returns are to be delivered at a risk level lower or

equal to the NCREIF Property Index as measured by the volatility of the annual returns.

2004 Annual Report at D-ERISA-000002, attached as Ex. 1 (emphasis added); *see also* 2005 Annual Report at D-ERISA-000049, attached as Ex. 2; 2006 Annual Report at D-ERISA-000097, attached as Ex. 3; 2007 Annual Report at D-ERISA-000130, attached as Ex. 4.

37.    During the Class Period, Principal continuously highlighted the low risk or moderate to low risk profile and strong liquidity focus of the Property Account to participants. For example, in a brochure published by Principal entitled "The Case For Real Estate," Principal explained that the Property Account "is designed to have a low-to-moderate risk profile compared to other open-end real estate property funds," and that the Account "[o]perates with a strong liquidity focus, client diversification and limited fund-level obligations." Principal Global Investors, *The Case for Real Estate*, at 3, attached as Ex. 5. Further, Principal stated that the three primary benefits of investing in the Property Account were enhanced diversification, "current income and stability," and a hedge against inflation. *Id*. at 1.

38.    Additionally, Principal characterized the "[t]ypical" Property Account investor as someone who:

- Prefers a direct exposure to a diversified pool of properties

- Is attracted to stable returns, primarily delivered through a high annual income component

- Has low risk tolerance with regard to return volatility and leverage

- Finds the lack of correlation between Principal U.S. Property Account and the stock market highly appealing

- Is available to qualified employee benefit plans

*Id*. at 3.

39.     Principal provided the following risk/return spectrum to participants in their respective plan statements, which categorized the different financial product investment options offered by Principal:



David Engelbert 401(k) Plan Quarterly Statement, Jan. 1, 2008 – Mar. 31, 2008, at ENGELBERT000003, filed under seal as Ex. 6.

40.     Principal listed (and continues to list) the Property Account as a "Fixed Income" option, indicating that the Account was relatively low risk and low return compared with other financial products offered by Principal.  *See* Principal Financial Group, *Defined Contribution (DC) PCRP Contract Investment Unit Values & Performance* at 6, available at http://www.principal.com/rates.htm, attached as Ex. 7.  Other products in the same category included the "Government and High Quality Bond Separate Account" and the "Bond Market Index Separate Account."  *Id.*  Thus, the Property Account was presented by Principal as a less risky option than the "Balanced/Asset Allocation" investment options.  According to Principal, the *only* products less risky than the Property Account were those included in the "Short-Term Fixed Income Category," such as money market and stable value funds.  *Id.*

41.     The 2007 Annual Report, the last annual report published by Principal prior to the imposition of the Withdrawal Queue in 2008, noted that "the Account will continue to place equal emphasis on return generation and risk management, while maintaining our focus on liquidity management."  2007 Annual Report at D-ERISA-000133, attached as Ex. 4.

42.     Principal also stressed that the Property Account was managed with a strong focus on liquidity, and assured potential investors that during its entire twenty-five year history,

it had never failed to meet all redemption requests on a daily basis. *See, e.g.*, 2007 Annual Report at D-ERISA-000132, attached as Ex. 4 ("The Account also continued its twenty-five year history of honoring all redemption requests on a daily basis.").

43.     Similarly, in its 2004 Annual Report, Principal boasted that because of its "strong liquidity focus," "the Account has never experienced a withdrawal queue." 2004 Annual Report at D-ERISA-000002, attached as Ex. 1.

44.     Taken together, Principal explained that it would manage the Property Account in the manner necessary to:

      a.      Maintain appropriate liquidity so that clients could make daily contributions or withdrawals;

      b.      Be a lower risk investment option than other open-end real estate funds, by virtue of operating with a strong liquidity focus;

      c.      Be a lower risk investment option than most of the other financial products offered by Principal to ERISA plan participants;

      d.      Be an appropriate investment option for ERISA plan participants that had low risk tolerance for return volatility and leverage;

      e.      Balance risk management with return generation; and

      f.      Maintain its focus on liquidity.

45.     Thus, Principal represented that the Property Account was a "low risk" investment that would provide stable returns and enough liquidity that retirement funds in the Account would be accessible when needed.

## V. FACTS BEARING ON FIDUCIARY BREACH

46.     Principal marketed the Property Account as a "low risk" investment option compared with other types of financial products, and a low risk investment option compared with other real estate funds, due to the Property Account's focus on operational liquidity and limited fund level debt.  Fundamental to the Property Account's risk profile was its oft-repeated "focus" on liquidity that would enable investors to make daily withdrawals.

47.     However, Principal failed to prudently manage the Property Account so as to maintain a "focus" on liquidity that would enable investors to make daily withdrawals.  As a result of Principal's imprudent management, the Property Account's risk profile increased dramatically, and investors suffered enormous losses in their retirement savings.

### A.     PRINCIPAL GROSSLY MISMANAGED THE PROPERTY ACCOUNT

48.     As explained above, Principal repeatedly characterized the Property Account as less risky than other real estate funds because Principal's "focus" on maintaining liquidity allowed investors to make daily withdrawals.  *See supra* ¶¶ 34 - 44.  Thus, the fundamental stated investment objective of the Property Account was to provide investors with the ability to invest in real estate, traditionally viewed as an asset class with little liquidity, on a basis that would afford them liquidity comparable to that offered by securities traded on active public markets.

49.     Achieving this investment alchemy – converting illiquid assets into a liquid investment opportunity – is a tall task that would have required a rigorous and carefully calibrated investment management discipline.  The maintenance of sufficient cash reserves and appropriate credit facilities, as well as the careful design of the real estate portfolio was required.  But Principal failed to employ the prudent practices necessary to achieve the Property Account's

stated liquidity objectives. Thus, Principal promised a special kind of real estate fund, but failed to manage the Property Account in the manner necessary to meet the stated objectives of the fund.

50.     Principal's failures in this regard were of, at least, four types. First, Principal adopted a liquidity strategy that provided for inadequate short term liquidity and contemplated that much of the Property Account's "liquidity" would be achieved through borrowings. Second, Principal failed to manage liquidity appropriately even within its stated strategy, discussed *infra*, allowing its liquidity to be at or below the low ends of the ranges called for by its strategy. Third, Principal relied upon continued substantial net inflows of capital from investors, and disregarded the substantial deterioration in cash flow from investors that occurred after 2005. Fourth, Principal pursued portfolio management strategies, including the continued acquisition of major projects at imprudent prices long after a reasonably prudent fiduciary would have begun to reduce exposure to risky real estate assets.

51.     Principal's short term liquidity strategy had three components: cash balances (which were to be 1-5% of the Property Account), short term borrowings (7-10%) and property cash flow (2-5%). Principal U.S. Property Account Investment Policy Statement & Addendum at D-ERISA-001527, filed under seal as Ex. 8. Thus, the totals for the three components were to be 10-20% of the Property Account. This strategy was profoundly imprudent for several reasons. First, the heavy reliance on short term borrowings was imprudent. Under the strategy, short term borrowings could be as much as 10% of the Property Account, while cash balances and property cash flow could be as little as 3%. *Id*. While some limited borrowing to provide liquidity may have been appropriate, the magnitude of borrowing called for by the strategy was not. Short term borrowing of the level contemplated by the strategy, even if it provided liquidity

for current withdrawal requests, created the potential for a liquidity crisis when the borrowings were to be repaid, and thereby greatly increased the risk profile of the Property Account for the remaining investors.[1]  The real liquidity of the Property Account, i.e., its cash reserves and cash from operations could be as little as 3% under the strategy (and no more than 10%).  Thus, if withdrawals requests were received for 10% of the Property Account, the Property Account's liquidity would be completely exhausted, even if Principal had maintained cash reserves and cash from operations at the high end of the ranges called for by the strategy and even if other aspects of the Property Accounts operations (such as property level occurrences) were not a drain on liquidity.  As a result, the liquidity strategy was hopelessly imprudent as a means of managing the Property Account so as to provide the investment objective of liquidity sufficient to permit daily withdrawals.

52.    Moreover, Principal did not manage liquidity at the high end of the ranges provided for by the strategy, but, instead, at or below the low end of the ranges.  For example, at the end of 2007, cash balances and cash from property operations were no more than 4% of the Property Account, and available short term borrowings were no more than approximately an additional 5%.  Thus, total liquidity, even including the short term borrowing capacity, was below the 10% minimum called for by Principal's own liquidity strategy.

53.    Principal's fecklessness in managing liquidity appears to have resulted from its reliance upon continued investor cash flows as a source of liquidity.  In a document entitled "Plan of Operations," filed with the New York Department of Insurance, Principal listed one of its chief sources of liquidity for the Property Account as "new deposits."  Principal Life

---

[1] Investors, in fact, bore this greater risk during 2008 when, in reaction to increased investor withdrawal requests, Principal maximized its line of credit and caused its leverage ratio to grow precipitously from 16.5% to 26.1%.  2008 Annual Report at D-ERISA-000192, attached as Ex. 10.

Insurance Company Principal U.S. Property Separate Account Plan of Operation at D-ERISA-000326, filed under seal as Ex. 9.

54.　　But as promoters since Charles Ponzi have learned to their chagrin, the reliance on new contributions to fund investment programs is ultimately ill-fated.  In the case of the Property Account, Principal had no ability to influence, much less control, the continued inflow of deposits from investors.  Nonetheless, Principal relied upon the continuation of substantial positive cash flow from new contributions and utterly failed to adopt appropriate and prudent safeguards against the possibility that the net cash flow from depositors would turn negative.

55.　　The Property Account's cash flow from depositors for the years 2004 to 2008 is as follows:

| Year | Net Contributions to Property Account |
|---|---|
| 2004 | $774,199,534 |
| 2005 | $611,917,408 |
| 2006 | $318,790,534 |
| 2007 | $241,952,157 |
| 2008 | -$730,092,994 |

*See* 2004 Annual Report at D-ERISA-000035, attached as Ex. 1; 2005 Annual Report at D-ERISA-000084, attached as Ex. 2; 2006 Annual Report at D-ERISA-000116, attached as Ex. 3; 2007 Annual Report at D-ERISA-000162, attached as Ex. 4; Principal U.S. Property Account 2008 Annual Report ("2008 Annual Report) at D-ERISA-000207, attached as Ex. 10.

56.　　Long before the massive negative cash flows of 2008 (which do not take into account the withdrawal and transfer requests trapped in the Queue), the pattern of substantial erosion in cash flows was clear and should have sounded alarm bells for Principal.  Prudent fiduciaries faced with this pattern of decreasing cash flow would have redoubled efforts to maintain liquidity independent of investor contributions in order to achieve the Property Account's liquidity objective.  Prudence required that Principal manage the Property Account to

the high end of the ranges called for by the strategy, and update the strategy to decrease the reliance on short term borrowings and to increase the levels of cash balances and cash from operations so as to provide for increased liquidity overall.  However, Principal failed to do so.

57.     Instead, Principal continued to manage the liquidity in the Account at or below the low end of its range, thus maintaining no more than 10% of the balance in the Account in liquidity, consisting of cash, short term borrowings, and cash flows from the property owned by the Account.  Indeed, Principal had only between $2.4 and $31.2 million in cash on hand at year's end between 2004 and 2007 – a tiny fraction of the Account's net value of $3.6 to $7.8 billion.  *See* 2004 Annual Report at D-ERISA-000031, D-ERISA-000035, attached as Ex. 1; 2005 Annual Report at D-ERISA-000080, D-ERISA-000084, attached as Ex. 2; 2006 Annual Report at D-ERISA-000111, D-ERISA-000116, attached as Ex. 3; 2007 Annual Report at D-ERISA-000157, D-ERISA-000162, attached as Ex. 4.

58.     Principal's portfolio management strategies only heightened the risk that a liquidity crisis would eventuate.  For example, in 2007, Principal acquired $1.38 billion in new real estate for the Property Account, on terms that consumed over $400 million of available liquidity.  In 2008, the year the Queue was put in place, Principal acquired $231.9 million in real estate located in Scottsdale, Arizona (office), Fort Lauderdale, Florida (industrial/office), and Henderson, Nevada (land)—three areas already being hard hit by the real estate crisis.  2008 Annual Report at D-ERISA-000197, attached as Ex. 10.  In fact, the Arizona Republic reported that the price Principal paid, $172.7 million, for the Scottsdale, Arizona office space, was the highest amount per square foot anyone had ever paid for office space in the Phoenix area, $383. Andrew Johnson, *Two office buildings sell for record $173M*, The Arizona Republic, Mar. 11, 2008, attached as Ex. 11.

59.     Thus, despite Principal's knowledge of the steadily declining participant contributions, steadily increasing withdrawals, and growing problems in the residential and commercial real estate markets, on information and belief, Principal took no actions to shore up the liquidity in the Account to guard against the possibility of continued erosion in investor contributions and the possibility that one day investor withdrawals would exceed contributions.

60.     Unfortunately, that one day came in 2008 with the souring real estate market— for which Principal was wholly unprepared.  Having clung to an imprudent and inadequate liquidity strategy for several years – despite the funds purported focus on liquidity - in the face of eroding contributions, Principal was unable to provide the liquidity for daily withdrawals that its investment objective called for, and instead imposed the Withdrawal Queue.  Shortly after imposing the Queue, Principal admitted that "the Separate Account is experiencing liquidity issues caused by a marked slowdown in commercial real estate sales at the same time that cash flows out of the Separate Account have outpaced new contributions into the account." Principal Due Diligence Program Investment Bulletin, Foundation Options, at D-ERISA-000481, filed under seal as Ex. 12 (emphasis added).  The Plans and Plan participants continue to suffer the consequences of Principal's imprudence, as the Withdrawal Queue continues to this day—nearly two years after Principal initially froze the Account to withdrawals.

61.     Despite the fact that numerous ERISA plan and plan participant investors in the Property Account are unable to withdraw their retirement savings from the Account due to Principal's imprudent management and imposition of the Withdrawal Queue, upon information and belief, Principal is still charging and collecting investment management and recordkeeping fees from the Plans and Plan participants against these captive assets in the Withdrawal Queue.

62. Principal's conduct in managing the Property Account was negligent and a clear dereliction of its duties as an ERISA investment fiduciary. The conduct was manifestly imprudent because, among other reasons:

- Principal did not invest the participants' and Plans' assets in the Property Account in a manner consistent with the Property Account's stated objectives and philosophy;

- Principal did not maintain adequate liquidity in the Property Account to meet the needs of the participants despite stating that the Account was low to moderate risk because of its strong focus on liquidity;

- Principal failed to maintain adequate liquidity in the Account despite stating that its objective was to ensure that participants could make daily withdrawals, and instead instituted a Withdrawal Queue preventing any Plans or Plan participants from accessing their retirement assets (regardless of whether they want to retire or simply transfer the assets to a safer investment option);

- Principal imprudently relied on participant contributions as a primary source of liquidity to meet withdrawal requests; and

- Principal imprudently invested fund assets and as a result increased the risk of the Property Account and the potential for a liquidity crisis, and despite abundant signs of trouble in the real estate markets, failed to take actions necessary to deliver on the fund's "focus" on liquidity.

63. An investment manager acting prudently, loyally, and for the exclusive benefit of plan participants, as required by ERISA, would not have gambled with participants' retirement

savings as Principal did in this case, and instead would have adhered to the stated liquidity-oriented low risk objectives of the Property Account.

**B.  DEFENDANTS IGNORED ABUNDANT RED FLAGS**

64.     Principal was or should have been aware that the real estate markets in the United States were overvalued and that a downward correction was likely to occur no later than early 2007.  The financial media was awash with warnings about the commercial real estate market starting in this period.  In fact, Principal's own public statements, both about the Account and in general, indicate that it was well aware of these problems.  Yet, as explained above, even in face of these problems and in light of the rapidly declining contributions during this period, Principal took no action to shore up the liquidity of the account and was ultimately unable to meet its liquidity objectives.

65.     For example, an April 3, 2007 article in the *Financial Times* reported that the Fitch rating agency predicted sharply higher default rates for commercial properties during 2007.  The article stated that "[t]he warning echoes the turmoil in the risky U.S. subprime home loan market, where lax underwriting and a sharp slowdown in the housing market have resulted in a steep increase in mortgage payment problems in recent months.... Fitch warned that, in some parts of the commercial mortgage market, there were signs that such aggressive lending practices were already causing problems."  Saskia Scholtes, *Fitch in Fresh Mortgage Alert*, Financial Times, Apr. 3, 2007, attached as Ex. 13.

66.     A July 11, 2007 article in The Wall Street Journal, entitled "Fitch Sees Rising Shakiness In Commercial Mortgage Arena," reported that Fitch had issued another warning concerning a downturn in the sector, including that "[d]efaults on loans backing commercial mortgage-backed securities could soon begin to rise...," noting that "[t]he warning comes as investors have become more cautious about financing these deals...."  Ryan Chittum & Jennifer

S. Forsyth, *Moving the Market: Fitch Sees Rising Shakiness In Commercial Mortgage Arena*, Wall St. J., July 12, 2007, attached as Ex. 14.

67.     In a December 17, 2007 article, Kiplinger.com reported, "A dark cloud is hovering over commercial real estate.  The weakening economy and turmoil in the credit markets are combining to create stormy weather in 2008."  Jerome Idaszak, *Commercial Real Estate: The Next Shoe to Drop?*, Kiplinger.com, Dec. 17, 2007, attached as Ex. 15.  The article pointed out that "The issuance of bonds backed by commercial assets such as office buildings and shopping centers is plunging -- from around $200 billion this year to about $110 billion expected next year," and that "[t]he weakening economy -- gross domestic product will increase only 1% or less in this quarter and the first quarter of 2008 -- is raising fears of recession, which is also dampening both prices of existing property and plans for new construction.  Offices will feel the impact more as housing-related financial service firms lay off workers."  *Id*.

68.     Even Principal acknowledged the worsening commercial real estate market in its 2007 Annual Report, stating that:

> Significant volatility in the public quadrants of real estate – publicly traded REIT [Real Estate Investment Trust] prices and CMBS [Commercial Mortgage Backed Securities] spreads – and an increased risk of recession have influenced a change in market sentiment and less risk complacency among investors. Much more conservative lending practices resulting from credit market turmoil and a significant slowdown in transaction activity due to widening bid-ask spreads has resulted in a flattening of asset prices and in some cases, especially lower quality assets in secondary and tertiary markets, a decline in asset prices. As space market and capital market conditions continue to adjust to domestic and global economic uncertainties and less accommodative debt markets in 2008, thoughtful navigation of the real estate investment landscape will be imperative. … The nominal returns generated by core real estate in the past several years are unsustainable.

2007 Annual Report at 7, attached as Ex. 4.  Nevertheless, in the same breath, Principal reassured investors that "**the Account will continue to place equal emphasis on return**

**generation and risk management, while maintaining our focus on liquidity management**."
*Id*. (emphasis added).

69.     And, as early as October 2007, Principal, including members of the Investment and Real Estate Committees, which review real estate transactions in the Account, forecast increased volatility in the real estate market in various investor-targeted publications.

70.     In one publication titled, "The Caution Flag Comes Out," which was intended to provide "thought-provoking, highly analytical approach to real estate forecasting, with the hope that this publication would prove useful to investors in developing and executing their commercial real estate investment strategies," Principal advised:

After several consecutive years of mostly upside variances in the capital markets, 2007 brought a sudden reminder that downside variances and reversal of investor sentiment can occur quickly and unexpectedly. The commercial real estate markets were swept up in the subprime mortgage and global credit market meltdown, bringing out the yellow caution flag for what may be an extended period of time. Volatility in the real estate capital markets occurred despite reasonably strong underlying space market fundamentals, reinforcing how closely interconnected the real estate markets are with global capital market events, as well as the increased relative size and influence of the public real estate quadrants compared to past cycles.



Principal Real Estate Investors, Real Estate Research Corporation & CBRE/Torto Wheaton Research, *Expectations & Market Realities in Real Estate: 2008 – The Caution Flag Comes Out*, October 2007, at 9, attached as Ex. 16.  (Randall C. Mundt, the President and Chief Investment Officer of Principal Real Estate, who served on the Investment and Real Estate Committees to the Account (*see* Declaration of Teri Button in Support of Defendants' Motion to Transfer Venue

to the Southern District of Iowa ("Button Decl."), at 11, 13 (Doc. No. 32-2)), listed as a "Chair"

of the publication).

71. In another, Principal wrote:

> Despite still strong space market fundamentals in most metropolitan areas, commercial real estate has certainly not been immune to the sudden and severe shift in investor risk sentiment that adversely impacted global structured products and credit markets in 2007. In particular, the two public real estate quadrants (publicly traded REITs and CMBS/CRE CDOs), have experienced significant volatility during the past few months. Share prices of publicly traded REITs have gone from trading at a premium to net asset value (NAV) to trading at their greatest discount since 1999. Spreads on CMBS have widened to levels greater than during previous stress periods of either 1998 or September 2001. And while volatility in private equity commercial real estate markets has in comparison been relatively limited thus far, there has nevertheless been a clear sentiment shift, with an increasing number of transactions experiencing re-trading and sellers postponing deal offerings as bid-ask spreads widen.

Randall Mundt & Todd Everett, *The Global Credit Market Meltdown: Implications for the U.S.*,

Real Estate Finance and Investment, October 12, 2007, at 1, attached as Ex. 17 (Todd Everett,

the Managing Director and Head of Real Estate Fixed Income for Principal Life, is also a

member of the Real Estate Committee to the Account (*see* Button Decl. at 13)).

72. Thus, based on its own representations, such as the Annual Report and

publications noted above, as well as abundant articles during 2007 and 2008 dissecting the

dangers ahead in the commercial real estate markets, Principal plainly was on notice of the

deterioration of the commercial real estate markets. Principal could have, and a prudent

fiduciary would have, recognized these dangers and taken steps to protect the assets of the

Property Account long before the Property Account collapsed and Principal imposed the

Withdrawal Queue.

73.     Specifically, as fiduciaries, Defendants should have taken the appropriate action to ensure liquidity levels consistent with the Property Account's stated objectives, particularly as they had sufficient warning that the Property Account's liquidity levels were under threat. Putting aside that Defendants should have all along managed the Property Account with "a strong focus on liquidity" as they themselves indicated was the investment policy for the Property Account, once these warnings were sounded within the industry, they had sufficient time to reduce the Property Account's liquidity risk, but failed to do so. The participants of the Plans who invested in the Property Account, suffered substantial losses as a result of Defendants' breach.

74.     Principal's failure to maintain appropriate liquidity was all the more imprudent in light of the steadily, but dramatically, declining contributions to the Account, and in light of the fact that Defendants clearly knew or should have known that the commercial real estate market, in which the Property Account was heavily invested, was poised to suffer material losses. As such, the massive losses suffered by the Plaintiffs and the other ERISA plans and plan participants by virtue of Principal's failure to maintain promised liquidity was entirely foreseeable. Had Principal taken steps to shore up the Account's liquidity, many of the losses suffered by the Plaintiffs and the Class could have been avoided.

## C.     PRINCIPAL LOCKED UP PARTICIPANTS' RETIREMENT SAVINGS IMPRUDENTLY AND IMPROPERLY

75.     In September 2008, in the face of a collapsing real estate market and rapidly mounting withdrawal requests, Principal elected to close the Property Account to withdrawals, locking up the participants' and Plans' retirement savings in the Property Account. Principal explained that:

> On September 26, 2008, Principal Life Insurance Company ("Principal
> Life") determined that it was in the best interest of investors to apply a
> contractual limitation which delays the payment of withdrawal requests
> and provides for payment of such requests on a pro rata basis (a "Queue")
> as cash becomes available for distribution, as determined by Principal
> Life. The implementation of the Queue does not change the Account's
> strategy of seeking to achieve good risk adjusted returns through
> investment in core real estate. On September 30, 2008 the outstanding
> balance in the Queue was $179.8 million.

Principal U.S. Property Separate Account Third Quarter 2008 Performance Report at D-ERISA-000308, attached as Ex. 18. By September 30, 2008, the Withdrawal Queue already contained withdrawal requests from ERISA plans and plan participants amounting to $179.8 million in retirement savings.

76.     Principal gave literally no warning to participants or the Plans that it planned to freeze withdrawals from the Property Account, as Principal announced that it would impose the Withdrawal Queue at September 26, 2008 at 12:01 am—the same moment the withdrawal queue went into effect. Principal U.S. Property Separate Account, Q&A – RIS Participant, Sept. 1, 2009, at ZALL000017, attached as Ex. 19.

77.     Despite the fact the Principal imposed the Withdrawal Queue with no notice to the ERISA plans and plan participants invested in the Account, Principal had been considering imposing the Queue as well as other options several weeks prior to the imposition of the Withdrawal Queue. *See* Button Decl. at ¶¶ 22-23 ("Before the Queue was implemented, the 'Q8' working group was established to examine alternatives for addressing the real estate market conditions, including a potential restriction on withdrawals from the Account" and "[o]n September 10, 2008, the Queue Committee was established to determine whether and when to implement the Queue.")

78.     Once the Withdrawal Queue was in place, and investors could no longer move money out of the Property Account, Principal made several changes to the Property Account's

investment "objectives," "philosophy," and "background" in the Annual Reports to remove the references to the Property Account's supposed focus on liquidity.

> a. Principal removed reference to the Property Account's objective, "to maintain appropriate liquidity so that clients can make daily contributions or withdrawals,"

> b. Principal removed language suggesting that the Property Account is "open to contributions and withdrawals daily," and

> c. Principal removed language regarding the Property Account's philosophy that low to moderate fund level risk is accomplished by operating with a "strong liquidity focus."

*Compare* 2004 Annual Report at D-ERISA-000002, attached as Ex. 1; 2005 Annual Report D-ERISA-000049, attached as Ex. 2; 2006 Annual Report at D-ERISA-000097, attached as Ex. 3; 2007 Annual Report at D-ERISA-000130, attached as Ex. 4 (published prior to imposing the Withdrawal Queue) *with* 2008 Annual Report at D-ERISA-000180, attached as Ex. 10; Principal U.S. Property Account 2009 Annual Report ("2009 Annual Report") at D-ERISA-000223, attached as Ex. 21 (published after imposing the Withdrawal Queue).

79.     These revisions reflect a fundamental change in the stated strategy of the Property Account, and show the extent to which Principal backed away from its commitment to provide liquidity, presumably because its actual management strategy had long since deviated from its stated "strong liquidity focus."  *See supra* ¶¶ 34 - 44.

80.     Moreover, Principal itself recognized the extent of the Property Account's management problems.  Principal maintains a "Watch List" on which it places Sub-Advisors or

Funds for "qualitative or performance-related reasons."  Principal Real Estate Investors Principal
U.S. Property Account Investment Guidelines, at D-ERISA-000342, filed under seal as Ex. 23.

81.     Soon after management of the Property Account established the Withdrawal
Queue, Principal placed the Property Account on its Watch List effective September 26, 2008.
Thus, Principal's placement of the Property Account on the Watch List indicates that even
Principal regarded the imposition of the Withdrawal Queue to be linked to serious "qualitative or
performance-related" issues at the Property Account.

82.     Remarkably, even though the Withdrawal Queue is still in place, Principal
removed the Property Account from its Watch List on September 30, 2009, stating (self-
servingly) that it believed "that Principal Real Estate Investors has made prudent decisions in
managing this portfolio over the past year."  Principal Due Diligence Program Investment
Bulletin, Sub-Advised Investment Options, at D-ERISA-000434, filed under seal as Ex. 22.  In
truth, the failure to manage the Property Account according to its stated objectives and risk
profile was anything but "prudent."

**D.      PRINCIPAL'S IMPRUDENT ACTIONS DEPRIVED PARTICIPANTS OF CONTROL OVER THEIR
RETIREMENT SAVINGS AND CAUSED THEM TO SUFFER ENORMOUS LOSSES**

83.     Since the imposition of the Withdrawal Queue, the value of the Account has
plunged.  Between September 30, 2008 and March 31, 2009, the per share value of the account
had fallen from $704.57 to roughly $550.61.  As the account plunged, the amount in the Queue
has increased as reflected in the following table:

| Date | Amount in queue | NAV | % of Acct NAV | Per Share Value |
|---|---|---|---|---|
| 9/26/08 | QUEUE ESTABLISHED | | | |
| 9/30/08 | $179.8 M | $5.4 B | [3.3%] | 720.3687 |
| 12/31/08 | $837.8 M | $4.9 B | [17.1%] | 626.8715 |
| 03/31/09 | $1,035.5 M | $4,317 M | 24% | 550.6114 |

| | | | |
|---|---|---|---|
| 06/30/09 | $1,153.9 M | $3,889 M | 29.7% | 493.1299 |
| 09/30/09 | $1,153.5 M | $3,889 M | 29.6% | 450.1429 |
| 12/31/09 | $1,173.0 M | $3.4 B | 34.3% | 428.8689 |
| 03/31/10 | $1,045.8 M | 3,298 M | 31.7% | 429.22 |

84.     Plaintiffs and the Class have been damaged because they have been forced to wait in the Withdrawal Queue as the reported value of their investment in the Property Account has plummeted.  Had Principal honored these withdrawal requests consistent with the Account's objectives, philosophy, and background, then these investors would not have been exposed to the dramatic losses the Property Account has suffered since September 26, 2008.

85.     In addition, had participants been allowed to divest from the Property Account, participants would have been able to invest in other options which performed far better than the collapsing Property Account, including other "fixed-income" funds offered by Principal.  Indeed, as this chart shows, the Property Account grossly under-performed *every* other Principal investment option in the same risk category as the Property Account - fixed income - as well as Principal's Real Estate Securities Separate Account:

| Investment | 2009 Performance |
|---|---|
| **U.S. Property Separate Account** | **-31.6%** |
| High Yield I Separate Account | 52.9% |
| Income Separate Account | 21.3% |
| Bond & Mortgage Separate Account | 21.6% |
| High Quality Intermediate-Term Bond Separate Account | 12.9% |
| Preferred Securities Separate Account | 46.3% |
| Government & High Quality Bond Separate Account | 0.7% |
| Inflation Protection Separate Account | 6.4% |
| Real Estate Securities | 27.6% |

Source: http://www.principal.com

86.     Additionally, Principal has continued to charge fees to the Plaintiffs and Class members in the Queue, even though participants have not chosen to maintain their investment in the Property Account, and to the contrary have expressly sought to exit the fund.  Had Principal honored the withdrawal requests, the funds in the Queue would not have been further diminished by advisory fees Defendants have continued to charge to the Property Account since September 26, 2008.

87.     in light of the Property Account's purported focus on liquidity, the sudden lock down of the account was particularly shocking.   Participants were denied access to their retirement savings and were forced to sit on the sidelines as their savings were decimated. Instead of exercising control over how to allocate their plan account investment, participants found themselves at the mercy of Principal – only able to transfer or withdraw their savings when Principle, in its exclusive discretion, determined to process transactions.  This action, not surprisingly, has prompted outrage among Property Account participants.  Numerous participants have voiced their objections online to Principal's unilateral decision to deny participants access to their retirement savings.  As put by one participant on an on-line blog:

> Principal put the U.S. Property Separate account in the same catergory [sic] as Bonds as fairly secure investments.
>
> That turned out to be totally false and they should be held responsible for deceiving investors.
>
> They should be sued for thier [sic] deception.
>
> I am also watching my investment go down the drain and am unable to do anything about it.

Topix.com, posted June 27, 2009, available at http://www.topix.com/forum/com/pfg/ T4NPJJ67FB32RCHB8.  Another participant stated:

> It is now September 2009 and the fund is still falling at -25%. When will any of us have an opportunity to sell! I love the fact that they upheld their legal obligation to alert us by posting on the message board 2 hours and 13 minutes before they locked up our money. These people are criminals.

*Id.*, posted Sept. 15, 2009.

## VI. DEFENDANTS' FIDUCIARY STATUS

88.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i)-(iii).

89.     ERISA is clear that assets held by an insurance company in a separate account are plan assets. 29 U.S.C. § 1101(b)(1)-(2) excludes certain assets held in the general account of an insurance company from the definition of plan assets, but this exclusion does not apply to assets held in separate accounts. 29 U.S.C. § 1101(b)(2)(B). ERISA defines "separate account" to include "an account established or maintained by and insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 29 U.S.C. § 1002(17).

90.     The Principal U.S. Property Separate Account is an insurance company separate account pursuant to 29 U.S.C. § 1002(17) and § 1101(b)(2)(B). The assets held in the Property

Account are therefore plan assets. Button Decl. at ¶ 12; 2008 Annual Report at D-ERISA-000180, attached as Ex. 4; 2009 Annual Report at D-ERISA-000223, attached as Ex. 21.

91.    Principal had exclusive control and authority over the management and investment of the plan assets that were invested in the Property Account.

92.    Under 29 U.S.C. § 1002(21)(A)(i)-(iii), Principal's exclusive control and authority over the management and investment of the Plan assets in the Property Account renders Principal an ERISA fiduciary to the Plans with respect to its management of these assets.

93.    In addition, Principal has emphasized that it is an ERISA fiduciary with respect to the management of the assets in the Property Account. Principal explained that "Principal Life Insurance Company is a fiduciary with regard to the management of the Separate Account…." Principal U.S. Property Separate Account, Q&A – RIS Participant, Sept. 1, 2009, at ZALL000011, attached as Ex. 19

## VII. RELEVANT LAW

94.    29 U.S.C. § 1132(a)(2) provides, in pertinent part, that a civil action may be brought by a participant for relief under 29 U.S.C. § 1109.

95.    29 U.S.C. § 1109(a) "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

96.     29 U.S.C. § 1132(a)(3) authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

97.     29 U.S.C. §§ 1104(a)(1)(A) and (B) provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

98.     These fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A) & (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Property Account;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to

convey complete and accurate information material to the circumstances of participants and beneficiaries.

99.     According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under 29 U.S.C. § 1104(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

100.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  o The composition of the portfolio with regard to diversification;

  o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements; and

    o  The projected return of the portfolio relative to the funding objectives.

101.    As set forth herein and specifically in Count I of the Complaint, Principal failed abysmally in this regard, and generally, in its duty to manage the assets of the Property Account prudently, loyally, and in the best interests of the Plan participants.

102.    Plaintiffs therefore bring this action under the authority of 29 U.S.C. § 1132(a)(2) for relief under 29 U.S.C. § 1108(a) to recover losses sustained by the Property Account arising out of the breaches of fiduciary duties by the Defendants for violations under 29 U.S.C. § 1104(a)(1).

## VIII.  CLASS ACTION ALLEGATIONS

103.    Class Definition.  Plaintiffs brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure for the losses suffered by their retirement savings plans and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans and the participants and beneficiaries of those plans that invested directly or indirectly in the Principal U.S. Property Account between September 26, 2008 and the present (the "Class Period") that have suffered losses since they were placed in the Withdrawal Queue as a result of the Principal's failure to maintain adequate liquidity to provide for daily withdrawals from the Property Account. Specifically excluded from the Class are the Individual Defendants herein, officers and/or directors of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party, other than qualified ERISA plans offered by Principal or any of its affiliates to its employees and which suffered losses due to investment in the Principal U.S. Property Account.

104.    Numerosity.  The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that at

least hundreds if not more ERISA qualified plans throughout the country with thousands of participants and beneficiaries, offered the Principal U.S. Property Account and had assets invested in the Principal U.S. Property Account during the Class Period that incurred losses as a result of the breaches of fiduciary duty alleged in the Complaint.

105.    Commonality.  The claims of Plaintiffs and the members of the Class have a common origin and share a common basis.  The claims of all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants. Proceeding as a class is particularly appropriate here because the Principal U.S. Property Account held assets in a commingled account, in which the assets of every plan that invests in the Property Account are pooled, and, therefore, Principal's imprudent actions affected all plans that invested in the Property Account in the same manner.

106.    Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The many questions of law and fact common to the Class include:

a.    Whether Defendants breached their fiduciary duties under ERISA;

b.    Whether Defendants deviated from the stated objectives and philosophies of the Property Account when they failed to ensure the Account would have adequate liquidity; and

c.    Whether Defendants' acts proximately caused losses to the plans at issue; and

d.    Whether Defendants are equitably liable to the Class for disgorgement of ill gotten fees from imprudent fiduciary conduct, for equitable tracing, for

restitution, for the imposition of a constructive trust, and/or for other equitable or injunctive relief.

107.    Typicality.  Plaintiffs' claims are typical of the claims of the members of the Class because: (A) Plaintiffs seek relief for the losses suffered by their Plans and on behalf of all similarly situated Plans and their participants and beneficiaries in the Class pursuant to 29 U.S.C. § 1132(a)(2), and, thus, their claims for the Plans' are not only typical to, but identical to, a claim under this section brought by any Class member; and (B) Plaintiffs seek relief under 29 U.S.C. § 1132(a)(3) on behalf of the Plans for equitable relief, that would affect all Class members equally.  If brought and prosecuted individually, each of the members of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

108.    Adequacy.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel that are competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interest antagonistic to or in conflict with those of the Class.  Plaintiffs will undertake to vigorously protect the interests of the absent members of the Class.

109.    Rule 23(b)(1)(A) & (B) Requirements.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the

interests of other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

110.    Rule 23(b)(2) Requirements.  Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

111.    Rule 23(b)(3) Requirements.  In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## IX. LOSS CAUSATION

112.    The participants and plans that invested in the Property Account suffered hundreds of millions of dollars in losses because Principal mismanaged the Property Account, and failed to maintain adequate liquidity in the Account to meet withdrawal and redemption requests, as described in the Account's objectives and investment philosophy, in breach of Defendants' fiduciary duties.  By failing to maintain adequate liquidity and by managing the Property Account imprudently and disloyally, Principal exposed the Plans and participants to excessive risk, including the risk of a liquidity crisis, which Principal's actions ultimately caused.

113.    All members of the Class are ERISA plans or plan participants who have attempted to withdraw all or some of their funds from the Property Account but have been prevented from doing so by Principal's imposition of the Withdrawal Queue.

114.    In addition, Defendants knew or should have known that the commercial real estate market, in which the Property Account was heavily invested, was predicted to suffer

material losses prior to and at the time that the Withdrawal Queue was implemented, thus, the losses to the Plans were entirely foreseeable.

115.    Plaintiffs and the Class have been damaged because they have been subjected to substantial losses as the Property Account has rapidly declined in value since the imposition of the Withdrawal Queue.   In addition, Plaintiffs and the Class have been deprived of the opportunity to invest in other retirement savings options that have performed far better during the time that the Property Account has been frozen, including, but not limited to, other low to moderate risk funds in the same "risk profile" as the Property Account.  Had Principal honored these withdrawal requests, then these investors would not have been exposed to the dramatic losses the Property Account has suffered since September 26, 2008.

116.    Moreover, because the account balances of Plaintiffs and the Class have been frozen in the Queue, the existing value of their shares in Property Account, as reported by Principal, is entirely theoretical, as they are unable to obtain these funds on demand and no market exists for them to sell their shares.

117.    Defendants also continued to charge fees associated with the Property Account, of which Plaintiffs and the Class had to pay a pro-rata portion based on their investments that were frozen in the Withdrawal Queue.

118.    Defendants were not entitled to charge advisory fees for the funds subject to the Withdrawal Queue.

119.    Moreover, had Principal honored the withdrawal requests, the funds held in the Withdrawal Queue would not have been further diminished by advisory fees Defendants have continued to charge to the Property Account since September 26, 2008.

120.     Defendants are liable for these losses because they were caused by Defendants' breaches of fiduciary duty, including, but not limited to, their decision to disregard the investment strategy of the Property Account by failing to maintain adequate liquidity in the Property Account -- a decision which was imprudent under the circumstances presented here.

121.     Had the Defendants properly discharged their fiduciary duties, the Plans that offered the Property Account and the Plan participants that invested in the Property Account would have avoided some or all of the losses that they have suffered since being placed into the Withdrawal Queue.

122.     Plaintiffs and the Class are entitled to the presumption that, but for the breaches of fiduciary duty described herein, they would not have made or maintained their investments in the Property Account and their investments in the Property Account would have instead been made in the most profitable alternative investment(s) available in the Plans.

## X.  CLAIMS FOR RELIEF

### COUNT I
(AGAINST PRINCIPAL, PRINCIPAL LIFE, PRINCIPAL GLOBAL ADVISORS, PRINCIPAL MANAGEMENT CORPORATION, PRINCIPAL REAL ESTATE AND JOHN DOE DEFENDANTS 1-20 FOR FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS AND THEIR ASSETS)

123.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

124.     Under 29 U.S.C. § 1002(21), Principal and Principal's individual employees responsible for managing the assets invested in the Property Account were at all relevant times ERISA fiduciaries as to the Plans and with respect to the Plan assets invested in the Property Account.

125.     As alleged above, the scope of the fiduciary duties and responsibilities of Principal included managing the assets of the Property Account.

126.     The Defendants were obligated to discharge their duties with respect to the Property Account (a) solely in the interest of the participants and beneficiaries of the Property Account and for the exclusive purpose of providing benefits to them, and (b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   29 U.S.C. §§ 1104(a)(1)(A) and (B).   In carrying out these responsibilities, the Defendants were required to evaluate the merits of the Property Accounts investments on an ongoing basis and take all necessary steps to ensure that the Account's assets were invested prudently.

127.     Yet, contrary to their duties and obligations under ERISA, the Defendants failed to loyally and prudently manage the assets of the Plans in the Property Account managed by Principal.  Specifically, Defendants breached their duties to the participants, in violation of 29 U.S.C. § 1104 (a), by, *inter alia*, (a) failing to invest the assets in the Property Account in a manner consistent with the objectives and philosophies described in the materials Principal circulated about the Property Account, and (b) generally failing to invest and manage the assets of the Property Account in the manner of a reasonably prudent fiduciary acting under similar circumstances.  In particular, Defendants acted imprudently and disloyally by failing to manage the Property Account in the manner necessary to meet the stated objected of a low to moderate risk investment with a focus on liquidity.  They imprudently relied on participant contributions as a primary source of liquidity to meet withdrawal requests, and failed to take any action to shore up liquidity in light of steadily declining participant contributions, and impending market

collapse. Indeed, despite knowing full well that the market was facing a crisis, Defendants purchased additional properties, exacerbating the Property Account's liquidity problems. Defendants' failure to maintain and ensure sufficient liquidity levels in order to fulfill participant withdrawal requests in the face market changes of which they were well aware was a breach of their fiduciary duty to plan participants invested in the Property Account.

128.     Further, Defendants placed their own interests in obtaining fees from continued assets under management in the Property Account, ahead of the interests of participants who wished to liquidate their Property Account holdings, as the liquidation of such holdings would have reduced the advisory fees which Principal stood to gain, and did gain, from such continued assets under management.

129.     As a consequence of the Defendants' breaches of fiduciary duties alleged in this Count, the Plans and participants which allocated retirement savings to the Property Account have suffered and continue to suffer massive losses. Had Defendants discharged their fiduciary duties to prudently invest the Property Account's assets and maintained adequate liquidity in the Property Account, the losses suffered by the Plans and participants in the Withdrawal Queue would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, Plaintiff and the other Class members have lost hundreds of millions of dollars of retirement savings.

130.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duty alleged in this Count and to provide other equitable relief as appropriate.

## XI. REMEDY FOR BREACHES OF FIDUCIARY DUTIES

131.     The Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the Property Account failed to maintain adequate liquidity to meet the withdrawal requests of the participants during the Class Period.  As a consequence of the Defendants' breaches, participants in the Plans who invested in the Property Account suffered significant losses.

132.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. § 1109.  Section 1109 requires "any person who is a fiduciary… who breaches any of the… duties imposed upon fiduciaries… to make good to such plan any losses to the plan."  Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate."  Here, in addition to causing losses, upon information and belief, Defendants Principal Real Estate, Principal Life, PMC, PGI and PFG, all profited from their breaches and the breaches of their co-fiduciaries by continuing to reap fees from the assets ostensibly "under management" in the Property Account that were subjected to the Withdrawal Queue – which was imposed as a consequence of Defendants' fiduciary breaches in the management of the Property Account as described above -- which Plaintiffs and the Class had sought to redeem, but were unable to.  Defendants are not entitled to the profits from fees on those assets, and such profits must be disgorged to the Plans.

133.     With respect to calculation of the losses to the Property Account, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets prudently and appropriately, and in this instance, according to the stated objective of the Property Account.  In this way, the remedy

restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

134.    29 U.S.C. § 1132(a)(3) also authorizes the award of other appropriate equitable relief for violations of fiduciary duty. Such relief includes disgorgement of ill gotten fees from imprudent fiduciary conduct, as well as equitable tracing, constructive trust, and restitution.

135.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans that offered the Property Account to make good to the Plans the losses resulting from the breaches of fiduciary duties alleged above (including disgorgement of profits from fees based on assets subjected to the Queue which Plaintiffs and the Class had requested to redeem but which requests were denied) in an amount to be proven at trial based on the principles described above, as provided by 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a), 1132(a)(2) & (3); (c) injunctive and other appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

136.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Plaintiffs and the Class;

B.      An Order compelling the Defendants to make good to the ERISA plans and plan participants in the Class all losses to the ERISA plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Class resulting from imprudent investment of the assets in the Property Account, and to restore to the Class all profits – including all improperly gained fees – Defendants made through use of the Class's assets, and to restore to the Class all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Property Account for ERISA plans;

E.      Actual damages in the amount of any losses the Class suffered, to be allocated among the plans and the participants' individual accounts in proportion to the losses suffered as required by ERISA;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law;

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including restitution, disgorgement of fees, and equitable tracing; and

I.      Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated:     August 6, 2010           KELLER ROHRBACK, L.L.P.


By: /s/ Derek W. Loeser
      Derek W. Loeser
      Lynn L. Sarko
      Cari Laufenberg
      KELLER ROHRBACK L.L.P.
      1201 Third Avenue, Suite 3200
      Seattle, Washington 98101
      Telephone: (206) 623-1900
      Facsimile: (206) 623-3384
      dloeser@kellerrohrback.com
      lsarko@kellerrohrback.com
      claufenberg@kellerrohrback.com

      Gary A. Gotto
      James A. Bloom
      KELLER ROHRBACK P.L.C.
      3101 N. Central Ave., Suite 1400
      Phoenix, Arizona 85012
      Telephone: (602) 248-0088
      Facsimile: (602) 248-2822
      ggotto@krplc.com
      jbloom@krplc.com

      ***Interim Lead Counsel for Plaintiffs***

      David Harris Goldman
      Kodi Ann Brotherson
      Michael J. Carroll
      BABICH GOLDMAN CASHATT &
      RENZO PC
      100 Court Ave, Ste 403
      Des Moines, IA 50309-2296

Telephone: (515) 244-4300
Facsimile: (515) 244-2650
dgoldman@babichlaw.com
kbrotherson@babichlaw.com
mcarroll@babichlaw.com

*Interim Local Counsel for Lead Plaintiffs*

Andrew E. Lencyk
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
alencyk@wolfpopper.com

*Counsel for Plaintiff Eric Cruise*

Jeffrey I. Carton
MEISELMAN DENLEA PACKMAN
CARTON & EBERTZ PC
1311 Mamaroneck Avenue
White Plains, NY 10605
Telephone: (914) 517-5000
Facsimile: (914) 517-5055
jcarton@mdpcelaw.com

*Counsel for Plaintiff Jaime Rose Jover*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| IN RE PRINCIPAL U.S. PROPERTY ACCOUNT ERISA LITIGATION | Case No.  4:10-cv-00198-RP-TJS |
| This Document Relates To:<br><br>All Actions.<br><br>*Cruise* Action 4:10-cv-00198-RP-TJS<br><br>*Mullaney* Action 4:10-cv-00199-RP-TJS | |

**<u>CERTIFICATE OF SERVICE</u>**

I, Derek W. Loeser, hereby certify that on August 6, 2010, a copy of Plaintiffs' Consolidated Complaint for Violations of the Employee Retirement Income Security Act of 1974 was filed electronically under seal, and is being served electronically this date upon all involved parties participating in the Court's electronic filing system or first-class mail, postage pre-paid.

Dated:  August 6, 2010

By :  /s/ Derek W. Loeser
        Derek W. Loeser
        dloeser@kellerrohrback.com
        KELLER ROHRBACK L.L.P.
        1201Third Avenue, Suite 3200
        Seattle, WA 98101
        Telephone:  (206) 623-1900
        Facsimile:  (206) 623-3384