# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

IN RE PRINCIPAL U.S. PROPERTY
ACCOUNT ERISA LITIGATION

This Document Relates To:                    MASTER FILE NO.: 4:10-cv-00198-RP-TJS

All Actions.

# DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION TO PARTIALLY DISMISS
# PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT FOR ALLEGED
# VIOLATIONS OF ERISA

# TABLE OF CONTENTS

**page**

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND AND KEY ALLEGATIONS
      OF THE AMENDED COMPLAINT .............................................................. 3

      A.    Pertinent Features Of The Property Account ........................................ 3

      B.    The 2008 Credit Market Crisis And Defendants' Implementation Of The
            "Withdrawal Queue." ........................................................................... 5

      C.    The Amended Complaint's Material Allegations ................................. 6

III.  ARGUMENT ...................................................................................................... 8

      A.    Plaintiffs Lack Standing To Pursue Claims On Behalf Of ERISA Plans
            Other  Than Their Own ........................................................................ 9

            1.    ERISA Does Not Afford Plaintiffs Statutory Standing To Sue On
                  Behalf Of Plans With Which They Have No Relationship ....................... 9

            2.    Asserting Claims On Behalf Of A Purported Class
                  Does Not Excuse Plaintiffs' Lack Of Standing ....................................... 12

      B.    Plaintiffs' Monitoring Claim Against PFG, Inc. Fails As A Matter Of Law
            Because PFG, Inc. Had No Appointment, Monitoring, Or Removal
            Authority Over Property Account Fiduciaries ..................................... 17

IV.   CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

page(s)

*Acosta v. Pac. Enterprise*, 950 F.2d 611 (9th Cir. 1991) .............................................12, 15

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................15

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ......................................................................8, 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................8, 9

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ........................................17

*Bridges v. America Electric Power Co., Inc.*, 498 F.3d 442 (6th Cir. 2007) ....................13

*Brown v. Medtronic*, 619 F. Supp. 2d 646 (D. Minn. 2009) ...............................................9

*Crocker v. KV Pharm. Co.*, 2010 WL 1257671 (E.D. Mo. Mar. 24, 2010) .......................17

*Crawford v. Roane*, 53 F.3d 750 (6th Cir. 1995) ...............................................................13

*Dubinsky v. Mermart, LLC*, 595 F.3d 812 (8th Cir. 2010) ..................................................9

*Enervations, Inc. v. Minn. Mining & Mfg. Co. (3M)*, 380 F.3d 1066 (8th Cir. 2004) ........................................................................................................................19

*Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410 (6th Cir. 1998) ............. passim

*Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101 (5th Cir. 1993) ...............................14, 15

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1 (1983) .....................11

*Hall v. Lhaco, Inc.*, 140 F.3d 1190 (8th Cir. 1998) ...........................................................16

*Harley v. Minn. Mining & Manufacturing Co.*, 284 F.3d 901 (8th Cir. 2002) .................16

*Hastings v. Wilson*, 516 F.3d 1055 (8th Cir. 2008) ...............................................10, 12, 16

*In re ING Groep N.V. ERISA Litigation*, No. 1:09-CV-0400, 2010 WL 1704402 (N.D. Ga. Mar. 31, 2010) .........................................................................................12

*Johnson v. Buckley*, 356 F.3d 1067 (9th Cir. 2004) ...........................................................10

*LoPresti v. Citigroup Inc.*, 171 Fed. Appx. 900, 901 (2d Cir. 2006) ................................11

# TABLE OF AUTHORITIES (CONT'D)

page(s)

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..........................................9

*Mass. Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985)....................17

*McCullough v. Aegon USA, Inc.*, 585 F.3d 1082 (8th Cir. 2009) ......................17

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993) ...................................16, 17

*Miller v. Rite Aid Corp.*, 334 F.3d 335 (3d Cir. 2003)......................................10

*Modern Woodcrafts, Inc. v. Hawley*, 534 F. Supp. 1000 (D. Conn. 1982).......11

*Mulder v. PCS Health System, Inc.*, 216 F.R.D. 307 (D.N.J. 2003) .................15

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ...............................................15

*Piner v. E.I. DuPont de Nemours & Co.,* 238 F.3d 414 (Table), 2000 WL
    1699837 (4th Cir. Nov. 14, 2000).................................................................10

*Rawls v. Unum Life Insurance Co. of America*, 219 F. Supp. 2d 1063 (C.D. Cal.
    2002) ...........................................................................................................15

*In re Reliant Energy ERISA Litigation*, 336 F. Supp. 2d 646 (S.D. Tex. 2004)...............12

*Ruppert v. Principal Life Insurance Co.*, 252 F.R.D. 488 (S.D. Iowa 2008) ....................11

*Ruppert v. Principal Life Insurance Co.*, Case No. 06-CV-903-DRH, 2007 WL
    2025233 (S.D. Ill. July 9, 2007).....................................................10, 11, 12

*Sanofi-Synthelabo Inc. v. Eastman Kodak Co.*, No. 99 Civ. 4888 LAP, 2000 WL
    1611068 (S.D.N.Y. Oct. 27, 2000) ..............................................................11

*In re SLM Corp. ERISA Litig.*, No. 08-4334 (WHP), 2010 WL 3910566
    (S.D.N.Y. Sept. 24, 2010)...............................................................10, 11, 12

*Smith v. Hickey*, 482 F. Supp. 644 (S.D.N.Y. 1979)....................................11, 12

*Sutton v. Medical Serv. Ass'n*, No. 92-4787, 1993 WL 273429 (E.D. Pa. July 20,
    1993) ......................................................................................................14, 15

*Taylor Chevrolet Inc. v. Med. Mut. Servs. LLC*, 306 F. App'x. 207 (6th Cir. 2008) .........13

*Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893 (8th Cir. 2010) ...........9

- iii -

## TABLE OF AUTHORITIES (CONT'D)

page(s)

## FEDERAL STATUTES

29 U.S.C. § 1109(a) .........................................................................................................10

29 U.S.C. § 1132(a) ...........................................................................................9, 10, 15, 17

29 U.S.C. § 2072 (b) .......................................................................................................15

ERISA Section 409(a)....................................................................................................16

ERISA Section 502(a)..............................................................................3, 10, 12, 13, 16

## LEGISLATIVE HISTORY

H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in*, 3 Leg. Hist.
    4594.................................................................................................................16

DB1/66086414.4

Defendants Principal Global Investors, LLC, Principal Financial Group, Inc.; Principal Life Insurance Company; Principal Management Company; Principal Real Estate Investors, LLC; and John Does 1-20 (collectively "Defendants"), move to dismiss in part the Amended Consolidated Complaint ("Amended Complaint") of Plaintiffs Francisco Carpio, Eric Cruise, Greta de Kock, David Engelbert, John Fischer, Jaime Jover, Denis Mullaney, Heinz Rosen and Michael E. Zall ("Plaintiffs").

I.      **INTRODUCTION**

Principal Life Insurance Company ("Principal Life") offers retirement plans the opportunity to invest in the Principal US Property Separate Account ("Property Account" or "Account") through group annuity contracts issued by Principal Life.  Plans electing to invest do so pursuant to decisions by each plan's fiduciaries to invest the plan's assets or to offer their plan participants the opportunity to elect to invest their retirement funds in the Account.  The Property Account is typically only one of many investment strategies used by these plans.

The Property Account invests in directly owned real estate, meaning that it owns actual property[1] that is bought and sold in private real estate transactions, a fact disclosed to the Property Account's investors.  In the 26 years since the Property Account's inception in 1982, it has always maintained sufficient liquidity (cash reserves) to accommodate requests by investors to cash out their investments.  However, the unprecedented global financial crisis that started in 2008 and was prompted in large part by the sudden collapse of the U.S. real estate mortgage markets, generated unprecedented numbers of requests by the Property Account's investors to redeem all or part of their investments.  Indeed, the Amended Complaint filed by Plaintiffs in this case alleges that Property Account investors sought to withdraw between 25% and 35% of

---

[1] The Property Account also uses single purpose vehicles such as partnerships and limited liability companies to acquire and hold real estate, as is common in the industry.

the entire value of the Property Account.

Faced with limited cash reserves and virtually no buyers for any of the Property Account's real estate, Principal Life invoked its right under the group annuity contracts to delay withdrawals until enough of the Account's real estate could be sold to pay off the withdrawing investors.  This was accomplished through the imposition of a withdrawal limitation on September 26, 2008.  The withdrawal limitation is the subject of Plaintiffs' Amended Complaint.[2]

Plaintiffs allege that the Defendants breached their ERISA duties by failing to foresee the global financial collapse and "manage" the Property Account in a way that would have allowed Plaintiffs to instantly exit the Account at the Account's stated value when they demanded their withdrawals.  Plaintiffs demand to be put in the position they would have been in but for this alleged breach.  But, putting Plaintiffs in such a position would require assuming that it would have been prudent for the Property Account to maintain a cash cushion of 25%-35% of its entire assets, which would have vastly reduced the Property Account's returns over the years and defeated its purpose – to invest in real estate.[3]  It would also be detrimental to the interests of the substantial majority of the Property Account's investors who did not request withdrawals, because putting Plaintiffs in the position they seek would require reducing the Property Account's historical returns to reflect a 25%-35% cash reserve and paying Plaintiffs more than the Account received when it sold real estate to redeem their investments.

---

[2] Plaintiffs incorrectly describe the limitation as a "Withdrawal Queue", which suggests the investors seeking to withdraw were put in line and serviced on a first come first served basis.  (Am. Compl. ¶ 4).  In fact, investors requesting withdrawals were paid out *pro rata* when funds became available and all withdrawal requests made on or before November 11, 2010 have been paid.

[3] Despite the crash in the real estate markets, the Property Account has earned a compounded annual net return of 5.57% since its inception. http://www.principalglobal.com/us/puspa/performance.aspx.  The Court can take judicial notice of the fact that cash investments offering the kind of liquidity demanded by Plaintiffs, such as 90-day Treasury Bills, would have generated far lower returns over the same period. http://www.federalreserve.gov/releases/h15/data/Annual/H15_TB_M3.txt.

While Plaintiffs' claims raise a number of legal and factual issues strongly favoring dismissal, Rule 12 does not provide the means of resolving them all.  Rule 12 does, however, require that Plaintiffs plead facts establishing their statutory standing to pursue the claims stated in the Amended Complaint.  Under ERISA §§ 502(a)(2) and (3), Plaintiffs are not authorized to sue on behalf of a class consisting of participants in ERISA plans that Plaintiffs do not participate in and admittedly have no knowledge of.  Thus, while Plaintiffs can attempt to state claims to recover "losses" to plans in which they participate, they lack statutory standing to assert claims to recover losses on behalf of all other ERISA plans.

Rule 12 also requires Plaintiffs to allege facts from which the Court can reasonably conclude that each Defendant acted as an ERISA fiduciary in a manner relevant to Plaintiffs' claims.  Plaintiffs allege, based on two documents, that Principal Financial Group, Inc. ("PFG, Inc.") is a proper fiduciary defendant due to its role in a "Due Diligence Program."  But the documents attached to the Amended Complaint give rise to no such inference and other "Due Diligence Program" documents make it clear that Defendant Principal Life is responsible for the operation of the Property Account, not PFG, Inc.

Accordingly, as set forth more fully below, all claims Plaintiffs purport to assert on behalf of ERISA plans in which they do not participate should be dismissed, as should all claims against PFG, Inc.

## II.    FACTUAL BACKGROUND AND KEY ALLEGATIONS OF THE AMENDED COMPLAINT

### A.    Pertinent Features Of The Property Account.

The Property Account is a commingled insurance company separate account that invests primarily in directly-owned commercial real estate.  (Amended Consolidated Complaint ["Am. Compl."] ¶ 31; Ex. 19, p. 1 (ZALL000001); Ex. 21, p. 2 (D-ERISA-000223)).  The Property

- 3 -

Account is established by Principal Life, managed by Principal Real Estate Investors ("PrinREI"), and is made available to tax qualified retirement plans. (Am. Compl. ¶ 32; Ex. 19, p. 4 (ZALL000004), Ex. 9 (D-ERISA-000317); Ex. 21, p. 2 (D-ERISA-000223)). Plans that choose to invest in the Property Account do so pursuant to decisions by the plans' fiduciaries to purchase group annuity insurance contracts issued by Principal Life that govern the terms of the Plans' investments in the property Account. (Am Compl. Ex. 19, pp. 4, 8 (ZALL000004, 8)). Many of the plans that invest in the Property Account are defined contribution plans and are "self-directed," meaning that participants have the ability to direct the investment of their accounts among investment options selected by each plan's fiduciaries on a daily basis. (Am. Compl. ¶ 10).

Unlike other funds that invest in public securities sold on an exchange, the Property Account invests in actual real estate, such as office and apartment buildings bought and sold in private transactions. (Am. Compl. ¶ 31; Ex. 19, p. 1 (ZALL000001)). Accordingly, Principal Life consistently disclosed that the Property Account was subject to liquidity risk. For example, fact sheets and performance materials generally stated that the Property Account "is subject to investment and liquidity risk and other risks inherent in real estate such as those associated with general and local economic conditions." (Am. Compl. Ex. 19, pp. 8, 11 (ZALL000008, 11); *see also* Ex. 9, §§ 16 and 17 (D-ERISA-000320-21)). Further, the group annuity contracts entered into by plan fiduciaries permit Principal Life to limit withdrawals from the Property Account should conditions warrant it. (Am. Compl. Ex. 19, pp. 8, 11 (ZALL000008, 11) ("Payment of principal and earnings may be delayed").[4]

---

[4] These disclosures also appear on the Property Account's fact sheet, which is publicly available at www.principal.com. (Am. Compl. Ex. 19, pp. 6, 9 (ZALL000006, 9)).

Consistent with these contractual provisions, the Property Account's Plan of Operation explains: "Principal Life has reserved the right to temporarily or permanently terminate the ability of all contractholders to make contributions or transfers to this Separate Account . . . . Principal Life also reserves the right to limit or defer any particular contractholder's right to make contributions or transfers to this account . . . ." (Am. Compl. Ex. 9, p. 6 (D-ERISA-000320)). The Plan of Operation includes a "Liquidity Policy," which functions to ensure that "anticipated liquidity needs, including but not limited to benefit events and withdrawals, can be efficiently incorporated into the business plan for the [Property Account]." (Am. Compl. Ex. 9, Liquidity Policy Attachment (D-ERISA000333)). From the Account's inception in 1982 until 2008, the Property Account was able to meet withdrawal requests on a daily basis. (Am. Compl. ¶ 43; Ex. 19, p. 1 (ZALL000001); Ex. 4, p. 2 (D-ERISA-000130). However, because the assets of the Property Account were invested in directly owned real estate, the Account could not be instantaneously liquidated if necessary to meet extraordinary withdrawal requests. (Am. Compl. ¶¶ 43-44; Ex. 19, p. 1 (ZALL000001)) (reflecting same).

     B.     **The 2008 Credit Market Crisis And Defendants' Implementation Of The "Withdrawal Queue."**

The unprecedented global financial crisis that began in 2008 and was brought on largely by turmoil in the real estate lending markets caused dramatic drops in the value of residential and commercial real estate nationwide. This financial calamity stimulated withdrawal requests from the Property Account at levels never seen before as investors sought to flee the real estate market. (Am. Compl. ¶ 84; Ex. 19, p. 1 (ZALL000001)). The liquid funds held by the Property Account were quickly exceeded by these unprecedented withdrawal requests, and the requests could not be immediately honored because it was impossible to sell the Account's real estate holdings quickly enough to provide the cash necessary to honor them. (Am. Compl. Ex. 19, pp.

- 5 -

1-3 (ZALL000001-3)).  Moreover, selling the Property Account's real estate holdings in a "fire

sale" on markets embroiled in the turmoil of the credit crisis would be devastating to the interests

of the substantial majority of Account's investors who did not request withdrawals, as well as the

Plaintiffs themselves.  (*Id*. at p. 5 (ZALL000005)).

       Accordingly, withdrawal limitations were implemented in order to protect the interests of

all investors in the Account.  The limitations became effective September 26, 2008 and provided

that withdrawals from the Property Account would be delayed until sufficient liquidity was

available.  (Am. Compl. Ex. 18, p. 5 (D-ERISA-001359); Ex. 19, p. 11 (ZALL000011)).  As of

the date hereof, all requests subject to the withdrawal queue made on or before November 11,

2010 have been processed and paid.[5]

       **C.**     **The Amended Complaint's Material Allegations.**

       The Amended Complaint alleges that Defendants should have invested the Property

Account assets to maintain sufficient liquidity to cover withdrawals no matter how unforeseeable

the level of economic turmoil and consequent withdrawals might be.  (Am. Compl. ¶¶ 2, 10, 57-

75, 84-85, 118, 120).  For example, taking the allegations of paragraph 84 as true, Plaintiffs

effectively allege that the Property Account should have maintained a constant liquidity

"cushion" of between 24% and 34% of its entire net asset value.  Moreover, Plaintiffs contend

that they should have been paid out instantaneously at the value of the Account units when they

requested their withdrawals, rather than the value when the distributions were actually made, to

the detriment of the majority of investors who did not request withdrawals.  (Am. Compl. ¶¶ 4-5,

84-86).  Accordingly, Plaintiffs claim they have been damaged "because they have been forced

---

[5] The Property Account continued to pay out withdrawals to participants (or beneficiaries) who became entitled to distributions under their plans due to death, disability, qualified retirement and financial hardship without regard to the withdrawal limitation.  (Am. Compl. Ex. 19, p. 2 (ZALL000002)).

to wait [for withdrawals] as the reported value of their investment in the Property Account ha[s] plummeted." (Am. Compl. ¶ 85).[6]

 The nine Plaintiffs allege that they are participants in nine different ERISA defined contribution plans that offered the Property Account as an investment option.  (Am. Compl. ¶¶ 15-23).  Plaintiffs do not indicate whether they are current or former employees of the companies that sponsor these plans and they do not attempt to sue the fiduciaries of their plans, who made the decisions to offer Plaintiffs the Property Account that Plaintiffs chose to invest their accounts in.  Plaintiffs purport to assert claims to recover losses not only to their own 401(k) plan accounts, but also to *all other* "qualified ERISA defined contribution plan participants and beneficiaries that invested directly or indirectly in the Principal U.S. Property Account between September 26, 2008 and the present . . . whose Plans or plan accounts have suffered losses since they were placed in the Withdrawal Queue."  (Am. Compl. ¶ 109). Plaintiffs do not allege that they were participants, beneficiaries or fiduciaries of any of the "hundreds if not more" of other ERISA plans under which they purport to sue.  (Am. Compl. ¶¶ 10, 15-24, 109-10, 113).  The Amended Complaint is devoid of any factual allegations regarding the "losses" that Plaintiffs seek to recover on behalf of those plans.  For example, the Amended Complaint contains no allegations as to when those participants invested in the Property Account and requested withdrawals.

 The Amended Complaint correctly alleges that Principal Life is a fiduciary of the

---

[6] Of course, the Amended Complaint makes no mention of what could have happened to the Property Account's assets *without* the Withdrawal Queue.  Amended Complaint paragraph 84 alleges that the value of Account units at the imposition of the Withdrawal Queue was $720 and that, by December 31, 2009, it had fallen to $429.  Paying the Plaintiffs at $720 per unit when cash became available and the true value of Account units was substantially less would favor the Plaintiffs at the expense of the continuing investors.  For example, if three investors in a fund each owned one-third of the fund's units and one demanded a distribution when the units were valued at $700 and was paid $700 but after the underlying assets were actually liquidated at a true value of $500, the unit value of the continuing investors' interest would drop to $400 solely because the departing investor got paid more than the true value of the units at the time of the distribution.

Property Account by virtue of its control over the Account.  (Am. Compl. ¶ 25).  However, the Amended Complaint also alleges that PFG, Inc. was a fiduciary of the Property Account because, through the Principal Due Diligence Program, PFG, Inc. allegedly exercised discretionary authority with regard to the appointment and monitoring of the investment fiduciaries for the Property Account.  (Am. Compl. ¶ 97).  The Amended Complaint describes the Principal Due Diligence Program as a "'qualitative and quantitative' review process 'for identifying, selecting, and monitoring investment management firms' for investment options, including the Property Account."  (Am. Compl. ¶ 97; Ex. 22 (D-ERISA-000434-35)).  Through the Due Diligence Program, the Amended Complaint avers, PFG, Inc. placed PrinREI on a "Watch List" and had the power to monitor and remove PrinREI and PGI as Property Account fiduciaries.  (Am. Compl. ¶¶ 97, 140; Ex. 22 (D-ERISA-000434-35)).[7]  PFG, Inc.'s failure to remove PrinREI and PGI, the Amended Complaint alleges, violated PFG, Inc.'s duty to loyally and prudently monitor Property Account fiduciaries.  (Am. Compl. ¶ 144).

III.   **ARGUMENT**

Under Rule 12(b)(6), a court should dismiss a complaint if it fails to set forth "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, 'it stops short of the line between possibility

---

[7] Although the Amended Complaint alleges that PrinREI was placed on the Watch List, the cited document states that the Property Account, sub-advised by PrinREI, was placed on the Watch List.  (Am Compl. Ex. 22 (D-ERISA-000434-35)).

- 8 -

and plausibility of entitlement to relief.'"  *Id.* (*quoting Twombly*, 550 U.S. at 570).  Allegations

that are "implausible," even if all reasonable inferences are drawn in Plaintiffs' favor, cannot

withstand a motion to dismiss.  *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 (8th

Cir. 2010).

     While the Court must take all facts alleged in the Amended Complaint as true,

"threadbare" assertions of a cause of action are insufficient.  *Dubinsky v. Mermart, LLC*, 595

F.3d 812, 816 (8th Cir. 2010).  This tenet (i.e., that a court must accept as true all of the

allegations contained in a complaint) "is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at

1949.  Thus, a complaint "that offers 'labels and conclusions' or a 'formulaic recitation of the

elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550

U.S. at 555).

    A.    **Plaintiffs Lack Standing To Pursue Claims On Behalf Of ERISA Plans Other Than Their Own.**

    Plaintiffs allege they are suing on behalf of a class of "hundreds" of plans and their

participants in addition to the nine plans in which Plaintiffs participate.  However, before Rule

23 is considered, it is Plaintiffs' burden to establish standing, or the right of each Plaintiff to

bring this action.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To sustain their

claims Plaintiffs must demonstrate *both* constitutional and statutory standing.  Constitutional

standing refers to the case or controversy requirement under Article III, while statutory standing

concerns whether the person whose standing is challenged is a proper plaintiff under the terms of

the statute in question.  *See Brown v. Medtronic*, 619 F. Supp. 2d 646, 649 (D. Minn. 2009).

    1.    **ERISA Does Not Afford Plaintiffs Statutory Standing To Sue On Behalf Of Plans With Which They Have No Relationship.**

    ERISA expressly confers standing on four classes of plaintiffs:  participants,

beneficiaries, fiduciaries and the Secretary of Labor.  *See* 29 U.S.C. § 1132(a).  Plaintiffs allege

standing to sue under ERISA Sections 502(a)(2) and (3) as "participants."  (Am. Compl. ¶ 10).

Section 502(a)(2) permits a "participant" to sue for "appropriate relief under section 1109,"

which states in relevant part, "[a]ny person who is a fiduciary with respect to a plan who

breaches any of the responsibilities . . . imposed upon fiduciaries by this subchapter shall be

personally liable to make good to *such* plan any losses to *the* plan . . . ."  29 U.S.C. § 1109(a)

(emphasis added).  Similarly, Section 502(a)(3) authorizes suit by a "participant" "to enjoin any

act or practice which violates any provision of this subchapter or the terms of *the* plan, or . . . to

enforce any provisions of this subchapter or the terms of *the* plan."  29 U.S.C. § 1132(a)(3)

(emphasis added).  Obviously, this statutory language presumes that the "participant" bringing

suit is a participant in the plan for which he seeks relief.[8]  Here, Plaintiffs have not alleged that

they were participants, beneficiaries or fiduciaries in or of any of the ERISA plans for which

they purport to seek relief other than in the nine separate plans identified in the Amended

Complaint. (Am. Compl. ¶ 113; *see also id.* ¶¶ 10, 15-23, 109).  Plaintiffs therefore lack statutory

standing to bring claims on behalf of any other ERISA plans.

        In *Ruppert v. Principal Life Insurance Co.*, Case No. 06-CV-903-DRH, 2007 WL

2025233 (S.D. Ill. July 9, 2007), Judge Herndon reached a similar conclusion on substantially

identical facts.  Like Plaintiffs here, Ruppert claimed a nationwide class of retirement plans that

invested in funds offered by Principal had suffered losses as a result of alleged breaches of

---

[8] *See Hastings v. Wilson*, 516 F.3d 1055, 1060-61 (8th Cir. 2008) (holding that ERISA plaintiffs lacked standing to bring suit claiming defendants breached fiduciary duties related to plans in which plaintiffs did not participate); *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (holding that plaintiffs lacked standing to sue for violations of ERISA's disclosure requirements because they were not participants in the plan at the time of the alleged violation); *Miller v. Rite Aid Corp.*, 334 F.3d 335, 345 (3d Cir. 2003) (holding that employee who voluntarily resigned and thus became ineligible for any severance in the future was not an ERISA plan "participant" with standing to sue); *Piner v. E.I. DuPont de Nemours & Co.*, 238 F.3d 414 (Table), 2000 WL 1699837, at *4 (4th Cir. Nov. 14, 2000) (holding that a participant in one plan maintained by his employer had no standing to sue his employer for failure to provide information about another plan, where he was concededly not a participant in the other plan); *In re SLM Corp. ERISA Litig.*, No. 08-4334 (WHP), 2010 WL 3910566, at *12 (S.D.N.Y. Sept. 24, 2010) (holding that plaintiffs lacked statutory standing to assert class claims on behalf of a plan in which they were not participants, beneficiaries or fiduciaries).

ERISA fiduciary duty by Principal Life and other affiliates.  However, Ruppert served as a fiduciary of only one of the thousands of Plans he purported to include in his putative class.  The court granted Principal Life's motion to transfer venue from the Southern District of Illinois to this District and the plaintiff moved for reconsideration, arguing that the court had failed to give sufficient weight to the number of plans in the putative class serviced by Principal Life within the Southern District of Illinois (137 total).  The court rejected Ruppert's argument, holding that "while Ruppert is a fiduciary of [his] Plan with standing to sue on behalf of [that] Plan, he does not have standing to sue on behalf of plans of which he is not a fiduciary."  *Id.* at **3-4 (collecting cases).[9]  The court went on to conclude that "Ruppert's lack of standing to sue on behalf of plans of which he is not a fiduciary renders irrelevant the question of the total number of plans serviced by Principal in this District and elsewhere."  *Id.* at *4, citing *LoPresti v. Citigroup Inc.*, 171 Fed. Appx. 900, 901 (2d Cir. 2006) ("To recover on his ERISA claims, Appellant was required to establish that he was a fiduciary of an ERISA plan and that … [it is] the same plan in which the violations [of fiduciary duty] are alleged to have occurred."); *Sanofi-Synthelabo Inc. v. Eastman Kodak Co.*, No. 99 Civ. 4888 LAP, 2000 WL 1611068, at **3-4 (S.D.N.Y. Oct. 27, 2000) (a plaintiff has no standing to bring suit for breach of fiduciary duty on behalf of a plan of which he was never a fiduciary); *Modern Woodcrafts, Inc. v. Hawley*, 534 F. Supp. 1000, 1013-14 (D. Conn. 1982) (trustees of an employee benefit plan lacked standing to sue for breach of fiduciary duty on behalf of a different employee benefit plan); *Smith v. Hickey*,

---

[9] Ruppert brought suit in his capacity as a fiduciary of a single plan and was also a participant in that plan.  The distinction is irrelevant since the question is the same in either case -- whether a party seeking to sue under ERISA is one of the parties specifically authorized to sue in Section 502(a).  *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27 (1983) ("ERISA carefully enumerates the parties entitled to seek relief under § 502; it does not provide any one other than the participants, beneficiaries, or a fiduciaries with an express cause of action").  After *Ruppert* was transferred to this District, Judge Jarvey assumed without deciding that Ruppert had standing to represent the Rule 23 class of other plans he proposed but declined to certify the class for a number of reasons equally applicable here.  *See Ruppert v. Principal Life Insurance Co.*, 252 F.R.D. 488, 498-99 & n.3 (S.D. Iowa 2008).

482 F. Supp. 644, 650 (S.D.N.Y. 1979) (plaintiff fiduciaries of an employee benefit plan lacked standing as "fiduciaries" under ERISA to sue the fiduciaries of a different plan because the plaintiffs had never been fiduciaries of the latter plan).

Other decisions from this and other Circuits reinforce Judge Herndon's conclusion.  For example, in *Hastings*, 516 F.3d at 1055, two plaintiffs brought breach of fiduciary duty claims involving two of Northwest Airline's pension plans, the IAM Plan and the Pilots Plan.  Plaintiffs were participants in the IAM Plan, but not the Pilots Plan.  *Id*. at 1058.  The Eighth Circuit affirmed the dismissal of plaintiffs' claims with respect to the IAM Plan because they were subject to mandatory arbitration under the Railway Labor Act (*id*.), but the court also affirmed the dismissal of plaintiffs' claims under the Pilots Plan because the plaintiffs were not participants in that Plan and, therefore, lacked statutory standing under ERISA to sue.  *Id.*; *see also Acosta v. Pac. Enter*., 950 F.2d 611, 617 (9th Cir. 1991) (holding that plaintiff lacked standing to sue on behalf of a plan in which he did not participate); *In re SLM Corp.*, 2010 WL 3910566, at *12 (same); *In re ING Groep N.V. ERISA Litig*., No. 1:09-CV-0400, 2010 WL 1704402, at **4-5 (N.D. Ga. Mar. 31, 2010) (same); *In re Reliant Energy ERISA Litig*., 336 F. Supp. 2d 646, 653-54 (S.D. Tex. 2004) (same).  These decisions confirm that the Court should dismiss Plaintiffs' claims to the extent they are asserted on behalf of other plans in which Plaintiffs do not participate because the language of ERISA Section 502(a) is clear: only participants, fiduciaries or beneficiaries in/of a plan have statutory standing to sue for losses under *their* plan.

2.   **Asserting Claims On Behalf Of A Purported Class Does Not Excuse Plaintiffs' Lack Of Standing**

Plaintiffs will undoubtedly argue that *Fallick v. Nationwide Mutual Insurance Co*., 162 F.3d 410 (6th Cir. 1998), supports the notion that Rule 23 expands statutory standing under

ERISA and relieves them of their obligations to establish standing to sue on behalf of the

unidentified plans they purport to represent.  The *Fallick* decision has not been adopted by any

court in this Circuit and Defendants respectfully submit that this Court should not adopt it in this

case because, as set forth more fully below, it reflects an impermissible expansion of statutory

standing under ERISA.

In *Fallick*, the plaintiff sought to represent a class of all participants in Nationwide-

insured ERISA health plans whose benefits were denied based on Nationwide's application of

"reasonable and customary" charge limitations.  162 F.3d at 423.  The district court denied

certification of the class and the Sixth Circuit reversed, ruling that "once the district court

correctly determined that Fallick had standing to bring suit under ERISA against Nationwide

with respect to its application of reasonable and customary limitations . . . , the court should then

have analyzed whether Fallick satisfied the criteria of Rule 23 with respect to the absent class

members."  *Id.*

In reaching its conclusion, the Sixth Circuit addressed the interplay between Rule 23 and

Article III constitutional standing – not ERISA statutory standing, which is a separate question –

and decided that, once the plaintiff had established an injury, Rule 23 enabled him to sue on

behalf of any participant in any ERISA plan that suffered the same injury.  *Fallick* did not

squarely address the question of statutory standing under ERISA,[10] but noted  "courts have

recognized that the standing-related provisions of ERISA were not intended to limit a claimant's

---

[10] In contrast, when the Sixth Circuit *has* decided statutory standing under ERISA, the court has expressly addressed and applied the relevant statutory provisions.  *See, e.g., Taylor Chevrolet Inc. v. Med. Mut. Servs. LLC*, 306 F. App'x. 207, 211-13 (6th Cir. 2008) ("fiduciary" standing under ERISA Section 502(a)); *Bridges v. Am. Elec. Power Co., Inc.*, 498 F.3d 442, 444-45 (6th Cir. 2007) ("participant" standing under ERISA Section 502(a)); *Crawford v. Roane*, 53 F.3d 750, 753-55 (6th Cir. 1995) ("beneficiary" standing under ERISA Section 502(a)).  Further, in *Bridges*, the Sixth Circuit reiterated the *difference* between Article III standing and ERISA statutory standing.  *See Bridges*, 498 F.3d at 444 ("This case turns on whether Bridges is a 'participant' in the Plan, a question of 'statutory standing' (not Article III standing).").

- 13 -

right to proceed under Rule 23 on behalf of all individuals affected by the challenged conduct,
regardless of the representative's lack of participation in all the ERISA governed plans
involved." *Fallick,* 162 F.3d at 423.

However, the "courts" referred to by the *Fallick* panel, *Forbush v. J.C. Penney Co., Inc.*,
994 F.2d 1101 (5th Cir. 1993), and *Sutton v. Med. Serv. Ass'n*, No. 92-4787, 1993 WL 273429
(E.D. Pa. July 20, 1993), do not support the panel's conclusion.  Indeed, the *Fallick* panel
ultimately relied on those decisions *not* to support a ruling on statutory standing, but rather to
support the court's holding as to Article III standing: "once a potential ERISA class
representative establishes his individual standing to sue his own ERISA-governed plan, there is
no additional *constitutional* standing requirement relating to his suitability to represent the
putative class of members of other plans to which he does not belong."  *Id.* at 424 (emphasis
added).

While *Forbush* and *Sutton* may have supported *Fallick*'s holding that the plaintiff had
Article III standing, neither supports the notion that Rule 23 trumps (and expands) ERISA's
statutory standing provisions.  Indeed, *Forbush* did not address ERISA statutory standing at all
and simply held that the plaintiff could assert class claims under four benefit plans sponsored by
his employer where he challenged the employer's "common" pension-offset practices for Social
Security benefits.  *Forbush,* 994 F.2d at 1106.  *Sutton* allowed a participant in one ERISA plan to
assert claims on behalf of participants in other ERISA plans insured by the same company to
challenge allegedly misleading explanation-of-benefit forms, concluding that the named plaintiff
could represent the class because the action would not "expand" the remedies available under
ERISA.  *Sutton,* 1993 WL 273429, at **4-5.  However, the court did *not* address ERISA's
express limitation that a participant can sue only with respect to the plan in which he or she is

- 14 -

actually a "participant," nor did the court address the interplay between this aspect of statutory

standing and Rule 23.  29 U.S.C. § 1132(a).

To the extent that *Forbush* or *Sutton* can be read as supporting *Fallick*'s conclusion that

Rule 23 can expand ERISA statutory standing rights,[11] they (as well as *Fallick*) are inconsistent

with the Rules Enabling Act, which was reinforced in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815

(1999), and *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  Neither of these controlling

cases was considered by *Fallick* (*Oritz* post-dates it), and *Fallick* ignores the admonition that "no

reading of the Rule [23] can ignore the [Rules Enabling Act's] mandate that rules of procedure

'shall not abridge, enlarge or modify any substantive right.'"  *Oritz*, 527 U.S. at 845 (quoting 29

U.S.C. § 2072(b) and *Amchem*, 521 U.S. at 612).  This Court's power to hear Plaintiffs' claims

derives from and is limited by ERISA's substantive civil enforcement provisions – not Rule 23.

Indeed, *Fallick*'s outcome is exactly backwards.[12]  As the Supreme Court explained in

*Mertens v. Hewitt Associates*, the appropriate question is not whether ERISA "bar[s]" a suit, but

rather "whether the statute affirmatively authorizes such a suit."  508 U.S. 248, 254 n.5 (1993).

Far from authorizing suits against other plans, ERISA's plain language precludes a plaintiff from

challenging decisions affecting ERISA plans in which he or she does not participate.  *See* 29

U.S.C. § 1132(a).  These provisions are no accident.  ERISA's legislative history indicates that

Congress intended to limit participant claims for breach of fiduciary duty to participants' *own*

---

[11] A few courts have read *Fallick* to encompass statutory standing.  *E.g.*, *Rawls v. Unum Life Insurance Co. of America*, 219 F. Supp. 2d 1063, 1068-69 (C.D. Cal. 2002); *Mulder v. PCS Health System, Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003).

[12] In a footnote, *Fallick* also commented that the Ninth Circuit's standing analysis in *Acosta*, 950 F.2d at 617 (holding that a participant in one plan lacked standing to sue on behalf of other plans in which he did not participate), was "correct" in an individualized action but suggested that, had the plaintiff in *Acosta* purported to bring a class action, the Ninth Circuit's analysis of whether the plaintiff would have represented participants in other plans "would have depended solely on whether his relationship with those class members satisfied Rule 23, not a separate determination of standing . . . ."  *Fallick*, 162 F.3d at 422 n.9.  The Sixth Circuit provided no authority for this dicta.

- 15 -

plans.  *See* H.R. Conf. Rep. No. 1280, at 148, 327, 93d Cong., 2d Sess. (1974), *reprinted in*, 3

Leg. Hist. 4594 ("[i]n addition to being able to request the Secretary of Labor to bring suit on

their behalf . . .individual participants and beneficiaries will also be able to bring suit in Federal

court . . .to obtain redress of fiduciary violations. . . . [and that] participants and beneficiaries

may bring suit to recover benefits denied contrary to the terms of *their* plan . . . .") (emphasis

added).  In contrast, Congress intended to vest the Secretary of Labor with broad public powers

to enjoin "practices" by fiduciaries which allegedly violate ERISA provisions.  *Id.*  Thus, ERISA

provides a statutory mechanism for broad groups of employee benefit plans to have their rights

asserted by the Secretary, not through "private attorney general" participant lawsuits under Rule

23.  Permitting Plaintiffs to bring suit on behalf of other plans in which they do not participate

would effectively eliminate the requirement of statutory standing and invade the sphere of public

enforcement delegated to the Secretary.

   Although it has had the opportunity to do so, the Eighth Circuit has not adopted *Fallick*.

In *Hastings*, the court concluded that the plaintiffs "must have standing to pursue their breach of

fiduciary duty claims involving the Pilot Plan and cannot rely on *Fallick* . . . to obtain such

standing."  *Id.* (citing *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) (holding that an

individual who lacked standing to sue under one ERISA plan could not obtain standing over that

same plan by asserting claims on behalf of a purported class)).  Defendants are not aware of a

single district court within the Eighth Circuit that has applied *Fallick*, and it is unlikely that this

Circuit would adopt *Fallick*'s view of statutory standing given the Eighth Circuit's restrictive

approach to standing under ERISA Section 502(a).  *See, e.g.*, *Harley v. Minn. Mining & Mfg.*

*Co.*, 284 F.3d 901, 907 (8th Cir. 2002) (refusing to apply ERISA Sections 502(a)(2) and 409(a)

to permit monetary relief to overfunded defined benefit where "investment loss did not cause

- 16 -

actual injury to plaintiffs' interests in the Plan"); *McCullough v. Aegon USA, Inc.*, 585 F.3d 1082, 1085-87 (8th Cir. 2009) (reaffirming *Harley*'s restrictive view of standing and extending it to claims for injunctive relief); *Hastings*, 516 F.3d at 1061; *Hall*, 140 F.3d at 1196.[13]

These decisions are consistent with the Supreme Court's refusal to "infer [additional] causes of action in the ERISA context" (here, a cause of action on behalf of participants in plans with which Plaintiffs have no relationship whatsoever) given the statute's "carefully crafted and detailed enforcement scheme[.]" *Mertens*, 508 U.S. at 254; *see also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA."). Accordingly, the Court should dismiss the claims that Plaintiffs purport to assert on behalf of plans other than those in which Plaintiffs themselves participate.

**B.    Plaintiffs' Monitoring Claim Against PFG, Inc. Fails As A Matter Of Law Because PFG, Inc. Had No Appointment, Monitoring, Or Removal Authority Over Property Account Fiduciaries.**

Under ERISA, fiduciaries who have appointed other fiduciaries have a continuing duty to monitor the actions of the appointed fiduciaries. *Crocker v. KV Pharm. Co.*, --- F. Supp. 2d ----, No. 4:09-CV-198 (CEJ), 2010 WL 1257671, at *27 (E.D. Mo. Mar. 24, 2010). Thus, to state a valid monitoring claim, Plaintiffs must allege, at a minimum, that the entity charged with the monitoring breach was responsible for appointing and removing the fiduciary responsible for the fiduciary conduct at issue. *Id.*

---

[13] In *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), the Eighth Circuit cited *Fallick* to support the propositions that "a plaintiff with Article III standing may proceed under § 1132(a)(2) on behalf of the plan or other participants" and "a plaintiff may seek relief under § 1132(a)(2) that sweeps beyond his own injury." *Id.* at 593. However, the claims in *Wal-Mart* were limited to the plan in which plaintiff was a participant, and the issue in *Wal-Mart* was whether plaintiff had standing to assert claims to recover losses to the plan based on alleged breaches under that plan that did not directly affect him. *Id.* Thus, *Wal-Mart* simply follows Section 502(a)(2)'s authorization of a participant to sue to recover losses to *his* plan even if he has not been directly injured by those losses, and the decision has no bearing on the ability of Plaintiffs here to assert claims on behalf of *other* plans in which they have never participated.

Here, in Count II, Plaintiffs allege that PFG, Inc. maintained the Due Diligence Program through which it had the power to select, monitor, and remove PrinREI and PGI as fiduciaries for the Property Account and that PFG, Inc. failed to loyally and prudently monitor PrinREI and PGI.  (Am. Compl. ¶¶ 28, 97, 140, 144).  Two Due Diligence Program documents, attached as Exhibits 12 and 22 to the Amended Complaint, provide the sole basis for Plaintiffs' allegation regarding PFG, Inc.'s fiduciary selection, monitoring, and removal authority.  Neither document explains PFG, Inc.'s role in the Program.  Apparently Plaintiffs base their monitoring allegation against PFG, Inc. on the inclusion of the following language in the Due Diligence documents: "We value your relationship with the Principal Financial Group.®"  (Am Compl. Ex. 12 (D-ERISA-000481); Ex. 22 (D-ERISA-000434)).

On the face of this document, the reference to "Principal Financial Group" is not to PFG, Inc. but rather to the Principal Financial Group registered trademark.  Moreover, even if this reference could be attributed to PFG, Inc., neither Exhibit 12 nor Exhibit 22, nor the information contained in the two exhibits combined, provides a reasonable basis upon which to infer that PFG, Inc. had any selection, monitoring, or removal authority with respect to Property Account fiduciaries.  The documents say nothing about PFG, Inc.'s role in the Due Diligence Program or its role with respect to selecting, monitoring, or removing Property Account fiduciaries.  In fact, the documents state that plan administrative services for Separate Accounts, including the Property Account, are provided by Principal Life.  (Am Compl. Ex. 12 (D-ERISA-000482); Ex. 22 (D-ERISA-000435)).

Other Due Diligence Program documents, not attached to the Amended Complaint but properly considered by the Court here, make clear that PFG, Inc. had no selection, monitoring,

- 18 -

and removal authority with respect to Property Account investment fiduciaries.[14]  Although these

Program documents are not attached to the Amended Complaint, they are central to and

"necessarily embraced by the complaint" because Plaintiffs' allegation that PFG, Inc. is a

Property Account fiduciary is based exclusively on the existence of the Due Diligence Program

and PFG, Inc.'s alleged role within the Program.  Therefore, these documents may be considered

in deciding a Rule 12 motion to dismiss.  *Enervations, Inc. v. Minn. Mining & Mfg. Co. (3M)*,

380 F.3d 1066, 1069 (8th Cir. 2004) ("Though matters outside the pleading may not be

considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the

complaint are not matters outside the pleading.") (citations and quotations omitted)).

        The attached documents demonstrate that PFG, Inc. had no selection, monitoring, and

removal authority with respect to Property Account investment fiduciaries.  Each Due Diligence

Quarterly Review pertaining to Separate Accounts, which include the Property Account, contains

the following language:  "Principal Life Insurance Company, as an investment manager, [not

PFG, Inc.] is a fiduciary with regard to the selection, monitoring and retention of the portfolio

managers for its Separate Accounts."  (Ex. A, Quarterly Review 2nd Quarter 2008, p. 2; Ex. B

Quarterly Review 3rd Quarter 2010, p. 2).  The Due Diligence Program 2009 Year in Review

document similarly recognizes that "Principal Life [] is a fiduciary with respect to the . . .

selection and monitoring of portfolio managers for our Separate Accounts."  (Ex. C, 2009 Year

in Review, p. 1).  Another Due Diligence Program document explains that Principal Life is a

fiduciary with respect to the selection and ongoing monitoring of portfolio managers for Separate

Accounts and that Principal Life's fiduciary status and obligations are specified in its written

agreements.  (Ex. D, How to Compare Retirement Plan Investment Services Providers, July

---

[14] The Due Diligence Program documents referenced herein are attached to the Declaration of Marianne Hogan as
Exhibits A through F.

2009, p. 5).  In a section labeled "Responsibilities of [Principal Life]," yet another Due Diligence

Program document states:  "For each Principal Life . . . Separate Account (or Sub-Advised

Investment Option), Principal Life has responsibility for . . . selecting, evaluating, and

monitoring investment managers."  (Ex. E, Managing Your Fiduciary Responsibilities, p. 1).

These documents, central to and embraced by the Amended Complaint, demonstrate that

Principal Life, not PFG, Inc., has appointment, monitoring, and removal authority with respect to

Property Account investment fiduciaries.  The Amended Complaint reinforces the central role of

Principal Life, alleging that it "established and maintains the Property Account . . . through

Principal Life's employees and subsidiaries, Principal Life manages the retirement plan assets in

the Property Account.  Principal Life's Investment Committee and Real Estate Committee

review, approve and supervise all real estate asset transactions involving Principal Life assets . . .

.  Principal Life also makes valuation determinations concerning the value of units issued by the

Property Account."  (Am. Compl. ¶ 25).  On the face of the Complaint and the documents central

to it, PFG, Inc. had no such authority; therefore Plaintiffs' monitoring claim against PFG, Inc.

fails as a matter of law and must be dismissed.

IV.     **CONCLUSION**

For the reasons set forth above, the Court should (1) dismiss all claims asserted on behalf

of ERISA plans other than the plans in which Plaintiffs participate; and (2) dismiss PFG, Inc. as

a Defendant.

Dated: November 24, 2010                    MORGAN, LEWIS & BOCKIUS LLP

                                            */s/ Gregory C. Braden*
                                            Gregory C. Braden (admitted pro hac vice)
                                            gbraden@morganlewis.com
                                            1111 Pennsylvania Avenue NW
                                            Washington, DC 20004
                                            Tel: (202) 739-3000
                                            Fax: (202) 739-3001

Deborah S. Davidson (admitted pro hac vice)
ddavidson@morganlewis.com
77 West Wacker Drive
Chicago, IL 60601-5094
Tel: (312) 324-1000
Fax: (312) 324-1001

Nicole Diller  (admitted pro hac vice)
ndiller@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: (415) 442-1000
Fax: (415) 442-1001

WHITFIELD & EDDY P.L.C.

Brian L. Campbell, AT0001361
campbell@whitfieldlaw.com
317 Sixth Ave., Suite 1200
Des Moines, IA 50309-8002
Tel: (515) 246-5503
Fax: (515) 246-1474

ATTORNEYS FOR DEFENDANTS

DB1/66086414.4

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory C. Braden, hereby certify that on November 24, 2010, a copy of DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION TO PARTIALLY DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT FOR ALLEGED VIOLATIONS OF ERISA was filed electronically, and is being served electronically this date upon all involved parties participating in the Court's electronic filing system or first-class mail, postage pre-paid.

Dated: November 24, 2010                MORGAN, LEWIS & BOCKIUS LLP

_/s/ Gregory C. Braden_
Gregory C. Braden (admitted pro hac vice)
gbraden@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 739-3000
Fax: (202) 739-3001