IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IN RE PRINCIPAL U.S. PROPERTY ACCOUNT ERISA LITIGATION | **No. 4:10-cv-00198 – JEG**<br><br>**O R D E R**<br>**FILED UNDER SEAL**[1] |

This matter is before the Court on Plaintiffs' Corrected Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 of this action brought against Defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1131, 1132(a)(3) for alleged breaches of fiduciary duty.  Defendants resist.  Also before the Court is Defendants' Motion to Strike the report of Plaintiffs' expert Dana Messina, which Plaintiffs resist.  A hearing was held on the Motions on June 25, 2013.  Attorneys Cari Laufenberg, James Bloom, and David Goldman were present representing Plaintiffs, with attorney Andrew Lencyk appearing by telephone.  Attorneys Brian Campbell and Gregory Braden were present representing Defendants.  The Motions are fully submitted and ready for disposition.

I.    **BACKGROUND**

   A.  **Factual Background**

      1.  **The Account**

Since 1982, the Account has been an "open-end, commingled real estate fund sponsored by Principal Life Insurance Company ("Principal").  The Property Account is managed by

---

[1] Pleadings, exhibits, and documents submitted and relied upon in support and resistance of the pending Motions were filed under seal subject to the Stipulation and Order for the Production and Exchange of Confidential Information filed on June 2, 2010, ECF No. 71.  In resolution of these Motions, it was necessary for the Court to discuss material that is subject to the Stipulation and Order, and therefore the Court filed this Order under seal.

PrinREI." Berg Decl. ¶ 4, ECF No. 161. "The Account is managed as a diversified real estate equity fund that acquires and holds primarily high quality, well-leased real estate properties in the multi-family, industrial, office, retail and hotel sectors." Id. ¶ 5. John Berg (Berg) has been the lead portfolio manager for the Account since 2003, and he has been the Managing Director of Portfolio Management since 2005. He and three other individuals manage the Account on a day-to-day basis and are involved in the Account's investment property selection, strategic development, marketing, and investor relations.

Berg stated that "Principal estimates the net asset value for the Property Account on a daily basis," which, along with valuation adjustment recommendations provided by an independent valuation consultant, are incorporated into the Account's unit value; the public can access the daily unit values at Principal's website. Id. ¶ 6. Berg stated that the Account returns for 1999-2007 were between 4.9-20.0%; 2008 had negative 12.2% returns; 2009 had negative 30.8% returns; and the Account returns improved in 2010 for a 17.3% return and in 2011 for a 16.7% return. The annualized return since the Account's inception in 1982 is 7.14%, as of December 31, 2011. The Account directly owns actual buildings and land, and "[s]ince 1999, over 90% of the Account's gross asset value is and has been invested in real property," with two brief exceptions. Id. ¶ 10.

Berg noted that "[c]ash is generally held for investor liquidity, transactional and property maintenance purposes only," and "[c]ash holdings are generally limited as cash dilutes the Account's returns." Id. ¶¶ 11-12. "Levels of cash are disclosed and publicly accessible in the Account's Annual Reports and Quarterly Reports"; Quarterly Reports can be accessed at Principal's website. Id. ¶ 12 (footnote omitted). Berg stated that from 1999 to 2011, the

2

Account's year-end cash balances ranged anywhere from 0.9% to 6.7% of the Account's gross assets.  Berg further explained,

> The underlying real estate in the Property Account is sold in private transactions that may take months or even years to complete and are subject to the vagaries of the real estate and credit markets.  This process involves listing the property, offers and counter-offers, property inspections, obtaining buyer financing, etc.  Accordingly, the ability to impose a withdrawal limitation is part of every contract entered into by Property Account investors.

Id. ¶ 13.

As defined in the Separate Account Plan of Operation (SA Plan of Operation) - Introduction, Separate Accounts are "designed to be used in conjunction with certain group annuity contracts and funding agreements . . . issued by Principal Life . . . ."  SA Plan of Op. - Intro., Ex. 14 to Pls.' Br. on Mot. for Class Cert., ECF No. 162-1.  The SA Plan of Operation goes on to detail that "Principal Life has reserved the right to temporarily or permanently terminate the ability of all contractholders to make contributions or transfers to this Separate Account," and "Principal Life also reserves the right to limit or defer any particular contractholder's right to make contributions or transfers to this account."  Id. ¶ 16.  Before the 2008 economic crisis hit, the Account never imposed a withdrawal limitation for its investors.  However, the Account imposed its first limitation on cash-inflows from 2004-2007 to "allow for orderly Account growth and prevent dilution of Account earnings."  Berg Decl. ¶ 15.

Then, starting in 2008, Berg states that "the unprecedented crisis in the real estate and credit markets materially impacted asset values, impaired liquidity and significantly diminished commercial real estate transaction volume."  Id. ¶ 17.  From 2007 to 2009, there was an 89% drop in the real estate transaction volume, so "the ability to dispose of real estate, including Account assets, was significantly compromised – with much of the available capital for acquisition coming from 'bottom fishers' looking to buy at 'fire sale' prices."  Id.  Berg stated that

"[c]ash flows out of the Property Account dramatically outpaced new contributions as investors sought to reduce their real estate allocations or exit the real estate market entirely."  Id.

The SA Plan of Operation defines that "[t]he purpose of this Separate Account is to give eligible contractholders of Contracts more investment flexibility and diversification than would otherwise be possible."  SA Plan of Op. - Part I: Separate Acct. Ops. ¶ 2, ECF No. 162-1. Additionally, it promises that "Principal Life shall not sell, exchange, or otherwise transfer any asset held for investment, other than cash, between separate accounts or between separate and other accounts except as permitted by New York Insurance Law."  Id. ¶ 7.  The Separate Account is limited almost entirely to holding real estate, as "[n]o stock, bond, note, or other security of any subsidiary or affiliate of Principal Life shall be allocated to this Separate Account, nor shall any stock, bond, note, or other security of any company controlling or under common control with Principal Life be so allocated."  Id. ¶ 8.  In keeping with the "separate" nature of the Separate Account, "[i]ncome, gains, or losses, whether or not realized, from assets allocated to this Separate Account shall, in accordance with the applicable Contracts, be credited to or charged against the Separate Account without regard to Principal Life's other income, gains, or losses."  Id. ¶ 9.

The SA Plan of Operation, which was provided to investors and accessible on Principal's website, specifically states that

> Principal Life has reserved the right to temporarily or permanently terminate the ability of all contractholders to make contributions or transfers to this Separate Account.  In addition, upon due notice as specified in a particular Contract, Principal Life may also close out this Separate Account and require that the assets associated with each Contract be redirected to another investment option available under the Contract in accordance with the directions of the contractholder or, if the contractholder fails to provide directions, as specified under the terms of the Contract.

4

Id. ¶ 16.  The SA Plan of Operation further provides that "Principal Life also reserves the right to limit or defer any particular contractholder's right to make contributions or transfers to this account" and promises that they will give advance notice to the contractholder if any such limitation is to be implemented.  Id.

In addition to limitations on investors' abilities to transfer assets into the Separate Account, the SA Plan of Operation also sets forth Principal's contractual rights to limit withdrawals, stating "[t]he maximum delay possible for making payments and transfers from this Separate Account is three (3) years, unless a longer delay is approved by the New York Insurance Department."  Id. ¶ 17.  The SA Plan of Operation further states that

> While transfers and withdrawals are normally processed within seven days after Principal Life receives the request, Principal Life reserves the right to defer payment . . . .  If the total amount of withdrawal requests exceeds the limits specified in the Contract, Principal Life reserves the right to make these payments in installments, using the procedure specified in the Contract.  This procedure "spreads out" the payments over a period of months, which should limit the harm caused by such withdrawals to the other contractholders with an interest in the Separate Account.  Payments or transfers which are deferred or paid in installments, in accordance with this paragraph, will be made using the applicable unit value for the valuation date immediately preceding the date payment or transfer of each installment is to be made.

Id. ¶ 18.  "The value of an interest on any date is determined by multiplying the number of units held by the unit value at the close of that valuation date."  Id. ¶ 21.  "Any delayed transfer is treated as if it were a 'payment' for purposes of this Paragraph, i.e., these transfers will be made using the unit value in the computer system at the time the payment is made.  Transfers are considered to be delayed transfers if . . . the request for a transfer is delayed in accordance with Paragraphs 17 and 18."  Id.

As set forth in the Plan of Operation - Part Two: Investment Policy,

> The primary investment objective of the account is to maximize total returns from investments in commercial property at a risk level appropriate for retirement plans.

> Secondary investment objectives for this Separate Account are to provide orderly cash flows for the separate account, to maintain the type of liquidity required for the day-to-day operations of the separate account, and to reduce the risks associated with investing in any one type of investment or maybe one particular investment. Because of the pooled nature of this Separate Account, Principal Life will balance these investment objectives based on the needs of all contractholders and plan members who have assets in this Separate Account.

SA Plan of Op. - Part II: Inv. Policy ¶ 1, ECF No. 162-1. The Plan of Operation Investment Policy section further states that the Separate Account's "investment portfolio will primarily contain real estate investments that are producing income or will ultimately produce current income," and that "[b]ecause of the inherently illiquid nature of the real estate investments, Principal Life generally will select the investments and manage this Separate Account in a manner which is designed to meet the anticipated liquidity needs of the Separate Account." Id. ¶ 2.

The Plan of Operation Investment Policy section also provides the Liquidity Policy for the Separate Accounts:

> Liquidity to cover contingencies is provided through several sources. Among these sources are: new deposits and cash flow from scheduled principal and interest payments from investments are available; the account may be partially invested in short-term (cash equivalent) instruments and cash holdings can be increased as needed; account holdings can be sold; and finally, funds may be borrowed from external sources.

Id. ¶ 5. "In implementing this Liquidity Policy, Principal Life will attempt to balance the needs of the various contractholders and plan members with assets in the Separate Account." Liquidity Policy - Attachments to SA Plan of Op. ¶ 2. This means seeking "to balance the needs for quick payments of benefits against the long-term investment needs of those with ongoing investments in the Separate Account." Id. "However, in seeking to balance these needs, Principal Life will pay special attention to the needs of plan members who have benefit payments due under a plan because of death, disability, retirement, or termination of employment." Id.

6

In order to meet the short-term cash needs of the Separate Account, Principal will use assets available from the following: "(i) cash or cash equivalent investments, (ii) cash flow from properties (*e.g.*, rent payments), (iii) sale of more liquid types of real estate, (iv) sale of Real Estate Investment Trust ("REIT") investments, (v) short-term borrowing by the Separate Account, and (vi) sale of other properties." Id. "Over time any one of these liquidity sources . . . will be used in different combinations or amounts depending on Principal Life's experiences, anticipated liquidity needs for the Separate Account, specific circumstances existing at a given time, and other appropriate factors." Id.

As set forth in the Addendum to the Account Investment Policy Statement, the Separate Account "operates as a well-diversified, open-end real estate equity fund consisting primarily of higher quality, well leased real estate properties in the multifamily, industrial, office, and retail sectors," and "is designed to have a moderate risk profile compared to other open-end real estate funds." Add. to Acct. Inv. Pol. Stmt. 4, ¶ 5.a., ECF No. 162-2. This "[m]oderate fund level risk is accomplished by operating with a strong liquidity focus, strong client diversification, and more limited fund-level obligations, such as forward commitments and fund-level leverage." Id. Additionally, "[a] moderate real estate property risk profile is accomplished by investing primarily in smaller and stable properties on an un-leveraged and direct basis." Id. The Separate Account "remains well diversified by property type, tenant, and geographic area." Id. The Separate Account's liquidity strategy is set forth numerically in the Addendum to the Account Investment Policy Statement as follows:

| Short term liquidity: | 1) Cash balances | 1-5% |
| | 2) Short-term borrowings: | 7-10% |
| | 3) Property cash flow | 2-5% |
| | Total | 10-20% |

> Longer term Liquidity:  Long term borrowing capacity (to a maximum of 33% leverage) and property sales

Id. ¶ 5.c.

Michael Gaul (Gaul) has worked at Principal in its Retirement and Investment Services (RIS) division since 1989.  Gaul has "been responsible for day to day corporate retirement plan operations since 2007, as a Director for RIS."  Gaul Decl. ¶ 2, ECF No. 165.  Primarily through its RIS division, Principal "is a leading provider of retirement services for defined contribution ("DC") and defined benefit ("DB") plans, serving more than 30,000 qualified retirement plans and over 3.2 million participants and retirees."  Id. ¶ 3.  "Principal currently makes available thousands of investment options to its retirement plan customers: over 3,000 mutual funds and over 70 sub-advised collective trust funds and insurance company separate accounts, including the Principal U.S. Property Separate Account."  Id. ¶ 5.

Julia Fitzgerald (Fitzgerald) has been the Assistant Director of Investment Operations for Principal Life since 2009, and she is "responsible for project operations related to Principal's investment platform and [is] aware of investment materials available to retirement plan partici-pants and fiduciaries related to the . . . Account."  Fitzgerald Decl. ¶ 2, ECF No. 163.  In her Declaration, Fitzgerald explained that "[t]he Account's investment materials were and are available to plan participants, plan fiduciaries and independent financial advisors [at] Principal's public website," and that "[f]rom January 1, 2004 to present, Principal disclosed in a number of ways that the Property Account is subject to liquidity risk and that payment of principal and earnings may be delayed."  Id. ¶¶ 4-5.  Fitzgerald stated that due to the "unprecedented economic conditions," Principal acted on September 26, 2008, to exercise "its contractually permitted right to delay withdrawal requests from the Property Account."  Id. ¶ 6.

8

### 2.   The Withdrawal Queue

Berg explained that "[f]rom March 2008 through September 2008, the Account experi-enced for the first time six consecutive months of negative outflows which reached a total of over $900 million, or approximately 15% of the Account's net asset value by September 2008." Berg Decl. ¶ 18, ECF No. 161.  Based on these unprecedented outflows, Principal decided on September 26, 2008, to exercise its right to impose a withdrawal limitation on investors seeking to withdraw or transfer their assets from the Account.  Id.  This resulted in withdrawal requests being delayed and put into a queue (the Queue) "until property could be sold to generate suffi-cient liquidity to satisfy the requests."  Id. (citing Exs. 29 & 10 to Berg's Decl.).

Berg explained that "[i]n order to satisfy all requests, the Account would have required almost 20% liquidity in late 2008 and almost 35% in 2009," which would have necessitated that the Account sell its real estate assets at "fire sale" prices due to the incredibly unfavorable mar-ket conditions.  Id. ¶ 19.  The Account's management, including Berg, believed such action "would not have been in the best interest of all Account investors, especially the majority that did not request withdrawals."  Id.  In the face of these two options – satisfy withdrawal requests and sell at fire sale prices or implement the Queue and protect the majority of investors who had not filed withdrawal requests – the Account management "believed [it] had a fiduciary duty to act," and that "[i]mplementing the withdrawal queue was the only option that had the potential to permit an orderly liquidation of property to satisfy the withdrawal requests, preserve as much of the Account's value as possible and balance the needs of all Property Account investors."  Id. ¶ 20.  Berg stated that by the end of 2008, numerous other investment companies offering similar

private equity real estate funds had instituted withdrawal limitations like the one imposed

by Principal.

Fitzgerald explained in her Declaration,

To notify plan fiduciaries, participants and advisors of the withdrawal limitation, Principal sent on September 25, 2008, an e-mail informing them that an important message regarding the Property Account was available in their secured access site at principal.com.  The statement on the secured access site explained that the payment of most withdrawal requests would be delayed, outstanding withdrawal requests would be paid proportionately and requests would be paid as sufficient cash becomes distributable and would be based upon the unit value as of the date of the distribution.

Fitzgerald Decl. ¶ 7, ECF No. 163 (citation and internal quotation marks omitted).

On September 26, 2008, "Principal made available on its secured access site a Question &

Answer document which was linked to the withdrawal limitation announcement."  Id. ¶ 8.  Also

on September 26, 2008, Principal "added a pop-up prompt to the secured access site utilized by

plan participants to change investment elections warning of the Account's withdrawal limitation

when a participant attempted to transfer funds into the Account."  Id. ¶ 10.  To further inform

investors about the Queue, in its Fourth Quarter 2008 participant account statements, Principal

advised every putative class member that the Queue was in place and that it would delay the

payment of most withdrawal requests for a period of time.  "Periodically, Principal also created

and made available on its secured access site additional information to update participants and

plan fiduciaries on the Property Account and the withdrawal limitation."  Id. ¶ 12.

Over one year after the Queue was implemented, the Account was able to make its first

distribution on January 28, 2010.  This first distribution "satisfied approximately 13% of the

value of transaction requests subject to the queue."  Berg Decl. ¶ 23, ECF No. 161.  "In

accordance with the Account's Plan of Operation . . . all payments were made on a pro-rata basis

and based on the unit values on the day payment was made."  Id.  In a similar fashion, partial

distributions were made on May 13, 2010; June 17, 2010; July 22, 2010; September 9, 2010; and

October 21, 2010.  Id. ¶ 24.  The distribution made on October 21, 2010, was the final pro-rata

payment, and all delayed withdrawal requests were satisfied on that day.  Any withdrawal

requests submitted after October 21, 2010, were also subject to withdrawal restrictions, though

none of these later requests were subject to delay in excess of 30 days.  "Each post-October 21

distribution resulted in a full payout of all queued withdrawal requests," and "[p]ayments were

based on the unit values on the date that payment was made."  Id. ¶ 25.  "As of March 24, 2011,

all requests subject to the withdrawal queue ha[d] been processed and paid."  Id. ¶ 26.

### 3.  Plaintiffs' Statements

Several plaintiffs/putative class members were deposed regarding what they experienced

when attempting to access assets from their Separate Accounts and ultimately being placed in

the Queue.

Plaintiff and putative class member John Fischer (Fischer) testified that he transferred

assets to the Account after the Queue was in place.  During a telephone call between Fischer and

a man named Solawi at Principal, Fisher admitted that he had received a notice message when he

transferred assets into the Account, but said he had not read it.  After Solawi consulted others at

Principal about the issue, Fischer was informed that because he received the notice message

before he transferred funds into the Account, Principal would not allow him to avoid application

of the Queue to his withdrawal request.  Fischer threatened to talk to people he knew at the U.S.

Attorney's office, and he requested to meet with Principal's CFO and was willing to fly to

Des Moines immediately to figure out how to deal with the problem.  When presented with the

transcript of his telephone call with Solawi, Fischer confirmed that it was accurate and that the

telephone call occurred, but continued to dispute that he had seen the notice message before he transferred his assets into the Account informing him that the Account had limited liquidity and any withdrawal requests would be queued.

Plaintiff and putative class member Jaime Rose Jover (Jover) confirmed in her deposition that her first request to withdraw part of her assets from the Account was denied and she then requested withdrawal of her entire investment in the Account to "pay bills."  Jover Dep., ECF No. 160-2.  Jover stated that she was unable to pay her mortgage, and she had to file for bankruptcy but admitted that she never filed a hardship request with Principal to try and transfer her assets out of the Account.  She also admitted never contacting Ms. Pidcock, who worked for Wynn Resorts, the administrator of Jover's 401(k) plan, and who had told Jover to call her if Jover had any questions about the hardship application.  Jover stated that she could not claim bankruptcy personally because of her 401(k) in the Account, and that she put her condo into bankruptcy in the summer of 2010 though she had no idea if it actually went into foreclosure sales.  She called Principal on January 21, 2009, to obtain copies of transcripts from her phone calls with individuals at Principal, and that was the first time she learned about the opportunity to use a hardship withdrawal, though that information was readily available on Principal's website. She explained that she never filed the hardship request because she thought it would only cover her most recent mortgage payment and not her arrears.

Plaintiff and putative class member Greta De Kock (De Kock) stated in her deposition that she wanted to move her assets from the Account to something more "secure," which she considered to be something that would guarantee interest and not decrease in value.  De Kock Dep. 134:1-134:13, ECF No. 160-3.  When she was laid off from her job in December of 2008, she wanted to roll her money over into an IRA rather than the Account, but her request was placed in the Queue.  De Kock explained during her deposition that she wanted to get her money out of the

Account to use those funds for college tuition, as she only had a two-year degree.  Principal informed De Kock that she may qualify for a hardship withdrawal to avoid the Queue, but she never followed through with such a request.  Additionally, she has not cashed out any of her other assets from other non-Principal accounts to use the money for college or any other purpose. Her understanding of the Queue is that she "know[s] that something is wrong if I can't transfer my money out, and it's locked, and – and being at the mercy of Principal.  I mean, something is wrong.  Someone is not doing something right."  De Kock Dep. 170:3-170:6.  De Kock felt that no matter what Principal had to do to the Account – even sell real estate at 50% of its value – Principal should have made sure she received her money on the day she requested it to be trans-ferred.  Additionally, when posed the question, De Kock agreed that Account investors should have received thirty to sixty days advanced notice before the Queue was put in place in September of 2008.

Plaintiff and putative class member Michael Zall (Zall) stated in his deposition that he "should recover whatever [his] value was at the time that that account was frozen" on September 26, 2008, regardless of when he requested such funds.  Zall Dep. 210:6-210:8, ECF No. 160-4.

Plaintiff and putative class member David Engelbert (Engelbert) agreed with the position espoused by the putative class representatives that all class members should be paid the value of their investment in the Account on the day the Queue was imposed – September 26, 2008. Engelbert also thought that Principal should have given investors in the Account advance notice of the Queue so they could withdraw funds before the Queue was in place.

Plaintiff and putative class member Eric Cruise (Cruise) stated in his deposition that he had not yet calculated what losses he wants to recover.  Cruise said that he had no claim regarding the investment management fees charged by Principal.

### 4.  Expert Reports

#### a.  Lassaad Turki

Lassaad Turki, Ph.D. (Turki) is Senior Vice President and head of the securities practice at Cornerstone Research, an economics and finance consulting firm.  Turki submitted an expert report on behalf of Defendants regarding the economic merits of Plaintiffs' proposed class. Turki stated that "Plaintiffs incorrectly assert that all Account investors were impacted identically by the portfolio management of the Account, the withdrawal limitations, and the Queue."  Turki Report 3, ECF No. 160-7.  He reasoned that additional liquidity in the Account would have negatively impacted pre-Queue Account returns, based in part on the additional liquidity utilized prior to implementation of the Queue.  Turki observed that the investment strategy utilized by Principal in 2008 affected Account investors differently:  "On one hand, long-term Account investors benefitted from the Account's actual pre-withdrawal limitation liquidity strategy as compared to plaintiffs' proposed liquidity strategy.  In contrast, other putative class members would not have been negatively affected by the higher liquidity levels demanded by plaintiffs."  Id.  Additionally, "[d]etermination of the effect of maintaining a liquidity level deemed 'prudent' by the plaintiffs would have to take into account transfers in and out of the Account."  Id.

According to Turki, the timing of each investor's entry into the Queue and the fact that some individuals cancelled their withdrawal requests while waiting in the Queue requires individualized analysis about the Queue's effect on each investor.  Id. at 4, 6.  Turki concluded that if Principal had done what Plaintiffs now believe to be the most prudent strategy and "had been forced to sell properties at distressed prices due to the lack of buyers and available credit in the

market, this would have disproportionately harmed investors who did not request withdrawals and may have resulted in a permanent impairment to the assets of the Account." Id. at 4.

As Plaintiffs would prefer to use the best-performing alternative when calculating how the class members' investments would have increased had they been able to transfer their assets out of the Account and into another fund, Turki explains that this alternative is problematic at the class certification stage, as "even if two participants entered and exited the Queue on the same days, they will likely have different 'best performing' alternatives in their 401(k) plans," and that differs even further when the individuals' entrance and exit days vary. Id. at 7. Because there were more than 13,000 plans represented in the Queue, Turki asserts that an incredibly individualized analysis to determine each individual's damages is required. Turki opines that it is not possible to develop a class-wide formula to calculate damages due to all of these individualized variables, and even if it were possible, "plaintiffs' use of multiple damage theories results in multiple distinct and conflicting classes." Id.

### b. Saul Solomon

Saul Solomon (Solomon), Director of the Berkeley Research Group, LLC, was retained by Plaintiffs to respond to portions of Turki's expert report, as well as to "explain how damages can be calculated in this matter on a class-wide basis and to provide a few examples of a typical ERISA damages methodology which could be implemented in this case." Solomon Report 2, ECF No. 193-1. Solomon noted that he had done a preliminary damages calculation of class members' out-of-pocket losses as well as calculations with an alternative investment method. Id. Solomon agreed with Turki's premise that the time at which an individual entered the Queue impacts the damages amount for each person and for the class as a whole but does not agree that

factor precludes class-wide calculation of damages.  Id. at 4.  According to Solomon, "[i]f the timing of contributions and withdrawals, or in this case the timing of requests for withdrawals, was accepted as an argument against class certification, then no class would ever be certified in any ERISA matter, or, indeed, any securities matter."  Id.

Solomon reported having used an alternative investment damages methodology numerous times in ERISA class action cases and has never had to perform individualized inquiries regarding whether each class member would have invested in the alternative.  However, he noted as follows:

> [I]f the Court determines that the alternative investment should be a weighted-average mix of the other investments held by each class member in his or her 401(k) plan, one can perform that calculation for each class member and sum up the results for all class members in order to arrive at damages for the class.  In addition, any rebalancing that occurred in each class member's 401(k) plan as well as any difference between the pending Queue transaction and the actual mix of investments held can be taken into account (assuming the necessary data is available).

Id. at 8.  Solomon reasoned that "if the Court were to direct that damages for each class member be based on the best performing alternative in that class members' particular plan, [Solomon] could perform that calculation as long as the data were available."  Id. at 10.

Solomon disagreed with Turki's position "that it is necessary to determine the reason for a cancellation," asserting it is unnecessary "to determine the reason for a withdrawal request in any ERISA class action damages calculation."  Id. at 7.  However, Solomon posited that "if the Court determines that different categories of cancellations should be treated differently for pur-poses of calculating damages, such a difference can be accounted for in a damages model."  Id.

Solomon discounted Turki's assessment that the fee disgorgement theory proposed by Plaintiffs "by definition, includes all participants in the Queue," and clarified that it "relates to the pro-rata portion of the fees relating to funds of the Plaintiffs and class members held in the

Queue." <u>Id.</u>  According to Solomon, both the best alternative theory and the fee disgorgement theory apply to the same group of individuals.  <u>Id.</u> at 9.  "Furthermore, the 'losses' damages methodology . . . incorporates into it the fee component of damages by virtue of the fact that the value of the account is reduced as a result of fees and damages are based on the differential between the value in the alternative and the Account."  <u>Id.</u>  "[I]f the Court finds it necessary to separately calculate the damages relating to the fees, this can be done for the class assuming the relevant data is made available."  <u>Id.</u>

Solomon believes the term "loss" in Plaintiffs' Motion for Class Certification refers to "out-of-pocket loss," not loss relative to the alternative investment option.  <u>Id.</u> at 10.  Solomon explains that "one would first determine the members of the class by calculating which Account investors had an out-of-pocket loss as a result of the implementation of the Queue. . . .  Next, for those class members damages would be calculated based on one or more alternative invest-ments."  <u>Id.</u>  As Solomon noted, since Turki was able to calculate those individuals who experienced an out-of-pocket gain, it stands to reason that Solomon should be able to identify those who experienced an out-of-pocket loss.

In sum, to determine who is in the class, Solomon believes the Court must determine who has an out-of-pocket loss, which means the Court must "compare[] the value that each investor would have received had his or her withdrawal requests not been placed in the Queue with the value that he or she actually received once the requested funds were eventually released or the request was cancelled."  <u>Id.</u> at 10-11.  Then, once the class is identified, the Court can calculate damages by comparing "the value that class members actually received once the funds were released from the Queue with the value they would have received had their withdrawal requests not been placed in the Queue and had instead been placed in one or more alternative

investments." Id. at 10. "In the case of calculating damages relative to an alternative investment other than cash, [Solomon] placed the value of the request that went into the Queue into the alternative investment on the date of the request. Then, on the date of the release . . . [he] compared the value in the alternative with the value actually received . . . to arrive at damages." Id. at 11. Solomon added up the out-of-pocket loss for the entire class, calculating that it was $173,345,516. Id. He also added the damages under his alternative investment methodology, finding a class-wide damages amount of $577,622,156. Id.

In his deposition, Solomon conceded that he had never created "a damages calculation involving a single case claiming losses under thousands of 401(k) plans." Solomon Dep. 21:12-21:14, ECF No. 193-2. With regard to the fact that the 145,000 putative class members have differing investment options in their 401(k) plans, Solomon stated that "you could track their investments individually and make a separate calculation," but "[i]t would be extremely costly to do because everybody's account, 145,000, would have individual transactions and individual activity that would have to be tracked into a variety of investments." Id. 21:20-21:25. In past cases, Solomon used the best alternative investment and applied it to each individual separately, but he had never applied more than a few alternative investment options in a case.

Solomon clarified in his deposition that the MSCI U.S. Real Estate Investment Trust Index[2] (the Index) is not actually an investment option and that he had not checked to see if any of the investments available to the putative class members tracked the Index when making

---

[2] The Morgan Stanley Capital International United States Real Estate Investment Trust Index "is a free float-adjusted market capitalization weighted index that is comprised of equity REITs" that "is an end of day, gross return index, available via Bloomberg and Reuters." MSCI, Index Definitions, http://www.msci.com/products/indices/country_and_regional/domestic_ equity_indices/reit/definitions.html (last visited Sept. 23, 2013).

investment decisions.  Solomon stated that his goal in using the Index as the alternative invest-

ment method was "not to find an investment that was offered in the fund that could have been

used as an alternative," but rather "to locate a fund that was basically, as close as we can get,

similar to the type of investment that the Principal fund was intended to be and generated a

return that we could use as a benchmark that the Principal fund theoretically could have achieved

if they had invested in a manner similar to the index."  Id. 33:21-34:3.  He used the Index "in

order to provide a proxy for a well-managed real estate investment option."  Id. 35:20-35:22.  He

did this because "had the queue not been necessary because of lack of liquidity, the fund would

have been in a different position in terms of its earnings and the return that would have been

earned by the plan participants who were desiring their money when they got it."  Id. 37:10-

37:18.  Thus, he was "measuring . . . the return that these other real estate funds were able to

generate during that time period as a proxy for what, if this fund were managed at least in a

similar manner to the index funds, would have realized during that time period."  Id. 37:18-

37:15.

　　Solomon also concedes that he has no basis for using another real estate investment proxy

as the alternative investment option, as his objective was to find a similar type of fund, "not to

try to indicate where people may have chosen to put the money on an individual basis."  Id.

39:21-39:22.  However, when Solomon does his "ERISA damages calculations in the context of

a stock drop case," he looks "first for an alternative investment to the options that are offered

under the plan."  Id. 39:24-40:1.  He does so because "that's what is offered in the plan and

that's the type of returns that the participants could have realized."  Id. 40:3-40-4.  Solomon

admitted that he never compared the returns shown in the Index to the returns of the investment

options the named Plaintiffs selected for their withdrawal requests from the Account, even

though that would have indicated what position the named Plaintiffs would have been in if there had been no alleged breach by Defendants.  Solomon explained that because there is no indication the Plaintiffs would have left the assets in their preferred alternative investment after withdrawal of their assets from the Account, the Index is a better option for his damages calculation. Solomon is unable to say who suggested using the Index as the alternative investment option for his damages calculation – Plaintiffs' counsel or one of his staff members – but "ultimately, the decisions of what went into the report were [Solomon's]."  Id. 43:8-43:11, 44:23-44:24.

Although he recognizes that the investors who chose to keep their money in the Account had different desires than those who chose to make withdrawal requests after the Queue was implemented, Solomon did not see this difference in investment strategy as a "conflict" for purposes of this case.  Id. 50:4-50:18.  He opined it was simply a difference in opinion.

In his past experience with ERISA class actions, Solomon has never dealt with a case where there were more than ten plans at issue; thus, he has never dealt with a case involving anywhere near 13,000 different plans.  Additionally, he cannot recall any of his past cases where the participants were denied the ability to transfer their assets or receive distributions.

When asked whether "the best-performing option . . . is inconsistent with the theory of putting the participant in the position they would have been in but for the breach because you don't know that all the participants would have invested in the best-performing option," Solomon answered, "[o]f course, but there are cases that have cited on this issue that the presumption that the courts have accepted, at least in some cases, would be the best-performing return would be utilized to calculate the loss."  Id. 60:7-60:15.  Solomon then cited a case he worked on involving a defined *benefit* plan, as opposed to a self-directed, defined *contribution* plan as is present here.  Solomon asserted that the rationale used in the defined benefit plan case

had nonetheless been relied upon in defined contribution plan cases, but Solomon was unable to cite those cases during his deposition.

Solomon said that in a previous case he had applied the best-performing alternative investment method for multiple plans within the same lawsuit, but acknowledged that in the previous case, there were only three plans, which were all sponsored by the same employer.  To calculate the best-performing alternative investment for 13,000 plans and 145,000 class members, Solomon admitted "[i]t would be a monumental task.  It would be a very complex and time-consuming calculation."  Id. 63:8-63:17.

In distinguishing between out-of-pocket loss and economic loss, Solomon noted that the economic loss calculation constituted the "entire economic impact of the issue," and that "you could have an out-of-pocket loss and no economic loss."  Id. 63:21-64:7.  Solomon said he did not think he had ever before addressed the issue of whether loss in the class certification phase of an ERISA case should be measured by an out-of-pocket loss as opposed to the economic loss.

Solomon acknowledged that someone with an out-of-pocket loss but no economic loss would be in the class, but would have no damages.  He opined that the Court should calculate damages for purposes of the class certification analysis using the economic loss calculation instead of the out-of-pocket loss formula.  Solomon's proposed calculation would include as class members individuals who cancelled withdrawal requests after they were placed in the Queue, without regard to the reason for the cancellation, as long as they suffered an out-of-pocket loss from the day their request was made to the day they cancelled their request. Solomon said he had not looked at the Teachers Insurance and Annuity Association-Cref Real Estate Account (the TIAA Account) in considering alternative investment options.

### c.   Dana Messina

Dana Messina (Messina), is a managing partner of the investment firm, Aria Partners GP, LLC, and principal of Kirkland Messina LLC, a firm that concentrates on leveraged buyouts and financial advisory services.  Plaintiffs retained Messina "to provide expert opinions regarding prudent fund management relating to the allegations that [Principal] breached [its] fiduciary duties under ERISA by failing to maintain adequate liquidity to provide for daily withdrawals from [the Account]" and to respond to Turki's expert report "regarding the effect of the Account maintaining greater liquidity."  Messina Report at 2, ECF No. 194-2.

Messina opined that Turki failed to "address how the Account, if it had been managed in a manner consistent with its mandate of providing daily liquidity, could have avoided the Queue altogether."  Id. at 3.  Messina reasoned that Turki's assessment that "additional liquidity would have diluted the Account's returns," neglected to consider (1) that the Account's objectives – daily withdrawal liquidity and being a low risk/fixed income fund – "should have informed its managers' investment decisions"; (2) "the numerous prudent non-cash options available to the Account's managers to provide daily liquidity which would have minimally impacted Account performance"; and (3) "that the Account's ability to provide daily liquidity has value in and of itself and the Account's failure to provide this liquidity deprived investors in the Account of a valuable benefit even apart from their capital losses."  Id.

Messina next reasoned that Turki's assessment that the liquidity shortfall created two choices – impose the Queue or sell the assets at fire-sale prices – "present[ed] a false dichot-omy," as "[t]he Account's managers had numerous choices for providing adequate liquidity for many years prior to the imposition of the withdrawal freeze."  Id.  Messina found Dr. Turki's conclusion that the Account managers could not have predicted the 2008 downturn flawed because (1) the Account managers were aware of and/or ignored red flags in the commercial real

estate market and the overall health of the economy; and (2) "the risks inherent in the 2008 downturn were not entirely unpredictable and the Account was not prepared for any number of adverse events." Id. at 3-4.

Messina's report focuses on the Account's objective of providing daily liquidity and a low-risk option for investors. In the report, Messina reasoned that the alleged unpredictability of the 2008 economic downturn is a Red Herring; the investors bought into the Account because it was a low risk investment offering daily liquidity, and when the Account "was unable to provide this liquidity it failed its investors and should be held accountable on this basis alone." Id. at 6. The report detailed that "[a]s early as 2006, the Account's managers should have been aware of the eventual decline (or at least the likelihood of potential decline) in real estate prices and the corresponding outflows of capital that typically occur in such downturns" and that "the Account was aware or should have been aware [of] the growth of housing prices to extreme levels and the risk that this pricing 'bubble' would burst." Id. at 6-7. Messina notes that "as early as 2006, emails reveal that there was growing concern internally over the potential for a decline in the real estate market and a reduction in the Account's asset base" and that although Berg had mentioned ways to increase liquidity in the Account at that time, the Account did not implement any such options to increase liquidity. Id. at 8. Thus, Messina concluded that the Account's managers neglected the Account's "low risk, fixed income profile and ignored the daily liquidity feature, apparently in order to obtain marginally higher returns." Id. at 10.

Messina opined that "[w]hile the timing of the 'run on the bank' can be unpredictable, a prudent fund manager knows such a risk exists and customarily obtains insurance, lines of credit, or keeps available liquid assets as a feasible means to manage through a variety of financial crises." Id. at 13. According to Messina, risks for which an account manager must prepare include: (1) "when a style of investing loses favor among the investing public," (2) "the poor

relative or absolute performance by a fund which can lead to massive withdrawals," or (3) "when a certain investment asset class loses favor among the investing public." Id. at 13-15. Messina concluded as follows:

> Given that these investment industry risks tend to occur more frequently than do broad-based economic declines, and can have an equally adverse effect on an investment's liquidity level, prudent fund managers prepare for these eventual dislocations in the investment and financial markets, no matter the historical success of the fund, by maintaining adequate liquidity, either directly or through insurance.

Id. at 15. Since the Account managers did not increase the Account's liquidity level before instituting the Queue, Messina concluded the managers acted imprudently in their management of the Account.

Messina further opined that Turki failed to consider non-cash alternatives for providing liquidity, such as (1) "[o]btaining a larger credit facility," (2) "[h]olding publicly traded REIT securities," or (3) "[o]btaining direct liquidity insurance." Id. at 16. Messina explained that "[a]n expanded credit facility could have provided a material amount of liquidity to weather substantial investor redemptions and in turn avoid the Queue" and while such expansion would be limited by the Account's real estate holdings, "it would not have been difficult for the Account to obtain a credit line of around 25% to 35% of the Account's assets," which "would have been sufficient to provide substantial and significant liquidity to investors." Id. at 17.

Another liquidity option proposed by Messina was "to hold a position in publicly traded REITs," which are "investment vehicles that trade on a public exchange and often times invest in illiquid real estate." Id. at 18. Unlike funds, REITs have permanent capital and "are much more liquid as compared to the Account's real estate holdings." Id.

Messina's third liquidity option was to obtain insurance on the Account's funding of daily withdrawals. Using the TIAA Account as an example, Messina explained that the TIAA Account, "an open-end real estate fund[,] which also provided daily liquidity[,] purchased

outright insurance for any liquidity shortfalls stemming from withdrawals." Id. at 19 (footnote omitted). Messina reported that the TIAA Account had a liquidity guarantee for its investors, wherein "TIAA's general account has agreed to purchase liquidity units," thus "guarantee[ing] that a participant can redeem accumulation units at their then-current daily net asset value." Id. at 19-20 (footnote omitted). This insurance cost TIAA Account investors "approximately $3.9 million for a fund with $14 billion in net assets or around 0.03% of the value of the fund." Id. at 20 (footnote omitted).

Messina opined that "[t]here was overwhelming evidence that the Account relied on the stream of new contributions to fund investor withdrawals." Id. at 24. "The imprudence of the Account's reliance on investor inflows as a primary source of liquidity was also heightened by the fact that investor contributions consistently made up the bulk of the Account's total cash inflows – outpacing rent and proceeds form [sic] property sales." Id. at 25. Messina surmised that the Account managers should have secured other forms of liquidity prior to 2008, as "[o]nce an adverse liquidity event is imminent, it can be very difficult and extraordinarily expensive to obtain liquidity." Id. at 26.

Messina also discredited the Account managers' decision to keep a low level of cash in the Account. According to Messina, "[t]he managers focused on performance, to the exclusion of all other considerations," and "[t]hese management decisions were diametrically opposed to the Account's guidelines which highlighted the Account's low risk and liquidity." Id. at 27. In financial terms, Messina equated the imposition of the Queue to "the investors having lost an option to sell their investment on a daily basis." Id. With his focus on liquidity as the main tenet of the Account, he maintained that "Principal was implicitly offering to investors the equivalent of a put option to sell their shares," as such an option "gives the holder the right to sell its invest-ment at a specific price." Id.

In his deposition, Messina acknowledged never having managed a real estate fund, worked in real estate development or investment, or published any articles or done any research about real estate investment or management.  Messina further acknowledged that in forming the opinion that the Account managers should have been aware of the housing price bubble and predicted the crash in the commercial real estate market, he had not done "any specific research to correlate the prices of residential and commercial real estate" and instead based his conclusion on his twenty-five years of investment experience.  Messina Dep. 33:14-34:20, ECF No. 193-5.  Messina agreed that in 2007, there were real estate professionals and managers predicting a slowing down no worse than in 2001 or 2002 and that there was a variety of opinion and debate on the matter.  Id. 46:14-46:20.  Messina clarified, however, that managers of a real estate investment fund that buys "illiquid assets" and promises daily liquidity, who knew there would be a decline, should have prepared for an economic downturn and have accounted for the possibility of other contingencies.  Id. 47:18-48:11.

Messina admitted that he had not analyzed the impact his liquidity measures would have had on the individual plan participants and that although he had predicted that some of the financial harm would occur in late 2007, he had not predicted the extent of the economic crash that occurred in 2008 and 2009.  Messina said he predicted that due to the extent of the leveraging, some investment banks would have problems, but that he did not foresee "it would sort of cascade into sort of every asset class, every industry, every country."  Id. 51:16-52:24.  Based on these predictions, Messina's investment firm bought "put" options, hedged where possible, and moved investments into cash during the third quarter of 2008, as it was clear by then that there were problems.  Id. 52:25-54:2.  Messina conceded that he did not "conduct any research in forming [his] opinions into whether managers of open end real estate funds foresaw the economic downturn and took action in advance to avoid it."  Id. 55:8-55:12.

26

Messina stated that in forming his opinion that the Account should have maintained 15% to 25% liquidity, he looked at a number of comparable funds focusing on publicly traded, real estate mutual funds with daily liquidity.  Messina confirmed that he also studied open-end, non-publicly traded, non-mutual, direct-owned commercial real estate funds looking for daily liquidity, and that of those funds, recalled that only the TIAA Account offered daily liquidity. Messina said that he did not have a record of the particular funds he analyzed, explaining that after making the initial determination that a fund did not have daily liquidity, he did not look any further at the fund because it was not relevant to his analysis.

Messina was asked about stated investment objectives, and he agreed that "in the fund world when you have stated fund objectives, that's not a guarantee that those objectives will in all events be met," including liquidity goals.  Id. 60:4-60:25.  Messina acknowledged that the documents governing the Account provided investors with notice that the Account managers reserved the right to impose withdrawal limitations if they deemed such action necessary but found it "very close to being irrelevant" because "almost every fund has . . . language . . . the lawyers write up to cover any and all sort of . . . events that can go on."  Id. 61:1-62:5.

With regard to the Account managers' actions in 2008 to increase liquidity, Messina stated that by then the Account already had liquidity trouble, so what Account managers did to increase liquidity at that point did not matter because it was already too late.  Messina opined that 15% to 25% liquidity would have been reasonable for the Account, but he has no idea if it would "have been sufficient to redeem all of the redemption requests in connection with the 2008, 2009, 2010 time frame."  Id. 70:7-70:24.  Messina acknowledged that in late 2008, "as the credit crisis unfolded and got worse, . . . a number of banks curtailed lines of credit and dramatically increased the costs of lines of credit."  Id. 92:24-93:3.  Messina clarified that in his opinion, the Account managers "should have had these lines of credit in place as sort of a general business

matter for [a] long time" because "in 2008, once you've driven off the cliff, . . . it was sort of too late to try and put a credit facility in place . . . ." Id. 93:3-93:11.

In order to keep liquidity as the top priority in the Account, Messina opined that the Account managers should have invested in REIT securities to ensure they could satisfy withdrawal requests, even if such investments increased risk and volatility in the Account. When it was pointed out that the Account guidelines prohibit REIT investments in excess of 2% of the Account's total assets, Messina conceded that his alternative investment strategy of having 10% of the fund's assets in REIT securities would have violated the Account's guidelines.

With regard to his proposition that the Account could have obtained liquidity insurance, Messina could not verify whether liquidity insurance for open-ended funds like the Account was even available in the marketplace, and he acknowledged that the TIAA Account was the only example of liquidity insurance he knew. Messina also acknowledged that even if the Account managers had maintained Messina's suggested 25% liquidity, they likely still would have been forced to sell Account real estate properties during the economic crisis to satisfy all of the withdrawal requests during that period of time.

### d.  Supplemental Report of Lassaad Turki

Turki submitted a supplemental report on behalf of Defendants in response to Solomon and Messina's expert reports. Therein, Turki summarized his findings, stating that "Plaintiffs (through their expert, Solomon) attempt to define the class using out-of-pocket losses rather than economic losses," and that "[t]his class definition yields a proposed class that is inconsistent with the set of participants who would have economic losses under Solomon's 'alternative' investment damages approach." Turki Suppl. Report at 1, ECF No. 194-1. Turki further stated that "Solomon's 'alternative' investment damages approach fails to return participants to the position in which they would have been but-for the alleged breach," and also that "Solomon fails

28

to address any of the participant-level impediments to calculating damages on a class-wide basis." Id. at 1-2.  In Turki's opinion, Solomon's damages model "does not result in the calculation of damages necessary to make putative class members whole for the losses they allegedly incurred." Id. at 2.

Turki noted that while both Solomon and Messina found that the additional liquidity that Plaintiffs promote would have had an impact on Account returns, "Solomon's flawed damages approach does not even attempt to address the impact of additional liquidity on the damages of putative class members." Id.  According to Turki, even if the damages approach used by Solomon was valid, Solomon's use of the Index as the "alternative" investment is flawed.  Id. Rather, the TIAA Account, which is the alternative investment option discussed in Messina's report, is exactly the type of open-end, commercial real estate fund with a daily liquidity guarantee that Solomon planned to use.  Turki then noted that the Account returns from 1999 through the end of the Queue period exceeded those of the TIAA Account, and therefore the "outperformance of the Account from 1999 through the end of the Queue period is consistent with the conclusion that an investor in the account would have been better off than an investor in the TIAA Account," and it is also "consistent with the conclusion that using the TIAA Account as the 'alternative' investment would result in negative damages."  Id.

Turki pointed out that Solomon's report has three main conclusions: (1) "the proposed class only includes those participants with an out-of-pocket loss while in the Queue," (2) "damages can be calculated on a class-wide basis using a single 'alternative' investment," and (3) "damages should be calculated using the MSCI U.S. REIT Index as the 'alternative' investment." Id. at 4 (footnote omitted).  Using Solomon's proposed class, which only includes individuals with an out-of-pocket loss while in the Queue, Turki calculated that it would result in a putative class of only 88,747 out of the possible 145,797 investors and would result in the

exclusion of two of the named proposed class members because one of them "had an out-of-pocket gain of $1,902" and the other "had an out-of-pocket gain of $214." Id. at 5.

Expounding on his contention that "the use of out-of-pocket losses as the determining factor for class inclusion is inconsistent with Solomon's flawed 'alternative' investment damages approach," Turki identified that "36,368 of the 57,050 putative class members who are excluded from the proposed class [because they broke even or had an out-of-pocket gain while in the Queue] incurred damages under Solomon's flawed damages approach." Id. at 5-6 (footnotes omitted). Additionally, "604 of the 88,747 members of the proposed class did not experience any economic losses under Solomon's flawed damages approach" and "this disconnect will occur regardless of the 'alternative' investment that is utilized." Id. at 6 (footnote omitted).

Turki opined that "Solomon's proposed damages approach completely fails to address any of the participant-level impediments to calculating damages on a class-wide basis," and that Solomon instead "characterizes these impediments as 'onerous,' 'time-consuming,' over-whelming,' and 'a monumental task' and then simply disregards them without performing any economic analysis." Id. (footnote omitted). According to Turki, Solomon disregards individual-level factors and promotes the alternative investment approach because Solomon "has utilized an aggregate 'alternative' investment approach in other ERISA matters (typically, so-called ERISA 'stock drop' matters)" and that in doing so, Solomon "fails to consider critical differences between ERISA 'stock-drop' matters and this matter." Id. at 6-7 (footnotes omitted). Turki explained that in stock-drop cases, "the theory of the case is that company stock became an imprudent invest-ment and should have been removed as a plan investment option on the date of imprudence." Id. at 7. Thus, "plaintiff-style damages calculations typically assume that the company stock

investment option is liquidated on the date it became imprudent to hold and the proceeds are invested in an alternative investment . . . from the same plan." Id. (footnote omitted).

However, in this matter, "the theory of the case is that the Account was imprudently managed and therefore participants were not able to exit the investment." Id. Here, "putative class members all actively submitted instructions regarding the desired destination of their Account assets (when they requested to transfer assets out of the Account)." Id. Detailing the disparate destination to which two Plaintiffs sent their Account holdings, Turki asserted, contrary to Solomon's assertion that it is unknown where the money would have gone, it is known where these investors sent their funds, and it was not the Index. Id. at 7-8. Accordingly, Turki concluded that "[c]orrectly determining and tracking the appropriate destination of these assets requires a participant-by-participant investigation." Id. at 8.

Turki additionally noted that "Solomon does not even attempt to determine a class-wide alternative investment that would have been commonly available to all proposed class members across all 13,000+ plans," but instead "selected as an alternative investment an *index* . . . that is not available as an investment option in any of the putative class members' 13,000+ plans." Id. (footnote omitted). Further, "Solomon concedes that he is unable to apply a class-wide alter-native investment that was available to all proposed class members." Id. Turki contended that "it is illogical to assume that the appropriate alternative investment for a cohort of people who no longer wished to invest in a real estate fund is a different type of real estate fund," making the Index an even less plausible alternative given that assumption. Id. at 11. Turki noted that "less than 2% of the putative class members' requests that were placed in the Queue were transfers from the Account to REIT or other real estate funds." Id.

Turki also discounted Messina's report, stating that "Messina's speculation that the additional liquidity necessary to avoid the implementation of the withdrawal limitation would have allowed the Account to honor its liquidity mandate with relatively little or no expense is incorrect." Id. at 3 (quotation marks omitted).  Turki opined that "[t]o the extent they were feasible, all of the liquidity strategies outlined by Messina – cash, credit facility, REIT securities, and liquidity insurance – would have negatively impacted the Account's returns prior to the implementation of the withdrawal limitation." Id.  Turki reasoned it was problematic that Messina did not "perform any analysis of the participant-by-participant impact of additional liquidity on the participants' Account returns to determine whether a participant would have been better off under his speculative conclusion that additional liquidity would have avoided the implementation of the withdrawal limitation." Id.  Turki reiterated that "Plaintiffs' opportunity cost-based damage theory cannot be applied on a class-wide basis," and that Account investors were not impacted identically by the management of the Account and the implementation of the Queue. Id.

Turki explained that "Messina's report focuses on issues related to merits, not class certification," as Messina "asserts that the Account was imprudently managed, that the managers took on too much risk, and that the Account should have been managed with greater levels of liquidity." Id. at 4 (footnote omitted).  Additionally, "Messina's conclusions are based on the speculative premise that the Account's portfolio managers had a 'mandate' to provide sufficient liquidity in order to avoid the need to implement a withdrawal limitation." Id. at 13 (footnote omitted).  Turki expressed his concern with the fact that Messina failed "to perform any analysis of the participant-by-participant impact of additional liquidity on Account returns." Id. at 24.

### B.  Procedural Background

On December 2, 2009, and December 4, 2009, in the Southern District of New York,

Plaintiffs and Putative Class Representatives filed two Class Action Complaints alleging

breaches of fiduciary duty in violation of ERISA against Defendants Principal Global Investors,

LLC (PGI), Principal Financial Group, Inc., Principal Life Insurance Co., and Principal Real

Estate Investors, LLC; one of the complaints included Defendants John Doe 1-20.  On January 4,

2010, the court consolidated the cases and appointed interim co-lead plaintiffs and ordered any

pending or subsequently filed actions arising out of the same operative facts to be consolidated

with the case.  The case was transferred on Defendants' motion to the Southern District of Iowa

on April 22, 2010.  On June 2, 2010, a second order of consolidation was filed, establishing a

master docket for the Consolidated Action, including subsequently filed actions, and ordered the

action recaptioned as: In re Principal U.S. Property Account ERISA Litigation.  On August 6,

2010, Plaintiffs filed a Consolidated Complaint adding Defendant Principal Management Corpo-

ration (PMC), listing several putative class representatives, and consolidating the claims against

the Defendants.  Plaintiffs filed an Amended Consolidated Complaint on October 22, 2010. On

January 31, 2011, Plaintiffs' claims against Defendant Principal Financial Group, Inc., were

dismissed without prejudice pursuant to the parties' stipulation.  On May 17, 2011, the Court

denied Defendants' Motion to Dismiss Plaintiffs' claims against the remaining Defendants.

On December 1, 2011, Plaintiffs filed this CORRECTED Motion for Class Certification.

Defendants filed their resistance on September 14, 2012, and requested oral argument on the

Motion.  On March 18, 2013, Defendants filed a Motion to Strike Messina Expert Report, which

Plaintiffs resist.  Both Plaintiffs and Defendants filed several Notices of Supplemental Authority

before and after the June 25, 2013, hearing.

## II.   DISCUSSION

### A.   Jurisdiction

Plaintiffs were participants in benefit plans defined under ERISA, 29 U.S.C. § 1002(2).

Plaintiffs allege Defendants breached fiduciaries duties owed to them under 29 U.S.C. §§ 1131,

1132(a)(3).  This Court has exclusive jurisdiction of claims arising under ERISA.  See § 1132(e).

### B.   Motion to Strike Messina's Expert Report

Defendants request that this Court strike Messina's expert report under Daubert v. Merrell

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), asserting that Messina's findings are irrelevant

for purposes of this Court's class certification determination.  Plaintiffs resist, arguing Defen-

dants' motion should be denied, or in the alternative, the Court must strike portions of Defen-

dants' briefing and exhibits, including portions of Turki's report.

District courts enjoy considerable discretion when ruling on a motion to strike.  See

Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc., 278 F.3d 742, 748 (8th Cir. 2001).  How-

ever, a motion to strike is not the proper vehicle to challenge affidavits and exhibits provided in

support of a motion.  The contested report does not constitute a pleading as anticipated by Rule

37.  See Fed. R. Civ. P. 7(a) (defining a pleading as including a complaint, an answer to a com-

plaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a

third-party complaint, an answer to a third-party complaint, and a reply to an answer when

ordered by the court).

As set forth by the Eighth Circuit, "[e]xpert disputes 'concerning the factual setting of the

case' should be resolved at the class certification stage only to the extent 'necessary to determine

the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true,

to make out a prima facie case for the class.'" In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 611 (8th Cir. 2011) (quoting Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir. 2005)).  "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.  That interest is not implicated at the class certification stage where the judge is the decision maker." Id. at 613.  Rather, "[t]he district court's 'gatekeeping function' under *Daubert* ensures that expert evidence "submitted *to the jury*" is sufficiently relevant and reliable, but '[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." Id. (second alteration in original) (internal citation omitted) (quoting Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001), and United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005), respectively).  That said, it is appropriate for this Court to conduct a "'rigorous analysis' of the parties' claims to determine 'whether the defendant's liability to all plaintiffs may be established with common evidence.'" Id. at 614 (quoting Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010)).

The Supreme Court in Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013), held that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id.

Defendants argue that Messina's report improperly focuses on the merits of the case – whether Defendants breached their fiduciary duty – and not on the class certification factors under Rule 23.  Defendants contend that Messina fails to provide discussion that is helpful at the class certification stage because Messina "opines that, in effect, none of the impediments to class certification cited by Defendants would exist if the Defendants had not allegedly breached their

fiduciary duties by 'imprudently' managing the Account."  Defs' Reply to Defs.' Mot. to Strike 1, ECF No. 203.  Plaintiffs contend that they "have demonstrated just what the Supreme Court requires – a *prima facie* showing that common questions predominate over individual questions," while "Defendants present a merits-based attack on the claims," and that Messina's report "directly **rebuts** arguments and factual assertions proffered by Defendants and their expert report, Dr. Lassaad Turki."  Pl. Resp. to Defs.' Mot. to Strike 1-2, ECF No. 199.  Plaintiffs claim that because Messina's report responds directly to Turki's report, Defendants' relevancy challenge must fail.

As set forth recently by the Supreme Court in <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1433 (2013), courts must go beyond the pleadings to determine whether the Rule 23 require-ments have been satisfied, including whether damages can be provided for on a classwide basis and whether classwide damages theories are tied to the theory of liability.  The Court rejected the lower court's rationale that the putative class had satisfied Rule 23 by providing "a method to measure and quantify damages on a classwide basis," and therefore it was "unnecessary [for the court] to decide whether the methodology [was] a just and reasonable inference or speculative."  <u>Id.</u> (second alteration in original) (citation and internal quotation marks omitted).

In the present case, the parties concede that in analyzing the requirements for class certifi-cation, the Court must consider merits-related issues to the extent they are relevant to this Court's Rule 23 analysis.  Although it is apparent that most – if not all – of Messina's expert report focused on the underlying merits of the case, the report meets the minimum relevancy requirement for this Court to consider portions of that report in making the class certification determination.  The Court will disregard statements contained therein that might be interpreted

as legal conclusions on the merits of Plaintiffs' breach of fiduciary duty claims.  Accordingly,

Defendants' Motion to Strike Messina's Report must be **denied**.

### C.  Plaintiffs' Corrected Motion for Class Certification

#### 1.  Standard for the Motion

"The class action is 'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only.'"  Comcast, 133 S. Ct. at 1432 (quoting Califano v.

Yamasaki, 442 U.S. 682, 700-01 (1979)).  "To come within the exception, a party seeking to

maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23."  Id.

(quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011)).  The party seeking

certification "must not only 'prove that there are *in fact* sufficiently numerous parties, common

questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as

required by Rule 23(a)," it "must also satisfy through evidentiary proof at least one of the pro-

visions of Rule 23(b)."  Id. (quoting Dukes, 131 S. Ct. at 2551).

District courts have broad discretion in determining whether a class should be certified

under Federal Rule of Civil Procedure 23.  Rattray v. Woodbury Cnty., IA, 614 F.3d 831, 835

(8th Cir. 2010) ("The district court is accorded broad discretion to decide whether certification is

appropriate, and [its determination] will [be] reverse[d] only for abuse of that discretion.").  A

class action is "peculiarly appropriate" when a case raises legal issues that are "common to the

class as a whole," as Rule 23 then provides an economical vehicle for resolution of the claims

before it.  Califano, 442 U.S. at 700-01.  "To be certified as a class, plaintiffs must meet all of

the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)."  In

re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005) (footnote omitted) (citing Amchem

Prods. Inc. v. Windsor, 521 U.S. 591, 613-14 (1997)).  Courts have also recognized, in addition

to the requirements of Rule 23(a) and (b), two "implicit" prerequisites for class certification: "1) that the class definition is drafted to ensure that membership is capable of ascertainment under some objective standard; and 2) that all class representatives are in fact members of the proposed class." In re Teflon Prods. Liab. Litig., 254 F.R.D. 354, 360 (S.D. Iowa 2008); see also Liles v. Am. Corrective Counseling Servs. Inc., 231 F.R.D. 565, 571 (S.D. Iowa 2005).

### 2. Parties and Claims

#### a. Management Defendants

Plaintiffs identify three Defendants as management fiduciaries of the Property Account: (1) Principal Real Estate, a portfolio manager for the Property Account; (2) Principal Global Investors, LLC (PGI), a diversified asset management organization that provided investment and reinvestment advisory services and produced reports regarding the Property Account; and (3) Principal Life, an insurance company that established the Property Account.  Defendants Principal Real Estate, PGI, and Principal Life admit they are ERISA fiduciaries only with respect to the investment and reinvestment of the Property Account assests.

#### b. Monitoring Defendants

Plaintiffs identify Principal Management Corporation (PMC) as a subsidiary of PGI and a fiduciary with respect to the Plans that provided investment advisory services to the Property Account.  In answer to the Amended Consolidated Complaint, Defendants deny this allegation.

#### c. Plaintiffs' Claims

Plaintiffs assert two causes of action against Defendants arising under ERISA § 502(a)(2) and (a)(3).[3]  Count One alleges Management Defendants violated ERISA § 404(a)(1)(B)[4] by

---

[3] Under ERISA § 502(a)(2) and (3), "[a] civil action may be brought – . . . (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or] (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice

imprudently failing "to manage the assets of the Property Account consistent with the Property Account's investment objective to maintain a strong focus on liquidity sufficient to permit daily withdrawals, at a low-to-moderate risk level appropriate for a fixed income retirement savings fund." Cor. Mot. Class Cert. 8, ECF No. 111.  Count Two alleges Monitoring Defendants violated ERISA § 404(a)(1)(B), by imprudently failing "to monitor the conduct of the management fiduciaries, thereby allowing the management fiduciaries to deviate from the Property Account's investment objective to maintain a strong focus on liquidity sufficient to permit daily withdrawals, at a low-to-moderate risk level appropriate for a fixed income retirement savings fund." Id.  Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Plaintiffs assert that Defendants are liable to restore the Plaintiffs' losses caused by Defendants' breaches of fiduciary duties and ask the Court to provide other equitable relief as appropriate.[5]

Plaintiffs essentially claim that Defendants have breached their statutory duty of care under ERISA.  See Christensen v. Qwest Pension Plan, 462 F.3d 913, 917 (8th Cir. 2006) (articulating that a claim under 29 U.S.C. § 1104(a)(1)(B) asserts a fiduciary violated their duty of care to

---

which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plans."  29 U.S.C. § 1132(a)(2) and (3).

[4] As set forth in ERISA § 404(a)(1)(B), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

[5] As set forth in 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

ERISA beneficiaries).  To recover under a duty of care claim for purposes of ERISA, the Plaintiffs "must prove a breach of this fiduciary duty and loss to the Plan."  Harley v. Minn. Min.and Mfg. Co., 284 F.3d 901, 905 (8th Cir. 2002).  "[T]he basic remedy for a breach of fiduciary duty is 'to restor[e] plan participants to the position in which they would have occupied but for the breach of trust.'"  Id. at 907 (quoting Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992)).

Thus, to prove their claim under ERISA, Plaintiffs will need to prove Defendants have breached a fiduciary duty owed to the class, and further demonstrate that this alleged breach resulted in a loss to the class.

### d.  Proposed Class Representatives

The Corrected Motion to Certify Class identifies the Proposed Class Representatives as Plaintiffs David G. Engelbert, Eric Cruise, Michael E. Zall, and Greta M. De Kock.  In the Amended Consolidated Complaint, Plaintiffs allege that each of the proposed class representatives, through various employee pension benefit plans within the meaning of 29 U.S.C. § 1002(2), invested in the Property Account.  Defendants admit the Proposed Class Representatives each invested in the Property Account.

### e.  Putative Class

Plaintiffs define the putative class as follows:

All qualified ERISA defined contribution plan participants and beneficiaries that, between September 26, 2008 and the present (the "Class Period"), were invested directly or indirectly in the Principal U.S. Property Account through their ERISA plan, were placed in the Withdrawal Queue, and suffered a loss during the Class Period as a result of the Defendants' mismanagement of the Property Account.  Specifically excluded from the Class are the Individual Defendants herein, officers and/or directors of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party, other than the participants or beneficiaries or qualified ERISA defined contribution plans offered

by Principal or any of its affiliates to its employees and which suffered losses due to
investment in the Principal U.S. Property Account.

Pl. Mot. for Class Cert. 5, ECF No. 111.  Based on this definition, Defendants contend that there

are two threshold inquiries before an individual can be included in the class: (1) determine

whether the individual requested to withdraw or transfer funds in the Account that was then

placed in the Queue, and (2) determine whether the individual incurred a loss that can be calcu-

lated on a class-wide basis.

### 3.   Rule 23(a)

To be eligible for class certification, Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable; (2)  there are
questions of law or fact common to the class; (3) the claims or defenses of the represen-
tative parties are typical of the claims or defenses of the class; and (4) the representative
parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  A district court "must conduct a 'rigorous analysis' to determine whether

the prerequisites for a class action under Rule 23(a) are satisfied."  Rattray, 614 F.3d at 835

(quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)).  "Though class certification

is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis'

under Rule 23 must involve consideration of what the parties must prove."  Elizabeth M. v.

Monenez, 458 F.3d 779, 786 (8th Cir. 2006).  Therefore, this analysis "will frequently entail

'overlap with the merits of the plaintiff's underlying claim.'"  Comcast, 133 S. Ct. at 1432

(quoting Dukes, 131 S. Ct. at 2551); see also Blades, 400 F.3d at 567 ("The preliminary inquiry

at the class certification stage may require the court to resolve disputes going to the factual

setting of the case, and such disputes may overlap the merits of the case.").  This is because

"class determination generally involves considerations that are enmeshed in the factual and legal

issues comprising the plaintiff's cause of action."  Comcast, 133 S. Ct. at 1432 (quoting Dukes,

131 S. Ct. at 2551).  However, while dispute between the parties "going to the factual setting of the case . . . may overlap the merits of the case," those "disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." <u>Blades</u>, 400 F.3d at 567.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." <u>Califano</u>, 442 U.S. at 700-01.  To serve as a class representative, an individual must show that they "'possess the same interest and suffer the same injury' as the other class members." <u>Dukes</u>, 131 S. Ct. at 2550 (quoting <u>E. Tex. Motor Freight Sys., Inc. v. Rodriguez</u>, 431 U.S. 395, 403 (1977)).  The claims of the putative class must depend upon a common contention "of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u> at 2551.

### a.  Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is imprac-ticable."  "[N]o arbitrary rules regarding the necessary size of classes have been established." <u>Belles v. Schweiker</u>, 720 F.2d 509, 515 (8th Cir. 1983).  However, courts may consider the number of persons involved in the class, the nature of the action, the value of each individual claim, and the inconvenience of trying individual suits.  <u>Paxton v. Union Nat'l Bank</u>, 688 F.2d 552, 559-60 (8th Cir. 1982).

Defendants concede that the putative class includes approximately 140,000 individuals in over 13,000 different benefit plans.  Cases with far fewer putative class members have been found to satisfy the numerosity requirement.  <u>See, e.g.</u>, <u>Paxton v. Union Nat'l Bank</u>, 688 F.2d 552, 560-61 (8th Cir. 1982) (finding 74 individuals to be sufficient to satisfy the numerosity

requirement, when all relevant factors were considered); <u>Arkansas Educ. Ass'n. v. Bd. of Educ.,</u>

<u>Portland Ark. Sch. Dist.,</u> 446 F.2d 763, 765-66 (8th Cir. 1971) (after considering the relevant

factors, the court found that 20 putative class members was sufficiently numerous for class cer-

tification purposes).  Thousands, if not over one hundred thousand putative class members, is

sufficiently numerous to satisfy the numerosity requirement under Rule 23(a) after considering

all relevant factors.

### b.  Commonality

Plaintiffs contend that because there was central management of the funds in the Account

by Defendants, all investors were affected in precisely the same way by the Queue.  Plaintiffs

provide two questions this Court must answer that they believe are common to all class mem-

bers: (1) "whether the Property Account was properly managed for liquidity," and (2) "whether

the lockdown and consequent losses were the result of Defendants' imprudent management of

the Property Account."  Pls.' Mot. Class Cert. 10, ECF No. 111.  Plaintiffs argue that because

these two common questions apply to all class members – the claims and alleged injuries arise

from the same alleged conduct by the same Defendants – all putative class members' claims

stem from the same source.

Defendants argue that Plaintiffs have not carried their burden as to either liability or

damages, because Plaintiffs fail to demonstrate that liability and damages can be proven on a

classwide basis.  First, with regard to liability, Defendants contend that even if Defendants'

actions were the same as to each putative class member, the individual investors' decisions were

all different, so there cannot be commonality among the putative class members.  <u>Blades</u>, 400

F.3d at 570 (affirming the district court's denial of class certification where "plaintiffs *presume*

class-wide impact without any consideration of whether [independent factors or the defendants'

alleged misconduct] operated in such a manner so as to justify that presumption"); <u>see also</u>

Bolden v. Walsh Constr. Co., 688 F.3d 893, 898 (7th Cir. 2012) (finding no commonality based on "the fact that plaintiffs' experiences differ").  Defendants allege that many putative class members invested in the Account after implementation of the Queue, so causation issues preclude a finding that Defendants are liable for any loss realized.  Defendants thus ask this Court to find that the individualized decisions by the putative class members necessitate a finding that Plaintiffs have failed to satisfy the commonality test under Rule 23.

Second, with regard to damages, Defendants assert that there must be two individualized damages determinations in this case: first to determine who is in the class, and second to determine the damages each class member should receive.  Defendants direct the Court to evidence that indicates 38% of the putative class members actually had an out-of-pocket *gain* during the time their assets were frozen in the Queue.  Defendants assert that there are several variables that will impact the determination of whether an individual suffered a loss and may therefore be included in the class: (1) how long the individual had invested in the Account before the Queue was implemented; (2) when the individual made their withdrawal that was placed in the Queue; (3) whether the individual withdrew their requested funds completely, in part, and when such withdrawal occurred; and (4) how the individual eventually invested their Account withdrawals and when their reinvestment occurred.

Commonality requires that there be "questions of law or fact common to the class." Bennett v. Nucor Corp., 656 F.3d 802, 814 (8th Cir. 2011) (quoting Fed. R. Civ. P. 23(a)).  "[A] proponent of certification must satisfy the commonality requirement by showing that a classwide proceeding will 'generate common *answers* apt to drive the resolution of the litigation.'"  Id. (quoting Dukes, 131 S. Ct. at 2551).  "This does not mean merely that they have all suffered a violation of the same provision of law," but rather that their claims "depend upon a common contention."  Dukes, 131 S. Ct. at 2551.  "That common contention, moreover, must be of such a

nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.  Class members are not required to be "identically situated," nor must "every question of law or fact be common to every member of the class."  Paxton, 688 F.2d at 561.  The requirement that there be common questions of law or fact can easily be misread as "[a]ny competently crafted class complaint literally raises common questions."  Dukes, 131 S. Ct. at 2551 (citation and internal quotation marks omitted).  "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  Id. at 2551 (alteration in original) (citation and internal quotation marks omitted).

In Dukes, the Supreme Court reversed the lower court's certification of a plaintiff class comprised of approximately one and one-half million current and former female Wal-Mart employees who alleged that their supervisors had denied them discretionary pay increases and promotions on the basis of gender in violation of Title VII.  Id. at 2547, 2561.  The Court, noting that the "crux of the inquiry" under a Title VII claim is "the reason for a particular employment decision," held that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  Id. at 2552 (internal quotation marks omitted).  The commonality inquiry is satisfied if "the legal question 'linking the class members is substantially related to the resolution of the litigation.'"  DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1174 (8th Cir. 1995) (quoting Paxton, 688 F.2d at 561).

Plaintiffs allege that Defendants violated their fiduciary duties under section 404(a)(1)(B) of ERISA, so Plaintiffs must prove Defendants breached a fiduciary duty that resulted in a loss to Plaintiffs.  See Harley, 284 F.3d at 905 (In order for Plaintiffs to recover under a breach of a

fiduciary duty of care claim for purposes of ERISA, Plaintiffs "must prove a breach of this fiduciary duty and loss to the Plan."). As set forth above, Defendants Principal Real Estate, PGI, and Principal Life admit they are ERISA fiduciaries only with respect to the investment and reinvestment of the Property Account assets. Putative class members must belong to an ERISA-protected benefit plan to state a claim for relief under ERISA § 404(a)(1)(B), and they must present an injury that allows for damages under ERISA, such as those set forth in 29 U.S.C. § 1109(a).

Plaintiffs allege that Defendants breached their fiduciary duty of care by implementing the Queue and thereby halting the transfer of Plaintiffs' assets out of the Account. Plaintiffs contend that this alleged breach is common to all putative class members, as all such individuals were investors in the Account who attempted to transfer funds out of the Account during the time period the Queue was in place. At first glance, this claim appears to be common to all class members; the problem arises when this Court must determine who is included in the class. There are thousands of putative class members enrolled in one of thousands of benefit plans, all of which had different investment options available.

Individualized investment decisions made by putative class members raises issues with the liability element of Plaintiffs' fiduciary duty claim. Plaintiffs concede that approximately 10,000 individuals who placed assets in the Account after the Queue was in place had notice of the withdrawal limitation – including several named Plaintiffs. This means that many putative class members – including named class representatives – may have contributed to their alleged damages by placing assets into the Account after the implementation of the Queue.

Plaintiffs counter that there are no individualized determinations as to causation because the burden of proof for causation issues rests with the Defendants once Plaintiffs have proved that Defendants breached a fiduciary duty and present a prima facie case of loss. See Martin,

965 F.2d at 671 ("[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima

facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to

the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the

breach of duty."); Harley v. Minn. Mining & Mfg. Co., 42 F. Supp. 2d 898, 905 (D. Minn. 1999)

("[I]n an ERISA breach of fiduciary duty case, the defendant bears the burden on the issue of

causation once the plaintiff proves a breach and provides evidence of a loss to the plan.").

This argument ignores that under the commonality prong of the class certification test, the

Court must determine whether the common questions of law and fact in this case predominate

over any individualized issues, and therefore must consider issues like causation, even if it will

be the Defendants' ultimate burden to prove that intervening causes prevent their liability.  See,

e.g., Martin v. Shell Oil Co., 198 F.R.D. 580, 592-93 (D. Conn. 2000) (denying class certifica-

tion reasoning that although the putative class presented issues supported by common evidence,

those issues were not enough "to overcome the extensive individualized proof of . . . breach

[and] causation . . . likely to be required").

Regarding damages for breaches of fiduciary duty in ERISA cases, the Supreme Court has

reasoned, "[u]nder the common law of trusts, which informs our interpretation of ERISA's

fiduciary duties, trustees are 'chargeable with . . . any profit which would have accrued to the

trust estate if there had been no breach of trust,' including profits forgone because the trustee

'fails to purchase specific property which it is his duty to purchase.'"  See LaRue v. DeWolff,

Boberg & Assocs., Inc., 552 U.S. 248, 253 n.4 (2008) (quoting Restatement (Second) of Trusts §

205 & cmt. I (1957)).  Under Restatement § 205, there are three measures of damages for breach

of trust: (1) "any loss or depreciation in value of the trust estate resulting from the breach of

trust"; (2) "any profit made by [the fiduciary] through the breach of trust"; or (3) "any profit

which would have accrued to the trust estate if there had been no breach of trust."

One decision by Account managers is at issue, the decision to implement the Queue on September 26, 2008; however, the putative class members responded in a variety ways to that decision, thereby creating the same dilemma addressed in <u>Dukes</u>.  Further, according to Plaintiffs' expert, Messina, Defendants made *numerous* faulty decisions regarding the liquidity of the Account prior to 2008.  Plaintiffs must have suffered the same injury to satisfy the commonality inquiry, which requires more than a violation of the same area of law, or as here, a singular management decision.  <u>Dukes</u>, 131 S. Ct. at 2551.  The mere fact that all Plaintiffs allege a breach of fiduciary duties by Defendants "gives no cause to believe that all their claims can productively be litigated at once."  <u>Id.</u>; <u>see also</u> <u>Elizabeth M.</u>, 458 F.3d at 786-87 ("The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry.").

In <u>Dukes</u>, the Court held that the claims at issue involved "literally millions of employment decisions at once"; the present case similarly contemplates thousands of putative class members who made different decisions regarding their assets in the Account.  <u>Dukes</u>, 131 S. Ct. at 2252.  Just as the Court reasoned in <u>Dukes</u> that each employee's qualification and each manager's motivation for denying promotion had to be considered individually, in the present case, several individualized inquiries must be made, including the timing of each investor's placement in the Queue, whether the investor cancelled his or her withdrawal request, what notice the investor received before his or her assets were placed in the Queue, and what alternative investment was designated by each investor.

At the hearing, Plaintiffs explained that they only seek to include in the class those individuals who experienced an out-of-pocket loss after attempting to withdraw or transfer funds from the Account unsuccessfully due to the implementation of the Queue.  Plaintiffs provide the Court with a methodology for calculating damages based on economic loss using the Index as

48

the alternative investment benchmark.  As Defendants argued at the hearing, an individual could experience an out-of-pocket loss and thus be included in the class, but have an overall gain from having their assets frozen in the Queue because their actual preferred investment at that time performed worse than the Account in 2008 and 2009.  Additionally, there may be individuals who experienced an out-of-pocket gain while in the Queue yet experienced an economic loss, who would not be in the class, even though they lost money overall from the implementation of the Queue.

Additionally, Plaintiffs proffer the Index as the "alternative investment" option for their damages methodology.  However, this ignores the fact that the Index was not available to any of the putative class members enrolled in Defendants' numerous plans and therefore is an "alternative investment" that could not actually have been used during the imposition of the Queue. Defendants point to the TIAA Account, which was a feasible alternative because it was available to many of the putative class members at the relevant time and it provided greater liquidity, which Plaintiffs insist should have been provided by Defendants, yet the TIAA Account performed worse than the Account during the time in question.  Turki stated in his supplemental report that the Account returns from 1999 through the end of the Queue period exceeded the returns in the TIAA Account, which supports his conclusion that using the TIAA Account as the "alternative investment" for purposes of determining damages would result in negative damages. He provides an example, opining that "[i]f a participant had invested $1,000 at the beginning of 1999 in the Account, it would have been worth $1,885 at the end of the Queue.  The same investment in the TIAA Account would have been worth $1,700."  Turki Suppl. Report 2-3, ECF No. 194-1.

Defendants also point out that many members attempted to transfer their funds from the Account to alternative investment options when their request was placed in the Queue. Turki stated that

> On a Queue-wide basis, 47% of Queue transactions involved a redemption that intended to transfer the participant's Account assets outside of a Principal-administered plan (i.e., a distribution). The ultimate destinations of these distributions were rollover IRAs, personal brokerage accounts, other 401(k) plans administered by other recordkeepers, bank accounts, and an indeterminately large number of other possible investments.

Turki Report 26, ECF No. 160-7 (footnote omitted). Turki noted that four out of the nine named Plaintiffs "had Queue transactions that resulted in the transfer of their Account assets out of their 401(k) plans," and he opines that "[t]he destination fund (or other investment), if any, for the four participants who exited their Principal-administered plans must be investigated on an individual basis to determine whether the participant has been damaged." Id.

If any requested transfers would have resulted in an overall loss by the investor because the alternative investment option selected by the investor performed worse than the Account during the relevant period of time, that person actually experienced an overall gain by being stuck in the Queue. These individualized differences between putative class members is problematic for producing a reliable, classwide damages calculation. See, e.g., Duchardt v. Midland Nat'l Life Ins. Co., 265 F.R.D. 436, 444 (S.D. Iowa 2009) (finding it problematic if there are thousands of individuals with differing investment decisions that affect account values, as any damages model fails to incorporate the reasons behind past investment decisions and therefore fails to produce a reliable calculation of damages on a classwide basis).

Solomon defined "loss" for purposes of class membership determination as out-of-pocket loss, as opposed to economic loss. Solomon Report 9-10, ECF No. 193-1. Solomon opined that for calculation of damages at the class certification stage, once it has been determined which individuals suffered an out-of-pocket loss while waiting in the Queue, the "best performing"

alternative investment test should be used to calculate damages.  Id. at 10.  Solomon admitted

that using out-of-pocket loss to define class membership excludes any putative class members

who, under his alternative investment theory, had damages but did not suffer an out-of-pocket

loss during their time in the Queue.  He also admitted that 57,000 individuals who requested

withdrawals and were forced to wait in the Queue had no out-of-pocket loss, but he had no idea

if they suffered economic losses.  Finally, Solomon conceded that his class definition included

individuals who suffered no compensable economic losses but did have an out-of-pocket loss

while in the Queue, so they would be included in the class but have no calculable damages.

Although Plaintiffs argue that out-of-pocket loss simply establishes standing for class

members, and economic loss establishes each class members' damages, this simplifies and

disregards a far more complex issue involving the individual investment decisions of putative

class members at the time the Queue was implemented.[6]  Solomon's calculation to determine

---

[6] Plaintiffs cite Brown v. Medtronic, Inc., 628 F.3d 451, 456-57 (8th Cir. 2010), for the
proposition that damages should be considered as a separate inquiry from the question of injury
– or out-of-pocket loss – for purposes of standing at the class certification stage.  However,
Brown is a case decided on standing issues, and the parties do not contest standing for purposes
of the determination of whether the class should be certified at this time; it is therefore
distinguishable from the present case.  Plaintiffs also cite Martin v. Feilen, 965 F.2d 660, 671
(8th Cir. 1992), which held that "once the ERISA plaintiff has proved a breach of fiduciary duty
and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of
persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not
attributable to, the breach of duty."  Martin is distinguishable from the present case, as the court
in that case was not dealing with either a class action or class certification standards.

Plaintiffs additionally contend that because a class member must have standing to be
included in the class at the certification stage, anyone with an out-of-pocket gain that has
experienced economic loss cannot be included in the class.  See, e.g., In re Zurn, 644 F.3d at 616
(noting that a class is not certifiable "if it contains members who lack standing").  The deter-
mination of which investors are in the class, as compared with which investors experienced an
actual economic loss in this case, is incongruent and depends on the facts surrounding each
investor's individual decisions.  Someone may lack standing for purposes of the class yet may
have suffered great loss due to the implementation of the Queue; conversely, someone may have
standing under Plaintiffs' class definition yet may have actually benefited from their placement
in the Queue.  The fact that individual decisions made by investors impacts the claim and

class membership presents as inconsistent with the definition proposed by Plaintiffs, which is problematic at the certification stage.

Additionally, Solomon's class membership calculation would include individuals who attempted to transfer assets to options that performed worse than did the Account – individuals who would have suffered losses during the relevant time.  Such individuals would therefore end up with a windfall due to Solomon's use of the Index, which is in contravention of the aims of ERISA.  See Henry v. Champlain Enters., Inc., 445 F.3d 610, 624 (2d Cir. 2006) ("The aim of ERISA is to make the plaintiffs whole, but not give them a windfall." (citation and internal quotation marks omitted)); Leister v. Dovetail, 546 F.3d 875, 881 (7th Cir. 2008) (reasoning that in making a valuation calculation, the court is not expected to "look back and decide which of [the] investment strategies has proved most profitable" because that "methodology would yield a windfall, given the uncertainty of investments"); Harms v. Cavenham Forest Indus., Inc., 984 F.2d 686, 693 (5th Cir. 1993) (noting that windfall recoveries are "abhorred by ERISA").

To satisfy commonality, Plaintiffs' claim must be based upon a common contention that is subject to classwide resolution.  If the damages determination for each putative class member requires individualized analysis, Plaintiffs' motion cannot survive the commonality inquiry.  See Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 339 F.3d 1001, 1012 (8th Cir.

---

potential damages available to each putative class member is relevant under the commonality prong, regardless of whether an individual actually does or does not have standing under Plaintiffs' class definition.

Finally, Plaintiffs contend that "the measure of . . . damages need not be exact – it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Martin, 965 F.2d at 672.  Again, Martin was not dealing with class certification issues, so although damages under an individually litigated ERISA case may be determined in accordance with the aforementioned test set forth in Martin, that test does not apply to the determination of whether damages can be calculated on a classwide basis for purposes of analyzing whether the commonality prong has been met for class certification to be appropriate.

2003) (holding that denial of class certification was appropriate because "questions affecting individual class members would predominate over common questions of law or fact"). In Dukes, that operative question underlying the plaintiffs' claim was "*why was I disfavored*." Dukes, 131 S. Ct. at 2552. In the present case, the crucial questions are "*did Defendants breach their fiduciary duties*" and "*what effect did this alleged breach have on each class member*." It is the second question that is problematic for purposes of class certification, as it requires individualized analysis to even determine who should be included in the class, and also to determine the effect of Defendants' alleged breach on each putative class member. See, e.g., Turner v. Talbert, Civil Action No. 04-450-JJB, 2009 WL 1683297, at *3, *7 (M.D. La. June 15, 2009) ("While plaintiffs assert that the damage calculations in this case will not be unduly troublesome, they do not propose a simple method of calculating damages," and it therefore "seems to this Court that in order to determine a particular class member's damages, individualized proof of what type of fund that class member would have invested in during the freeze would be necessary . . . [which] does not lend itself to a mathematical or formulaic damages calculation." (footnote, citation, and internal quotation marks omitted)); see also Groussman v. Motorola, No. 10 C 911, 2011 WL 5554030, at *4 (N.D. Ill. Nov. 15, 2011) ("This case will, in essence, after resolving some of [the] general issues in common, become a massive series of individualized analyses. Judicial economy is not best served by using a class action in order to engage in such individualized analyses.").

Without setting forth a workable methodology for calculating damages on a classwide basis, Plaintiffs cannot adequately support their certification motion as to commonality. This Court must ensure that the certified class is defined clearly enough to allow for proper notice to all class members. The unavoidable individualized calculations necessary to determine class membership in this case defeats the purpose of moving forward as a class action. See, e.g.,

Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012) ("Clearly delineating the contours of the class along with the issues, claims, and defenses to be given class treatment serves several important purposes, such as providing the parties with clarity and assisting class members in understanding their rights and making informed opt-out decisions.").

The determination of Defendants' liability to individual class members depends upon whether the class member was damaged by something Defendants did or failed to do, and it also involves individualized inquiry as to causation with regard to those investors who placed assets into the Account after the Queue was in place. These inquiries at the class certification stage necessarily intertwine the issues of liability and damages. Plaintiffs have failed to demonstrate that causation or damages can be determined on a classwide basis, and therefore have not met the commonality prerequisite.

### c. Typicality

Typicality, the third factor under Rule 23(a), tends to merge with the commonality requirement as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Dukes, 131 S. Ct. at 2551 n.5 (quoting Gen. Tel. Co., 457 U.S. at 157 n.13). Typicality requires that there are "other members of the class who have the same or similar grievances as the plaintiff." Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) (citation and internal quotation marks omitted); see also Paxton, 688 F.2d at 561-62 ("This [typicality] requirement is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." (citation and internal quotation marks omitted)). "The burden is 'fairly easily met so long as other class members have claims similar to the

54

named plaintiff.'" Alpern, 84 F.3d 1540 (quoting DeBoer, 64 F.3d at 1174). This is true even if there are factual variations present. Donaldson v. Pillsbury Co., 554 F.2d 825, 831 (8th Cir. 1977).

However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." Elizabeth M., 458 F.3d at 787. The focus under Rule 23(a)(3) is on the named Plaintiffs' situation and their typicality with the members of the putative Plaintiff class. The typicality of Plaintiffs' claims is undermined by the inherent case-by-case nature of relief sought here. Despite Plaintiffs' contention to the contrary, the Court is convinced determination of class membership and damages considerations require an individualized analysis of how much each investor has been damaged, which in the present case is premised upon the timing of entrance into the Queue as well as alternative investments available to and selected by putative class members. Due to the individualized inquiries necessary to determine both class membership and damages, Plaintiffs cannot satisfy the typicality requirement of Rule 23(a)(3).

### d. Adequacy

The Rule 23(a)(4) adequacy requirement focuses on whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." Paxton, 688 F.2d at 562-63. This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. Class representatives cannot have interests that are in conflict with other class members. See U.S. Fid. & Guar. Co. v. Lord, 585 F.2d 860, 873 (8th Cir. 1978) (stating that Rule 23(a)(4) requires that "the plaintiff must not have interests antagonistic to those of the class." (citation and quotation marks omitted)); Langbecker

v. Elec. Data Sys. Corp., 476 F.3d 299, 315-16 (5th Cir. 2007) (noting that "intraclass conflicts may negate adequacy under Rule 23(a)(4)").

Plaintiffs are unable to demonstrate their ability to adequately protect the interests of the putative class, as their interests are in conflict with those of both class and non-class investors in the Account. Both parties' experts agree that increased liquidity would have an effect on the Account returns. Messina advocates a level of liquidity that would likely have required Account managers to sell real property during the height of the economic crisis in 2008 and 2009. It is undisputed that when the Queue was implemented, some investors chose to keep their assets in the Account and other investors who initially placed their assets in the Queue cancelled their withdrawal requests. Plaintiffs' interests, at their core, are therefore in opposition to the interests of those putative class members whose assets remained in the Queue. Additionally, for any investors who had assets in the Account for years prior to implementation of the Queue, their returns would have been negatively affected if the Account had always ensured 25% to 35% liquidity. When there is an economic conflict between putative class members, or even class and non-class members, there is a concern that the class representatives cannot adequately represent the interests of those not directly involved in the litigation process but who have a stake in the outcome nonetheless. See, e.g., George v. Kraft Foods Global, Inc., No.08 C 3799, 2011 WL 5118815, at *9 (N.D. Ill. Oct. 25, 2011) ("[C]oncerns about conflicts arising from the different ways in which a fiduciary breach impacted plan participants cannot be so easily brushed aside."); Bayshore Ford Truck v. Ford Motor Co., Civil Action No. 99-741 (JLL), 2010 WL 415329, at *9 (D.N.J. Jan. 29, 2010) ("[T]he incentives of the named class members . . . [were] not aligned with the entire class" where plaintiffs' "damage theory and approach . . . produce[d] a possible claim of actual damages for the named plaintiffs and not for some absent class members").

It is noteworthy that named Plaintiffs are likely in conflict with each other, as some of them had invested in the Account before the Queue was implemented and never invested additional assets in the Account after the Queue was in place, while others transferred assets into the Account even though they had notice of the Queue.  Additionally, some named Plaintiffs experienced actual economic gains while in the Queue, and others experienced actual economic losses.  These conditions would result in some named Plaintiffs falling outside of the class, while others would be in the class but would not have damages.  Because the named Plaintiffs' claims cannot adequately protect the interests of the putative class, Plaintiffs have failed to demonstrate typicality.

### 4.  Rule 23(a) Implicit Factors

In addition to the Rule 23(a) factors, courts consider two implicit factors: (1) whether the class is ascertainable, and (2) whether the proposed class representatives actually satisfy the proffered class definitions.  <u>Liles</u>, 231 F.R.D. at 571.

#### a.  Ascertainability

Under Rule 23, an order certifying the class must set forth a definition for the class.  Fed. R. Civ. P. 23(c).  "Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable."  <u>Manual for Complex Litigation</u> (Fourth) § 21.222 (2004).  To ascertain the class, "[t]he Court should not be required to resort to speculation, or engage in lengthy, individualized inquiries in order to identify class members."  <u>In re Teflon</u>, 254 F.R.D. at 361 (internal citation omitted); <u>see Duchardt</u>, 265 F.R.D. at 444 (denying class certification for a proposed subclass finding that the relief sought required extensive individualized inquiry to ascertain the class).

Plaintiffs argue that the class is ascertainable because both parties' experts have reviewed the data and determined who has suffered out-of-pocket losses or gains.  However, ascertainability remains a concern here because there are several individualized variables that make it difficult to determine class membership.  As discussed in the Commonality section of the Order, actions taken by individual investors impact the determinations as to class membership, liability, and damages.  Due to the lengthy, individualized inquiry necessary to determine which investors satisfy the class definition, the Plaintiffs have not met their burden in showing that the class is ascertainable under Rule 23.

### b.   Whether the Proposed Representatives Satisfy the Definition

 "The second 'implicit requirement' of Rule 23 is that each proposed representative is in fact a member of the proposed class . . . ."  In re Teflon, 254 F.R.D. at 363.  Although some named Plaintiffs may meet their own definition, Fischer and others who transferred assets into the Account after receiving notice of the Queue may not appropriately be members of the class, as such notice potentially creates a problem with regard to causation and Defendants' purported liability.  As in Teflon, the Court cannot "in good conscience grant certification" when it is unable to "establish membership with objective certainty."  Id.  The second implicit requirement is not met as to all proposed class representatives here.

### 5.   Rule 23(b) Considerations

Even if Plaintiffs could overcome the pervasive shortfalls under Rule 23(a), they must also satisfy Rule 23(b), which requires Plaintiffs to demonstrate that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### a.  Predominance

"Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions," In re Zurn, 644 F.3d at 618, "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.  The Supreme Court has stated that, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." Comcast, 133 S. Ct. at 1432.  "The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions." In re Zurn, 644 F.3d at 619.  "Common questions are those for which a prima facie case can be established through common evidence." Id. ("Individual issues are those which require evidence that varies from member to member to make a prima facie showing.").  "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." Avritt, 615 F.3d at 1029 (quoting Blades, 400 F.3d at 566).

Defendants contend that this case necessitates individualized inquiries for Plaintiffs to prove their prima facie case, thus failing the test under Rule 23(b)(3).  See Blades, 400 F.3d at 566; Owner-Operator Indep. Drivers Ass'n, 339 F.3d at 1012 (affirming the denial of class certification under 23(b)(3), agreeing that "questions affecting individual class members [right to recover] would predominate over common questions of law or fact"); see also Windham v. Am. Brands, Inc., 565 F.2d 59, 66-67, 72 (4th Cir. 1977) (en banc) (affirming denial of class certification because "the overwhelming nature of the individual claims and their complexity, . . . the issue of violation did not predominate"); Walsh v. Principal Life Ins. Co., 266 F.R.D. 232, 260 (S.D. Iowa 2010) (concluding that due to "extensive individualized information regarding

detrimental reliance, . . .  Plaintiff [had] not met her burden to show that common issue[s] predominate over individual ones in the requisite causation inquiry.").

"Questions of individual damage calculations will inevitably overwhelm questions common to the class."  Comcast, 133 S. Ct. at 1433; see also Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 307 (5th Cir. 2003) ("[W]here the issue of damages does not lend itself to . . . mechanical calculation, but requires separate 'mini-trial[s]' of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance." (alterations in original) (quoting Windham, 565 F.2d at 68)).  "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ."  Comcast, 133 S. Ct. at 1433 (citation and internal quotation marks omitted).  The damages methodology must identify damages that are a result of the wrong committed by Defendants.  See id. at 1434.  This is because "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  Id. at 1435 (citation and internal quotation marks omitted).

Plaintiffs urge this Court to look for guidance from a post-Comcast Ninth Circuit panel opinion that held "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," because "damages could feasibly and efficiently be calculated once the common liability questions [were] adjudicated."  Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013).  However, a panel of the Eighth Circuit post-Comcast held that "[t]he predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member."  Halvorson v. Auto-Owners Ins. Co., 718 F.3d 773, 778 (8th Cir. 2013).  When liability and damages issues are intertwined, as they appear to be in this case, the predominance factor may not be satisfied.

Plaintiffs also encourage this Court to follow the Sixth Circuit's reasoning in Glazer v. Whirlpool (In re Whirlpool Corp Front-Loading Washer Products Liability Litigation), 722 F.3d 838, 860 (6th Cir. 2013), which found the damages calculation concerns in Comcast did not apply to a liability-only class certification. In re Whirlpool is distinguishable due to one crucial factual difference: the In re Whirlpool court was only certifying the class as to liability and reserving damages issues for individualized determination in a bifurcated proceeding. Id. In the present case, the Court is asked to certify a class as to both liability and damages issues, so Comcast applies and In re Whirlpool is inapplicable as to the predominance inquiry.

The individualized questions of loss, damages, and causation for each putative class member predominate over the common questions Plaintiffs provide for this Court to answer, as there are simply too many variables to control at both the class certification and the damages stages of litigation. As discussed by the Seventh Circuit, the Supreme Court in Comcast confirmed that class certification was improper if the plaintiffs failed to base the damages they sought on the injury for which they were complaining. Butler v. Sears, Roebuck & Co., __ F.3d __, Nos. 11-8029, 12-8030, 2013 WL 4478200, at *4 (7th Cir. Aug. 22, 2013) (noting the emphasis Comcast "places on the requirement of predominance and on its having to be satisfied by proof presented at the class certification stage rather than deferred to later stages in the litigation"). This is precisely the problem facing this Court with regard to Plaintiffs' class certification request. Under the predominance inquiry, this Court must determine whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. Although class members' damages need not be identical for a class to be certified, and there are options for individualized determination of damages while liability is determined on a classwide basis, this case involves a certification request as to both liability *and* damages, and the damages inquiry is so tied to the liability question that individualized analyses permeate this case. The individual

questions before this Court predominate over the common questions as to the merits of the case; therefore, the Rule 23(b)(3) predominance requirement is not met.

### b.  Superiority

Class certification is proper where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Relevant factors to be considered in making this determination include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  Although the thousands of potentially similar claims by investors in the Account make a class action a desirable avenue for relief, "[t]he individualized determinations necessary to decide whether any individual would even belong in the class or could establish liability or [the amount of] damages demonstrate that individuals have a strong interest in controlling the prosecution of separate actions." Rattray v. Woodbury Cnty., IA, 253 F.R.D. 444, 464 (N.D. Iowa 2008), aff'd, 614 F.3d 831 (8th Cir. 2010).

Additionally, supremacy is undermined by the individualized nature of even the named Plaintiffs' circumstances, as they are not similarly situated once the timing of their withdrawal requests, out-of-pocket losses and gains, and economic losses and gains are examined.  Accordingly, the supremacy element is not met. Id. at 465 ("Thus, while the logistics of a multiplicity of similar actions is daunting, the logistics of attempting to create a class action out of what are, in reality, a myriad of individualized claims is even more daunting.").

As the discussion demonstrates, Plaintiffs have failed to meet the requirements of Rule 23(a) and (b) due to the individualized issues pervasive among putative class members' liability

and damages claims.[7]  Therefore, the Court concludes class certification is not appropriate in this case.

### III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike Messina's Expert Report, ECF No. 195, must be **denied**, and Plaintiffs' Corrected Motion for Class Certification, ECF No. 111, must be **denied**.

**IT IS SO ORDERED.**

Dated this 30th day of September, 2013.

JAMES E. GRITZNER, Chief Judge
U.S. DISTRICT COURT

---

[7] As this Court is denying Plaintiffs' class certification motion, it need not address the qualifications of Plaintiffs' preferred class counsel under Rule 23(g).